**2024-1414**

# United States Court of Appeals for the Federal Circuit

---

MOTOROLA MOBILITY LLC,
*Appellant*

v.

LARGAN PRECISION CO., LTD.,
*Appellee*

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2022-01210

---

## OPENING BRIEF OF MOTOROLA MOBILITY LLC

Andrew M. Mason
Sarah E. Jelsema
John D. Vandenberg
Klarquist Sparkman, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204-2988
(503) 595-5300
andrew.mason@klarquist.com

*Counsel for Appellant*
*Motorola Mobility LLC*

## <u>REPRESENTATIVE CLAIM</u>

Claim 1 of U.S. Patent No. 9,696,519:

[1.1] An imaging optical lens assembly, comprising, in order from an object side to an image side:

[1.2] a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof;

[1.3] a second lens element having positive refractive power;

[1.4] a third lens element having negative refractive power;

[1.5] a fourth lens element having positive refractive power; and

[1.6] a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface;

[1.7] wherein the imaging optical lens assembly has a total of five lens elements;

[1.8] and wherein a curvature radius of the object-side surface of the first lens element is R1, a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the imaging optical lens assembly is f, a focal length of the third lens element is f3, a focal length of the fifth lens element is f5, and the following conditions are satisfied:

$$|R4/R3| < 1.0;$$

$$f5/f3 < 1.0;$$

$$-10.0 < R1/f < 0.$$

(Appx96 (33:2–28) (with bracketed labels added).)

# **CERTIFICATE OF INTEREST**

Counsel for the Appellant Motorola Mobility LLC certify that the following information is accurate and complete to the best of our knowledge:

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| Motorola Mobility LLC | N/A | Motorola Mobility Holdings, LLC |
| | | Lenovo Group Limited |
| | | Legend Holdings Corporation |

| **4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4). |
|---|
| Roy Chamcharas, Michael J. Loy, Frank Morton-Park, Todd M. Siegel, Sara E. Slabisak, Claire E. Green (all of Klarquist Sparkman, LLP) |

| **5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)? |
|---|
| Yes. Separate notice was filed. |

| **6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6). |
|---|
| Not applicable. |

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION ...................................................................................3

STATEMENT OF THE CASE.................................................................4

I.     PENDING LITIGATION AND IPRS.........................................4

II.    TECHNOLOGY BACKGROUND AND STATE OF THE ART .................4

    A.    Lens Design Is Iterative and Involves Balancing Competing
          Goals, Such as Field of View, Track Length, and Image Quality .......6

    B.    Lens Designers Rely on Software to Optimize Designs ......................9

    C.    Prior Art.........................................................................................9

          1.    Chung Discloses Five-Lens Wide-Angle Lens Designs...........10

          2.    Sekine Teaches Use of $R1/f$ to Balance
              Track Length and Image Quality When
              Widening Field of View in Five-Lens Wide-Angle Designs ...10

III.    THE '519 PATENT .................................................................13

IV.    THE *INTER PARTES* REVIEW PROCEEDING .........................................14

    A.    Petition.........................................................................................14

          1.    The Petition Showed Chung Satisfies All
              Elements of Claim 1, Except the $-10.0<R1/f<0$ Condition.......15

          2.    The Petition Explained a Skilled Artisan Would Have Been
              Motivated to Increase Chung's Field of View to 115 Degrees 15

3.    The Petition Explained a Skilled Artisan Would
Have Been Motivated to Use Sekine's R1/*f* Teachings to
Balance Field of View, Track Length, and Image Quality.......15

4.    The Petition Described the Level of Skill in the Art ...............18

5.    Motorola's Expert Used Standard
Lens Design Software to Confirm Obviousness......................18

B.    The Institution Decision Acknowledged the Objective of
Balancing Wide Field of View, Track Length, and Image Quality ....20

C.    Patent Owner Response........................................................................21

D.    Petitioner Reply to the Patent Owner Response .................................23

E.    Patent Owner Sur-Reply......................................................................25

F.    Oral Hearing........................................................................................25

G.    Final Written Decision ........................................................................26

SUMMARY OF THE ARGUMENT ....................................................................30

ARGUMENT .........................................................................................................33

I.    STANDARD OF REVIEW..........................................................................33

II.    THE BOARD ERRED BY ADOPTING A LEGALLY INCORRECT
FRAMING OF THE MOTIVATION-TO-COMBINE QUESTION ...........34

A.    The Board Mostly Misidentified the Asserted Combination .............35

1.    The Board Failed to Identify the
Differences Between the Primary Reference and the Claims...35

2.    The Board Erred by Focusing on the Differences
Between the Embodiments of the References Rather
than the Applicability of Sekine's Teachings to Chung ..........37

3.    The Board Erred by Focusing on Sekine's Other Teachings ...41

B.    The Board Mostly Misidentified the Asserted Motivation ................42

1.   The Board Erred by Focusing on Whether There Would Be Improvement to Each Design Characteristic, in Isolation ..43

2.   To the Extent the Board's Analysis Touched on the Actual Motivation, It Failed to Consider the Correct Perspective .......45

C.   The Board Dismissed Evidence About Motivation by Interpreting It as Being Just About Reasonable Expectation of Success................47

1.   The Petition Tied This Evidence to Motivation ......................48

2.   The Reply Properly Argued that ZEMAX Modeling Supported the Motivation to Combine......49

D.   The Board Erred by Disregarding the Level of Skill in the Art..........51

E.   The Board Erred by Dismissing Chung Embodiments 11 and 12 As Starting Point Designs ...........................52

III.   THE BOARD VIOLATED THE APA .........................................................55

A.   Because Largan Waived Its Argument Regarding Different Lens Powers, the Board Should Not Have Adopted It........56

B.   No Substantial Evidence Supported the Board's Finding that This Distinction Mattered ...........................59

C.   Substantial Evidence Does Not Support the Board's Finding About Sekine's Applicability to Chung's Embodiments ......60

CONCLUSION ....................................................................................................63

CERTIFICATE OF COMPLIANCE  WITH TYPE-VOLUME LIMITATION, TYPEFACE  REQUIREMENTS, AND TYPE STYLE REQUIREMENTS .........64

ADDENDUM ......................................................................................................65

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*,
  825 F.3d 1373 (Fed. Cir. 2016) ............................................................40

*Apple Inc. v. Andrea Elecs. Corp.*,
  949 F.3d 697 (Fed. Cir. 2020) ..............................................................50

*Axonics, Inc. v. Medtronic, Inc.*,
  73 F.4th 950 (Fed. Cir. 2023) ...................................................... passim

*Axonics, Inc. v. Medtronic, Inc.*,
  75 F.4th 1374 (Fed. Cir. 2023) ..................................................... 34, 58

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*,
  533 F.3d 1353 (Fed. Cir. 2008) ............................................................53

*Elekta Ltd. v. ZAP Surgical Sys., Inc.*,
  81 F.4th 1368 (Fed. Cir. 2023) .............................................................50

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
  983 F.3d 1334 (Fed. Cir. 2020) .................................................... 42, 45

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ................................................................................35

*In re Ethicon, Inc.*,
  844 F.3d 1344 (Fed. Cir. 2017) ............................................................47

*In re Gurley*,
  27 F.3d 551 (Fed. Cir. 1994) ................................................................40

*Intel Corp. v. PACT XPP Schweiz AG*,
  61 F.4th 1373 (Fed. Cir. 2023) .............................................................48

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................... 46, 53

*Netflix, Inc. v. DivX, LLC*,
  2023 WL 2298768 (Fed. Cir. Mar. 1, 2023) ................................ 41, 42

*Parus Holdings, Inc. v. Google LLC*,
  70 F.4th 1365 (Fed. Cir. 2023) ............................................................57

*Polygroup Ltd. MCO v. Willis Elec. Co.*,
  780 F. App'x 880 (Fed. Cir. 2019)......................................................49

*Rembrandt Diagnostics, LP v. Alere, Inc.*,
  76 F.4th 1376 (Fed. Cir. 2023) ............................................................50

*Ryko Mfg. Co. v. Nu-Star, Inc.*,
  950 F.2d 714 (Fed. Cir. 1991). ............................................................35

*Velander v. Garner*,
  348 F.3d 1359 (Fed. Cir. 2003) ...........................................................50

*Vicor Corp. v. SynQor, Inc.*,
  869 F.3d 1309 (Fed. Cir. 2017) ...........................................................33

**Statutes**

5 U.S.C. § 706 ...................................................................................33

35 U.S.C. § 103 ..................................................................................35

35 U.S.C. § 142 ....................................................................................1

**Regulations**

37 C.F.R. § 90.3 ....................................................................................1

## STATEMENT OF RELATED CASES

No other appeal from the same proceeding in the Patent Trial and Appeal Board has previously been filed. This Court's decision may affect pending district court litigation, *Largan Precision Co., Ltd. v. Motorola Mobility LLC*, Case No. 4:21-cv-09138-JSW (N.D. Cal.). Counsel for Motorola Mobility LLC ("Motorola") is aware of no other case pending in this or any other court that may affect or be affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

Motorola appeals from *inter partes* review No. IPR2022-01210, instituted under 35 U.S.C. § 311 *et seq.*, challenging U.S. Patent No. 9,696,519 (the "'519 patent"). The Final Written Decision, issued January 24, 2024, found that Motorola had not shown that any challenged claim is unpatentable. Motorola timely appealed to this Court on January 30, 2024. *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1).

Motorola has suffered an Article III injury, and has standing to appeal, because Largan Precision Co., Ltd. ("Largan") alleged in the pending litigation that Motorola technology infringes claims of the '519 patent that the Final Written Decision found were not shown unpatentable. While Largan dismissed those claims of infringement in May 2023, it did so without prejudice as part of efforts to lift a stay of the district court litigation.

## STATEMENT OF THE ISSUES

1.    Whether the Board adopted a legally incorrect framing of the motivation-to-combine question by:

    a.  failing to identify the difference between the challenged claims and Embodiments 11 and 12 of primary prior art reference Chung;

    b.  focusing almost exclusively on differences between the respective embodiments of Chung and the secondary reference, Sekine, rather than the Sekine teachings identified by Motorola as bridging the gap between the claims and the Chung embodiments;

    c.  focusing almost entirely on motivations not asserted by Motorola, while largely ignoring the asserted motivation;

    d.  in assessing motivation to combine, asking, in part, whether *Chung*, rather than a skilled artisan, would have been so motivated; and

    e.  dismissing Chung Embodiments 11 and 12 as starting point designs.

2.    Whether the Board erred by refusing to consider in its motivation-to-combine analysis expert modeling evidence submitted with the Petition showing that a skilled artisan would have easily applied Sekine's teachings to the Chung embodiments using known tools and achieved the desired benefits therefrom.

3.    Whether the Board violated the APA by relying in part on an argument that Largan had raised in its preliminary response but not in its post-Institution response.

## INTRODUCTION

The Board found claim 1 representative of the challenged '519 patent claims. Nearly all of claim 1 is found in each of two optical lens designs disclosed by the primary prior art reference, Chung, in its Embodiments 11 and 12. The sole difference is that claim 1 recites a particular range for a ratio of two lens design variables (R1/$f$) and the Chung embodiments fall outside that range. Motorola's asserted prior art combination bridging that difference was for the skilled artisan to modify those Chung embodiments with the R1/$f$ teachings of another reference, Sekine.

The skilled artisan would have been motivated to do this to obtain the benefits of widening the field of view of these Chung embodiments to 115 degrees, as recommended by Chung, while minimizing any resulting sacrifices to the track length and image quality per Sekine's teaching. Motorola supported this motivation in part with modeling evidence showing that the skilled artisan using known techniques and tools would easily have applied Sekine's R1/$f$ teachings to Chung Embodiments 11 and 12 to achieve those desired benefits. The Board, however, refused to consider this evidence, and through a series of legal errors found no showing of motivation to combine.

## STATEMENT OF THE CASE

### I.   PENDING LITIGATION AND IPRS

In November 2021, Largan sued Motorola for infringement of six lens system patents, including the '519 patent, in the Northern District of California. (Case No. 4:21-cv-09138-JSW.) Motorola filed petitions for *inter partes* review and the Board instituted review on five of the patents. (*Id.*, ECF No. 82, p.3.) Largan dismissed its infringement claim for the '519 patent without prejudice in May 2023. (*Id.*, p.4.)

Largan is appealing the final written decisions of two other IPR proceedings, where the Board found the challenged claims unpatentable. (*See* Case Nos. 2024-1468 & 2024-1540.) The remaining two IPR proceedings were terminated after Largan disclaimed all challenged claims. (IPR2022-01170; IPR2022-01172.)

### II.   TECHNOLOGY BACKGROUND AND STATE OF THE ART

The '519 patent relates to optical lens systems used in cell phones and similar devices. (*E.g.*, Appx80 (1:19–30).) These systems have multiple lenses, or "lens elements," with the lens elements spaced apart from one another, as shown in the example system below. (Appx678 (¶¶ 47–48).) Such systems have an "object side" (typically on the left) and an "image side" (on the right); similarly, each lens element has an object-side surface and an image-side surface. (Appx678–679 (¶¶ 49–50).) Typically, the leftmost lens element, closest to the object, is the "first" lens element (labeled 1110 below), with lens element numbers ascending towards the image side.

(*Id.*) Each surface of a lens element may be either plano (flat), convex (bulging out), or concave (bowing in) at its center or "on axis." (Appx680 (¶ 51).)



FIG.11A

(Appx882 (annotated).)

**A.  Lens Design Is Iterative and Involves Balancing Competing Goals, Such as Field of View, Track Length, and Image Quality**

The design process for these lens assemblies is like that used by an optometrist updating a prescription for glasses or contacts. The optometrist begins by programming a device with the old lens prescription and then flips through a series of modifications, repeatedly asking "which is better, number 1 or number 2?" By this iterative process, the optometrist reaches a new prescription, optimized for a person's current visual needs. (Appx693–696 (¶¶ 69–73).)

Similarly, a skilled lens designer typically begins with an older starting point design (often from a patent), and then iteratively implements and tests various modifications to develop a new, optimized lens system that suits the needs of an end-user. (Appx697–698 (¶ 76); Appx693–695 (¶¶ 69–71); Appx700–701 (¶¶ 82–83).)

Skilled artisans knew how to best implement changes, and in what order, to optimize the design and meet requisite specifications (*e.g.*, size, field of view, cost, image quality) for a given system. (Appx1038–1040 (possible specification checklist); Appx1075–1077 (common requirements); Appx1192–1193; Appx1220–1221; Appx1042; Appx697–698 (¶¶ 75–77).) The iterative lens design process is shown below:



**Figure 1.4**   Lens design flow chart.

(Appx1205; *see also* Appx1204; Appx1075–1084; Appx2037–2045; Appx695–697 (¶¶ 72–74).)

Ordinarily skilled lens designers also knew that lens design required balancing competing interests and making tradeoffs to arrive at a desired design. (*E.g.*, Appx6426 (discussing identifying "trades" between, e.g., performance and cost); Appx6473 (discussing need to improve a design without "significant increase" in size); Appx6352 (45:23–25 ("I spend most of my day having a bunch of constraints and trying to figure out the best balance among them."); Appx5422 (25:4–5) ("[E]verything in optical design is this balance between conflicting objectives."); Appx5431 (34:16–17) ("[I]n the challenges of lens design, you are compromising all the time.").)

7

Field of view ("FOV"), total track length ("TTL"), and image quality were three lens system characteristics that often required balancing. (*See, e.g.*, Appx1140–1141 (discussing "[t]he opposing requirements of good image quality and short [total track lengths]" and noting how "severe size restrictions will significantly compromise image quality"); Appx6460 (discussing distortion in wide-angle lenses); Appx6473 (noting that a "larger field . . . often come[s] with a challenging expectation of no significant increase in the physical size of the design"); *see also, e.g.*, Appx886 (¶ 5).)

Field of view relates to how wide a scene the lens system will capture, and thus higher field of view or "wider angle" systems "capture more people and background." (Appx702–703 (¶ 88); *see also* Appx681–682 (¶ 54).) A typical goal for wide-angle lens systems is a higher field of view, e.g., to capture a wider scene for applications such as selfies and landscape photos. (Appx886 (¶ 5); Appx887 (¶¶ 20, 33); Appx1004 (¶¶ 55, 63); Appx1026–1027; Appx702–703 (¶ 88).)

Image quality may be reflected in, e.g., distortion, aberrations, or f-number. (*E.g.*, Appx709–711 (¶¶ 107–108) (discussing aberrations); Appx6769 (¶ 27).) When increasing field of view, an increase in distortion was often an expected trade-off, and a fish-eye lens is one familiar example of a lens that trades an increase in distortion for a wider field of view. (Appx6460 ("Fish-eye lenses have an inherently large barrel distortion that is not necessarily considered to be an aberration but rather

a necessity.") (cited by App6768–6769 (¶ 26)); Appx6766 (¶ 21); Appx886 (¶ 5)

("provid[ing] wider angle of view" often "causes large distortion").)

Total track length is the distance from the system's object side to the image

plane. It relates to the size of the system, with thinner devices (e.g., smartphones)

requiring smaller lens systems, thus motivating designers to shorten the total track

length. (Appx1135; Appx1140; Appx699 (¶ 80); Appx702 (¶ 87); Appx1172 ("[A]

maximum overall length is usually imposed.").

### B.    Lens Designers Rely on Software to Optimize Designs

Modern lens design relies on ZEMAX or other software programs, which "are

highly sophisticated and enable the designer to perform a wide range of designs and

analyses." (Appx1168–1169; *see also* Appx2037 ("Computers have made what was

once a tedious and time-consuming task at least manageable.").) "Since at least the

1960s, lens designers have used software tools to quickly and easily manipulate,

optimize, and verify a given lens design." (Appx695 (¶ 72).)

### C.    Prior Art

Primary reference Chung and secondary reference Sekine each describes five-

lens wide-angle optical assemblies for use in mobile devices and other systems.

(Appx861 (Abstract); Appx886 (¶¶ 3, 8); Appx905 (¶¶ 199, 201); Appx907

(Abstract); Appx926 (¶ 3); Appx929 (¶ 53); Appx936 (¶¶ 91–94).)

### 1. **Chung Discloses Five-Lens Wide-Angle Lens Designs**

Chung is a U.S. Patent Application Publication titled "Wide-Angle Image Taking Lens System." (Appx861.) It notes "an increasing demand for angle of view and image quality" and that providing "wider angle of view . . . causes larger distortion." (Appx886 (¶ 5).) It also notes prior systems with total track length that is "too long." (*Id.*) It aims "to provide a wide-angle image taking lens system having a wide field of view, high resolution, extra short track length and small distortion." (*Id.* (¶ 7).)

Chung discloses five-lens wide-angle lens systems, including Embodiments 11 and 12, which are the only two embodiments having a first lens with a concave object-side surface. (Appx882 (Fig. 11A); Appx902 (¶ 180) ("The first lens element 1110 . . . has an object-side surface 1111 being concave."); Appx884; Appx903–904 (¶ 190) ("The first lens element 1210 . . . has an object-side surface 1211 being concave.").) Chung Embodiment 11 is depicted above on page 5 with markups. (Appx882.)

### 2. **Sekine Teaches Use of R1/$f$ to Balance Track Length and Image Quality When Widening Field of View in Five-Lens Wide-Angle Designs**

Sekine is a U.S. Patent Application Publication titled "Image Pickup Lens." (Appx907.) Sekine relates to a five-lens wide-angle system "having small F-value, high resolution, and small distortion." (*Id.* (Abstract).) It describes prior art wide-

angle lens systems, including ones with fields of view ranging from 89.6 to 106.9 degrees (Appx926 (¶ 7) ("a half angle of field of 44.8° to 53.45°")) but notes that in these systems it was "difficult to obtain" both a high-quality image and a wider angle. (*Id.* (¶ 8) ("[I]t is difficult to obtain the image pickup lens with comparatively bright image, high-resolution with various aberrations corrected satisfactorily, . . . and which corresponds to widening of angle.").) Sekine aims to solve these problems and "provid[e] an image pickup lens which is bright, compact, with distortion corrected satisfactorily, and has a relatively wide angle of field." (*Id.*)

Sekine provides at least two teachings aimed at this problem of maintaining image quality and compact track length while widening the field of view.

First, Sekine teaches to use a first lens with a concave object-side surface, "[i]n order to achieve widening of angle and downsizing." (Appx927 (¶ 10).) Doing this makes it "possible . . . to realize widening of the angle while maintaining the total track length short." (*Id.*)

Second, Sekine explains how to use the ratio "r1/$f$," where r1 is the "curvature radius of object side surface of first lens" and $f$ is the "focal length of overall optical system," when widening the angle of a lens system. (Appx926–927 (¶¶ 6–13); Appx928 (¶ 49).)[1] It specifies to adjust this ratio such that -70.0 < R1/$f$ < 0 and,

---

[1]    There is no dispute that Sekine's "r1/$f$" is the same as "R1/$f$" in the challenged claims. (Appx18 n.2.)

ideally, -70.0 < R1/$f$ < -3.0. (Appx927 (¶¶ 11–15).) This ratio is "for correcting the field curvature satisfactorily, while seeking widening of the angle." (*Id.* (¶ 13).) Sekine teaches that an R1/$f$ value greater than zero "is disadvantageous in widening of the angle[,] is disadvantageous in shortening of the total track length[, and] with respect to the field curvature, it is not preferable." (*Id.*) Field curvature relates to image quality as it "is an off-axis aberration that describes the departure of the image surface from a flat surface." (Appx6443.) Sekine further teaches that when R1/$f$ is below the lower limit of -70.0, "chromatic aberration at high image height deteriorates." (Appx927 (¶ 13).) By setting the upper end of the R1/$f$ ratio to -3.0, "a better effect may be obtained" at least because "it becomes possible to shorten the total track length." (*Id.* (¶¶ 14–15).) Consistent with these teachings, every Sekine embodiment is a five-lens wide-angle system with an R1/$f$ value between -70.0 and -3.0, and four of its six embodiments have an R1/$f$ value between -4.0 and -3.0:

| Sekine Embodiment | R1/$f$ |
|:---:|:---:|
| 1 | -4.0 |
| 2 | -3.3 |
| 5 | -3.2 |
| 6 | -3.7 |

(Appx195 (citing Appx929–931 (Tables 1 & 2); Appx934–936 (Tables 5 & 6); Appx729 (¶ 136)).) These are the Sekine R1/$f$ teachings that the Petition asserted a skilled artisan would apply to Chung Embodiments 11 and 12.

In addition to R1/*f*, Sekine teaches other ratio ranges, all of which he calls "conditional expressions." (Appx928 (¶ 49).) Sekine says that each "conditional expression" can be used independently to obtain its benefits: "It is not necessary to satisfy all the conditional expressions at the same time. Satisfying each conditional expression separately will make it possible to obtain the effect corresponding to each conditional expression." (Appx928–929 (¶ 50); Appx707 (¶ 103).)

## III.    THE '519 PATENT

The '519 Patent is titled "Imaging Optical Lens Assembly, Image Capturing Apparatus and Electronic Device" and relates to optical five-lens assemblies. (Appx48.) It alleges priority to a December 2015 Taiwanese application. (*Id.*) Its Background notes a known "trend in the market towards . . . wide angles of view." (Appx80 (1:18–47).)

Claim 1 is representative, and recites:

[1.1] An imaging optical lens assembly, comprising, in order from an object side to an image side:

[1.2] a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof;

[1.3] a second lens element having positive refractive power;

[1.4] a third lens element having negative refractive power;

[1.5] a fourth lens element having positive refractive power; and

[1.6] a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and

at least one convex shape in an off-axial region on the image-side surface;

[1.7] wherein the imaging optical lens assembly has a total of five lens elements;

[1.8] and **wherein a curvature radius of the object-side surface of the first lens element is R1**, a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, **a focal length of the imaging optical lens assembly is f**, a focal length of the third lens element is f3, a focal length of the fifth lens element is f5, and **the following conditions are satisfied**:

$$|R4/R3|<1.0;$$

$$f5/f3<1.0;$$

$$\mathbf{-10.0<R1/f<0}.$$

(Appx96 (33:2–28) (emphasis and bracketed labels added).)

## IV.    THE *INTER PARTES* REVIEW PROCEEDING

### A.    Petition

Motorola petitioned for *inter partes* review on two grounds, each asserting a Chung embodiment improved with Sekine's R1/$f$ teachings. (Appx155; Appx166.) Ground 1 challenged claims 1–18 and 20–27 as obvious over Chung Embodiment 11 in view of Sekine's teachings. Ground 2 challenged claims 1–7 and 9–27 as obvious over Chung Embodiment 12 in view of Sekine's teachings. (Appx166.)

14

### 1.     The Petition Showed Chung Satisfies All Elements of Claim 1, Except the -10.0<R1/$f$<0 Condition

The Petition showed how Chung Embodiments 11 and 12 each satisfies all aspects of claim 1 except the final requirement of limitation 1.8: -10.0<R1/$f$<0. (Appx187–195; Appx239–248; *see, e.g.*, Appx902–903 (¶¶ 179–188); Appx48 (Abstract).) Chung Embodiment 11 has an R1/$f$ of -15.195 (Appx194), and Chung Embodiment 12 has an R1/$f$ of -25.641 (Appx248).

### 2.     The Petition Explained a Skilled Artisan Would Have Been Motivated to Increase Chung's Field of View to 115 Degrees

Chung Embodiments 11 and 12 have fields of view of 95.9 degrees and 96.4 degrees, respectively, and Chung states a preferred field of view between 86 degrees and 115 degrees. (Appx903 (¶ 188); Appx905 (¶ 198); Appx181 (citing Appx887 (¶¶ 20, 33); Appx708–709 (¶ 106)).) The Petition explained how "the demands for camera systems with a higher [field of view]" would have motivated skilled artisans to "push Chung's embodiments to its higher end [field of view] of 115 degrees." (Appx181; *see also* Appx180.)

### 3.     The Petition Explained a Skilled Artisan Would Have Been Motivated to Use Sekine's R1/$f$ Teachings to Balance Field of View, Track Length, and Image Quality

The Petition explained why, in optimizing Chung's embodiments to a higher field of view, the skilled artisan "would have sought out teachings on maintaining image quality while increasing [field of view]" and naturally encountered Sekine.

(Appx181.) Like Chung, Sekine describes five-lens wide-angle systems that use aspheric plastic lenses and provide high-quality images for mobile devices. (Appx179–180.) Both describe systems with a first lens with a concave object-side surface. (Appx180 (citing Appx902–904 (¶¶ 180, 190); Appx927 (¶ 10)).) Chung explains that its first lens causes aberrations (Appx886–887 (¶¶ 15, 32)) and Sekine teaches reducing such aberrations by balancing the concavity of the first lens against the system focal length, *i.e.*, using R1/$f$ (Appx927 (¶¶ 18, 13)). (Appx180.) The Petition cited to Chung's stated need for a "wider angle of view" and "an increasing demand for angle of view and image quality," as well as a total track length that is not "too long." (Appx886 (¶ 5) (cited by Appx180).) The Petition provided evidence that total track length could undesirably increase if field of view were increased. (*See, e.g.*, Appx207–210 (citing Appx745–747 (¶¶ 163–164); Appx962 (¶ 43)).)

Motorola's expert, Mr. Aikens, explained that a skilled artisan would have understood that Sekine describes the tradeoffs with R1/$f$: a value closer to -70.0 widens the angle but undesirably affects aberrations, compared to a value closer to zero. (Appx710–711 (¶ 108) (citing Appx1117).) Sekine also explains that an upper limit of -3.0, such that -70<R1/$f$<-3.0, would permit shortening of the total track length. (Appx182 (citing Appx927 (¶ 15)).) The cited passages of Sekine teach use of R1/$f$ in the desired range for "correcting the field curvature satisfactorily, while seeking widening of the angle" (Appx927 (¶ 13)) and that narrowing the range to

-70<R1/$f$<-3.0 would provide a "better effect" that made it possible to "shorten the total track length" (Appx927 (¶¶ 14–15)). (*See* Appx181–182 (citing Appx926–927 (¶¶ 6–13); Appx710–711 (¶ 108)).)

Thus, the Petition explained, skilled artisans would "have been motivated to start with an R1/$f$ value at or near -3.0, and then reduce that value if possible to balance between aberration correction with shorter track length," while widening field of view. (Appx182–183; Appx710–711 (¶¶ 108–109); Appx194–195; Appx728–730 (¶¶ 135–137).) The Petition noted that the obviousness of the claimed -10.0<R1/f<0 condition was confirmed by four Sekine embodiments having an R1/$f$ value between -4.0 and -3.0. (Appx195 (citing Appx929–931 (Tables 1 & 2); Appx934–936 (Tables 5 & 6); Appx729 (¶ 136)).)

Specifically, a skilled artisan would implement Chung Embodiment 11 with an R1/$f$ ratio of -3.0 as taught by Sekine, and optimize with a wider field of view. (Appx183; Appx711–712 (¶¶ 110–111).) During optimization, the skilled artisan would "turn to the lens design program to find the balance between these competing objectives—a short [total track length], a wide field of view, and improved image quality—and optimize r1/$f$ to an appropriate value." (Appx184; Appx711–712 (¶¶ 110–111); *see also* Appx184–186; Appx712–714 (¶¶ 112–114).)

The Petition also relied on the same rationale in explaining that it would have been obvious to use Sekine's R1/$f$ teachings in optimizing Chung Embodiment 12 to a field of view of 115 degrees. (Appx237–239; Appx248.)

### 4.     The Petition Described the Level of Skill in the Art

The Petition explained that a person of ordinary skill in the art in December 2015 would have had a bachelor's degree in physics, optical sciences, or equivalent training, as well as approximately three years of experience in designing multi-lens optical systems. (Appx171.) In addition, a skilled artisan "would have had experience in analyzing, tolerancing, adjusting, and optimizing multi-lens imaging systems for manufacturing, and would have been familiar with the specifications of lens systems and their fabrication." (*Id.*) She also would have regularly used lens design software, such as ZEMAX, to create new lens designs, often using pre-existing lens designs as a starting point and then performing routine optimizations to reach a desired design. (Appx171–172.)

### 5.     Motorola's Expert Used Standard Lens Design Software to Confirm Obviousness

Motorola's expert, Mr. Aikens, performed modeling—using the same ZEMAX software functionality used by skilled artisans (Appx700 (¶ 81))—confirming that skilled artisans would have successfully applied Sekine's R1/$f$ teachings in optimizing Chung Embodiment 11 to "a desirable [field of view] of 115 degrees," with an R1/$f$ of -3.36. (Appx184–186; Appx711–714 (¶¶ 111–113).) This

modeling showed that the optimized Chung Embodiment 11 had wide-angle performance with a field of view of 115 degrees, with lenses that "retain largely the same shape as in Chung FIG. 11A." (Appx185.) The ray diagram below illustrates how light rays travel through the optimized Chung Embodiment 11 lens system, entering from the left and "focus[ing] on the image plane [at the right] across the wide range of field angles." (Appx185; Appx713 (¶ 113).) The rays are depicted as "ray bundles" with each color corresponding to a different field angle (e.g., blue rays focusing at 0 degrees and purple rays focusing at 57.5 degrees). (Appx185–186; Appx713 (¶ 113); *see also* Appx238–239; Appx794 (¶ 234).)



(Appx186.) The Petition explained that the "modeling confirms the obviousness of such an implementation, as it shows" how a skilled artisan would have "easily reached" the design. (Appx195; Appx728–730 (¶¶ 135–137).)

Mr. Aikens performed similar modeling for Chung Embodiment 12 (Appx237–239), showing "the routine nature of implementing $R1/f$ near -3.0 and the reasonable expectation of success," with an $R1/f$ of -2.55 (Appx248).

The Petition contended that this modeling confirmed that the proposed combinations collectively render every challenged claim obvious. (Appx187–235; Appx239–289.) While independent claims 14 and 23 recite ratios other than $R1/f$, the Petition and Motorola's expert explained how, when Chung Embodiments 11 and 12 were implemented with an $R1/f$ near -3.0, as taught by Sekine, then those different claimed ratios also were met. (Appx195–235; Appx730–791 (¶¶ 138–227); Appx248–289; Appx804–851 (¶¶ 251–321); Appx7864 (19:4–26).)

## B.    The Institution Decision Acknowledged the Objective of Balancing Wide Field of View, Track Length, and Image Quality

The Board instituted IPR, noting and agreeing with the Petition's balancing argument: "In other words, a POSITA would use a lens design program to balance between competing objectives—a short [total track length], a wide field of view, and improved image quality—by optimizing $r1/f$ to an appropriate value." (Appx2564 (citing Appx184).) The Board rejected Largan arguments regarding supposedly worse image quality in Sekine's embodiments because those arguments ignored that

20

the skilled lens designer would balance competing goals. (Appx2564 ("[T]he objective is to balance a short [total track length], a wide [field of view], and improved image quality.").)

The Institution Decision also rejected Largan arguments "that Chung Embodiment 11 and 12 are totally different optical systems having opposite arrangements of positive and negative power compared to Sekine." (Appx2565.) The Board reasoned that, even if true, this assertion did "not necessarily negate Chung's and Sekine's teachings to use the second lens to correct aberrations in the first lens." (*Id.*) It also rejected teaching-away arguments, noting that "Petitioner's proposed modification was not to replace the negative first lens of Chung's Embodiment 11 or 12 with a positive one." (Appx2565.)

The Board found claim 1 to be representative (Appx2549) and noted "Patent Owner does not contest that the combination of Chung Embodiment 11 and Sekine discloses the preamble and limitations of claim 1" (Appx2568).

### C.    Patent Owner Response

In its Patent Owner Response, Largan agreed that skilled artisans would have understood Chung "as encouraging" fields of view up to 115 degrees. (Appx2707; *see also* Appx2725–2726.) The Response acknowledged "the alleged motivations of widening Chung's [field of view] while maintaining image quality, and balancing aberration reduction with short [total track length]." (Appx2705.)

Largan's Patent Owner Response contrasted features of the *embodiments* of Chung and Sekine, and also emphasized other teachings and preferred ranges of Chung. (Appx2704–2732.) Largan argued that Chung already provided at least five teachings on maintaining image quality and three different ways of increasing field of view, and that Chung's preferred field of view range was higher than the fields of view of Sekine's embodiments. (Appx2711–2712; Appx2725; Appx2714–2715.)

Largan also alleged that the lens models showing optimized Chung Embodiments 11 and 12, provided by Motorola's expert, had worse image quality than the original embodiments, which had a narrower field of view, and argued that this undermined the motivation to make those optimizations. (Appx2737–2750.)

With the Patent Owner Response, Largan filed the transcript of its cross-examination deposition of Motorola's expert witness, Dave Aikens, during which Mr. Aikens explained how Sekine taught to focus on the concave shape of the object-side surface of the first lens when widening the angle, and why that teaching was particularly applicable to Chung Embodiments 11 and 12, which both also have first lenses with concave object-side surfaces. (Appx5449 (52:4–24); Appx5491–5493 (94:7–96:14); Appx5494–5495 (97:12–98:4).) Mr. Aikens testified that Sekine taught use of "retrofocus" (also known as "reverse telephoto") concepts that were applicable to Chung Embodiments 11 and 12 even though the first lenses in the Chung and Sekine embodiments had different powers. (*See, e.g.*, Appx5491–5492

(94:7–25); Appx5494 (97:6–19); Appx6460.)

### D.    **Petitioner Reply to the Patent Owner Response**

Motorola's Reply again explained the three-way balancing motivation: "Sekine outlines a specific solution to a problem identified in Chung and well-known to POSITAs: maintaining image quality and short [total track length] while increasing [field of view]." (Appx6281–6282.) In broadening the Chung embodiments to a field of view of 115 degrees, a skilled artisan "would have been motivated to use Sekine's teachings to maintain image quality and [total track length] to the best extent possible." (Appx6283; Appx6289–6292 (citing Appx6773–6775 (¶¶ 33–36)).) Sekine thus supplied "a known technique to address a known problem" (Appx6282; Appx6283) and the differences between the Sekine and Chung embodiments did not negate the applicability of this teaching (Appx6284–6287). The Reply explained how "image quality tends to decrease when broadening the [field of view] and thus Sekine's benefits largely accrue when broadening the [field of view] of Chung Embodiments 11 and 12 . . . to an end goal of 115°." (Appx6288–6289.) "Sekine's guidance to target an r1/$f$ of -3.0 plays an important role in ensuring that the broadened [field of view] does not unnecessarily

increase SAG and track length." (Appx6292–6293 (citing Appx6775–6776 (¶¶ 37–39)).)[2]

The Reply also explained how "optimizations regularly involved tradeoffs." (Appx6296; *see also, e.g.*, Appx6785–6787 (¶¶ 50, 53); Appx6761–6762 (¶ 13); Appx6769 (¶ 27); Appx6350 (43:4–24); Appx6426; Appx6473.)

The Reply explained that the ZEMAX modeling showed how "Sekine's teachings would have been easily incorporated into Chung," thus confirming that "the teachings of Sekine applied to Chung, [and] rendered '519 obvious." (Appx6296; Appx6297 (quoting Appx5574 (177:12–16)).)

Responsive to Largan's arguments regarding motivation and the ZEMAX modeling (Appx2738–2750), the Reply cited Motorola's expert's testimony on how the modeling submitted with the Petition showed that applying Sekine's R1/*f* teachings while increasing Chung's field of view resulted in a design that "improved [field of view] by almost 20°, kept [total track length] roughly the same, and achieved distortion far better than the '519 patent itself" (Appx6297 (citing Appx6787–6788 (¶ 54))).

---

[2]    "'SAG' is a measure of the length of a lens . . . ." (Appx26.) "Thus, the higher the SAG, the greater the length and the space occupied by the lens, and conversely, the lower the SAG, the lesser the length and space occupied by the lens." (Appx26–27.)

### E.    **Patent Owner Sur-Reply**

Largan agreed that claim 1 of the '519 patent is "exemplary." (Appx7088; *cf.* Appx692–693.) It distinguished Sekine as not being a retrofocus system (Appx7072) but without discussing the cross-examination testimony of Mr. Aikens that Sekine, while not a classical retrofocus design, taught use of retrofocus concepts particularly applicable to Chung Embodiments 11 and 12. (*Supra* Section IV.C.)

Largan also argued for the first time that other, separate teachings in Sekine would have dissuaded application of its R1/*f* teachings to Chung. (Appx7073–7076.)

### F.    **Oral Hearing**

At argument, Motorola explained the balance between the competing goals of wide field of view, short total track length, and image quality:

> As you start pushing the field of view wider and wider and wider, you're going to be experiencing a loss in image quality and perhaps an increase in total track length. And so, what the skilled artisan would look for then is teachings on how to maintain your image quality and how to maintain your total track length when increasing that field of view from say, 95 or 96 up to 115 degrees. And that's right where Sekine and its teachings come in . . . .

(Appx7854 (9:2–21); *see also* Appx7853–7855 (8:20–9:1 & 9:22–10:5).)

Motorola explained that the ZEMAX modeling "hammers home the point [that] there's a clear motivation here, and there would be actual success attained by these designs." (Appx7863 (18:10–19); *see also* Appx7863–7864 (18:20–19:2) (arguing that the ZEMAX modeling "further reinforces [Mr. Aikens'] expert opinion

25

that Sekine's R1/f teachings were directly applicable to Chung Embodiments 11 and 12"); Appx7861–7863 (16:21–18:9).)

## G.   Final Written Decision[3]

The Final Written Decision ("Decision") adopted Motorola's asserted level of ordinary skill in the art. (Appx11–12.) This included that "[a] POSITA would have regularly used [ZEMAX or other] software to create new lens designs, including through optimizing preexisting lens designs to reach a desired design." (Appx11.)

The Decision engaged in no explicit claim construction. (Appx12–13.)

After reciting the parties' positions, the Board began its analysis at page 29. (Appx30.)[4] Its analysis was narrow. It addressed only claim 1, found no claim element missing from the asserted prior art, did not reach reasonable expectation of success, and addressed only motivation to combine, finding none. (*E.g.*, Appx39 ("As we need only address the motivation to combine for the proposed combination to resolve this proceeding, we do not reach the separate issue of expectation of success.").) As both grounds relied on the same art and motivation arguments, the Board adopted its Ground 1 analysis for Ground 2. (Appx43.)

---

[3]     The Decision cover page and headers mistakenly identify "Patent 9,969,519" (*e.g.*, Appx1–2); the patent in dispute is 9,696,519. The decision identifies Judge Nabeel U. Khan (Appx1), but that appears to be a mistake as Judge Khan was replaced with Judge Chung (Appx2608–2609), who was then replaced with Judge Hamann (Appx6257–6258).

[4]     The Decision page numbering begins on its second page. (*See* Appx2.)

The Decision's analysis of motivation did not begin with, or include, identifying the differences between the primary prior art reference's embodiments, Chung Embodiments 11 and 12, and claim 1. Specifically, the analysis did not acknowledge that the only asserted difference between these Chung embodiments and claim 1 was an R1/$f$ ratio in the claimed range of -10 to 0. (*See generally* Appx30–40.)

In reciting the parties' positions, the Decision acknowledged that Motorola's asserted combination was to modify Chung embodiments not with Sekine's embodiments but with Sekine's R1/$f$ teachings. (*E.g.*, Appx17 ("Petitioner contends that a POSITA implementing Chung would have been motivated to incorporate Sekine's teachings on maintaining image quality at wider fields of view.").)

But in its analysis, the Decision largely focused not on that combination but instead on differences between the Sekine and Chung embodiments. For example, the Decision compared the fields of view of Sekine's embodiments (Appx35–36) to the fields of view of Chung's embodiments (Appx36–37) and found a skilled artisan would not "look to Sekine's R1/f teaching" because Sekine's fields of view were "inferior to Chung's" (Appx38). And it focused on the lens powers of the Chung and Sekine embodiments and supposed "differences in these systems' performance" as undermining "that Sekine's teachings are applicable to Chung's" embodiments. (Appx33–34.) The Board also noted the different f-numbers of the Chung and Sekine

27

embodiments as an apparent basis for concluding that Sekine "would appear to produce inferior results." (Appx34–35.)

When reciting the parties' positions, the Decision acknowledged that Motorola's asserted motivation for modifying Chung's embodiments with Sekine's R1/*f* teachings was the benefit of balancing three desired characteristics of this type of lens system. (*See* Appx20 (explaining Motorola's argument that a skilled artisan optimizing Chung to a field of view of 115 degrees "would have been motivated to start with an R1/f at or near -3.0, . . . to balance between aberration correction with shorter track length"); Appx21 (explaining Motorola's argument that a skilled artisan "would then turn to the lens design program to find the balance between these competing objectives—a short [total track length], a wide field of view, and improved image quality—and optimize [R1/f] to an appropriate value" to achieve a field of view of 115 degrees) (quoting Appx184).) The Decision also quoted Largan's Patent Owner Response, which had similarly acknowledged "the alleged motivations of widening Chung's [field of view] while maintaining image quality, and balancing aberration reduction with short [total track length]." (Appx28 (quoting Appx2733).)

But in its Analysis, the Decision almost entirely addressed different motivations, namely, improvement of each such design characteristic in isolation. For example, the Board focused on image quality alone, finding that Sekine's

teachings would not "improve Chung's image quality" and thus "a POSITA would not have been motivated to combine Chung with Sekine." (Appx34–35; *see also* Appx40 ("Petitioner's stated motivation to combine was to improve image quality.").) The Board later focused on field of view alone, finding that "Chung teaches three ways to increase [field of view], to attain angles much wider than Sekine's." (Appx37.) And it also analyzed track length in isolation, finding that Chung's original designs, before having their field of view widened, did not suffer the total track length problem solved by Sekine's R1/$f$ teachings. (Appx38.) In doing so the Board did not discuss the evidence that total track length could undesirably increase if field of view were increased. (*Supra* Section IV.A.3.).

In one paragraph, the Board addressed "tradeoffs, for example, sacrificing image quality for a wider [field of view]." (Appx40.) The Board dismissed this, however, on the ground that *Chung* would not have contemplated it: "Chung teaches, however, that its objectives are to increase [field of view], reduce total track length, and increase image quality. A proposed combination that sacrifices these objectives through tradeoffs is not what Chung contemplates." (*Id.* (citations omitted).)

The Decision declined to consider the ZEMAX modeling evidence showing application of Sekine's R1/$f$ teachings to Chung's embodiments. (Appx38–39; *see* Appx6787–6788 (¶ 54); Appx6297.) The Board reasoned that the Petition had

29

presented this evidence solely in support of a reasonable expectation of success. (Appx39 (citing Appx184).)

The Board accepted at least one argument that Largan had made in its Preliminary Response but had not repeated in its post-Institution Response: "that the use of a negative first lens instead of a positive first lens results in a considerably different system with considerably different performance." (Appx33.) In noting this argument, the Board cited to only (i) pre-Institution Largan expert testimony that had not been cited in the Patent Owner Response or Sur-Reply and (ii) a declaration from another expert in another proceeding on another patent that was filed as Exhibit 2053 in support of a later motion to amend not at issue in this appeal. (Appx33 (citing Appx2156 (¶ 79); Appx2157–2159 (¶¶ 82–83); Appx7489 (¶ 88)).) In accepting this argument, the Board considered none of Mr. Aikens' deposition testimony that had explained why Sekine's teachings applied to Chung despite the different powers of the first lenses in the Chung and Sekine embodiments. (*Supra* Section IV.C.) And the Board did not consider the ZEMAX modeling in concluding, in turn, that Motorola did not show "that Sekine's teachings are applicable to Chung's [embodiments] despite their different systems." (Appx34.)

## SUMMARY OF THE ARGUMENT

Several legal errors by the Board mandate vacatur.

First, the Board failed to identify the difference between the starting-point

prior art designs (Chung Embodiments 11 and 12) and the challenged claims, as required by Section 103, which led it to lose focus on the asserted combination bridging that difference. The difference is that Chung did not recognize R1/$f$ as a useful parameter to vary when widening the field of view of this type of lens system while minimizing any resulting sacrifices to track length and image quality, nor that an R1/$f$ value near -3.0 is particularly useful. The asserted combination bridging this difference was to modify these Chung embodiments per Sekine's R1/$f$ teachings, specifically, to vary each Chung embodiment's R1/$f$ value to be near -3.0. The asserted combination was *not* to combine a Sekine embodiment with a Chung embodiment. Yet, the Board's analysis mostly focused on supposed deficiencies or incompatibilities of Sekine's embodiments.

Second, the Board's analysis largely misidentified the motivation to combine asserted by Motorola. The asserted motivation to modify Chung's embodiments per Sekine's R1/$f$ teachings was not merely to improve a single characteristic of Chung's embodiments, but rather to widen the field of view to 115 degrees while minimizing any resulting sacrifices to track length and image quality. To the extent the Board analyzed this three-way-balancing motivation, it did so in only one brief paragraph, devoting the rest of its analysis to non-asserted motivations of improving one characteristic in isolation.

Third, to the extent the Board briefly analyzed the asserted three-way-balancing motivation, it answered incorrectly this basic question: Who would be motivated? The correct answer is, of course, the person having ordinary skill in the art. But the Board's answer was Chung, the primary reference's lead inventor. Specifically, the Board reasoned that tradeoffs were "not what Chung contemplates." (Appx40.) Even if true, that is irrelevant. The skilled artisan is not confined to the four walls of a prior artisan's thinking, knowledge, skill, or motivation.

Fourth, the Board dismissed probative evidence of motivation on the mistaken belief that the Petition had presented it solely as evidence of reasonable expectation of success. This dismissed evidence was modeling by Motorola's expert confirming that a skilled artisan would have easily achieved the benefit of three-way balancing if she had used known techniques and tools to apply Sekine's R1/$f$ teachings to Chung's asserted embodiments. The Petition presented this benefit-confirming evidence as showing both reasonable expectation of success and motivation to combine, namely as showing the skilled artisan "would have optimized Chung with a reasonable expectation of success, with no undue experimentation, and easily reached a design with R1/$f$ of -3.37." (Appx195 (emphasis omitted); *see also* Appx237 (citing this modeling as evidence of motivation); Appx248 ("ZEMAX modeling confirms the routine nature of implementing R1/$f$ near -3.0 and the reasonable expectation of success.").) That a contemplated modification to an

existing design would have been routine and easy to confirm using known techniques is probative of a motivation to combine. But the Board mistakenly understood this evidence to concern only reasonable expectation of success and disregarded it on motivation to combine.

Fifth, the Board underestimated the skilled artisan. It found no motivation in part because the skilled artisan allegedly would have had reason "to doubt or at least question that Sekine's teachings would have been useful in Chung." (Appx33.) But surely most routine advances in technology are accompanied by some question or doubt before success is confirmed. A skilled artisan is not a cowardly lion too scared to take the next natural step because success is uncertain.

Finally, the Board erred by dismissing Chung Embodiments 11 and 12 as starting point designs. Nothing required Motorola to defend the use of these embodiments as starting points.

These and additional errors mandate vacatur.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW**

The Court must set aside the Board's actions if they are "'not in accordance with law' or 'unsupported by substantial evidence.'" *Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1320 (Fed. Cir. 2017) (quoting 5 U.S.C. § 706(2)).

"Whether the decision on review rests on a failure to apply the correct legal standards is determined de novo on appeal." *Axonics, Inc. v. Medtronic, Inc.*, 73 F.4th 950, 957 (Fed. Cir. 2023) ("*Axonics I*"). "Factual findings are reviewed for substantial-evidence support, which exists when, on the whole record, 'a reasonable fact finder could have arrived at' the finding on review." *Id.* at 956–57.

"Obviousness is an issue of law decided based on numerous factual findings, including the scope and content of the prior art, the level of ordinary skill, and whether a relevant artisan would have had a motivation to combine references in the way required to achieve the claimed invention." *Id.* at 956.

The Court "review[s] the Board's compliance with the procedural requirements of the Administrative Procedure Act ('APA') de novo." *Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1380 (Fed. Cir. 2023) ("*Axonics II*") (citations omitted).

## II. THE BOARD ERRED BY ADOPTING A LEGALLY INCORRECT FRAMING OF THE MOTIVATION-TO-COMBINE QUESTION

The Board's obviousness analysis includes several legal errors. That analysis largely misidentified the asserted combination and the asserted motivation to combine. To the extent the Board addressed the motivation to combine that Motorola had identified, it did so from the incorrect perspective of the prior art's lead inventor, rather than the ordinary skilled artisan as required under Section 103. The Board improperly dismissed the ZEMAX modeling evidence as going only to a reasonable

expectation of success, when such benefit-confirming evidence is also relevant to whether a skilled artisan would have been motivated to combine the references' teachings. Finally, the Board underestimated the skilled artisan's willingness to take a natural step despite some uncertainty in the outcome.

Because the Board adopted its Ground 1 analysis for Ground 2 (Appx43), the same errors apply to both grounds. On remand, the Board should apply the proper legal framework to its obviousness analysis.

### A.    The Board Mostly Misidentified the Asserted Combination

#### 1.    The Board Failed to Identify the Differences Between the Primary Reference and the Claims

The Board started off on the wrong foot by failing to identify what the statute and precedent both mandate be identified: the differences between the prior art and the challenged claim. A patent may not be granted "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious . . . ." 35 U.S.C. § 103. The factfinder must determine those differences. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966) ("Under § 103, . . . differences between the prior art and the claims at issue are to be ascertained . . . ."). "When analyzing a patent claim for obviousness, the claim should be considered as a whole, but the differences between the claim and the prior art need to be identified to place the obviousness analysis into proper perspective." *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 717 (Fed. Cir. 1991).

The only difference between claim 1 and Chung Embodiments 11 and 12 is the value of the $R1/f$ ratio. (*See, e.g.*, Appx2566–2568; Appx2577–2580.) It was undisputed that the lens assembly disclosed in Chung Embodiment 11, for example, meets every claim 1 feature, except for $R1/f$ falling between zero and -10.0. (*See, e.g.*, Appx2702–2704; Appx2727.) Instead of falling within that range, Chung Embodiments 11 and 12 have $R1/f$ values of -15.195 and -25.641, respectively. (*Id.*)

While Chung did not disclose an $R1/f$ ratio in the claimed range, Sekine taught controlling the $R1/f$ ratio when widening a design's field of view, in order to minimize any negative impacts on total track length and image quality. (Appx927 (¶¶ 11–15).) Sekine taught that an $R1/f$ value at or near -3.0 is particularly useful, with this ratio falling between -4.0 and -3.0 for four of Sekine's six embodiments. (*Id.*; Appx710–711 (¶¶ 108–109); Appx6769–6776 (¶¶ 28–39); Appx195 (citing Appx929–931 (Tables 1 & 2); Appx934–936 (Tables 5 & 6); Appx729 (¶ 136)).)

The following graphic shows the differences between the $R1/f$ values of Chung's embodiments and the range of claim 1 of the '519 patent, along with Sekine teachings and disclosures relating to $R1/f$:



The Board's analysis, however, did not include this required step of identifying the differences between the claims and the prior art. Instead, the Board began its analysis by discussing the lens design process and then immediately proceeded to addressing the motivation to combine the art. (Appx30–33.) This erroneous first step, in failing to follow the statute and identify the differences between the prior art and the claims, led the Board into its next legal misstep: largely failing to analyze the actual combination of prior art teachings asserted by Motorola and instead focusing on the references' embodiments and Sekine's other, independent teachings.

> **2.**   **The Board Erred by Focusing on the Differences Between the Embodiments of the References Rather than the Applicability of Sekine's Teachings to Chung**

In view of this difference between the asserted Chung embodiments and claim 1, the motivation-to-combine inquiry is whether a skilled artisan would have been motivated to modify those embodiments using Sekine's R1/$f$ teachings, thereby bridging that difference. "The inquiry is not whether a relevant artisan would

combine a first reference's feature with a second reference's feature to meet requirements of the first reference that are not requirements of the claims at issue." *Axonics I*, 73 F.4th at 957. "A contrary view would run counter to established principles, including that the claim defines the invention whose obviousness is being assessed and that a skilled artisan may be motivated to combine particular features of different references, e.g., to secure some benefits at the expense of others." *Id.*

In *Axonics I*, the Board "adopted a legally incorrect framing of the motivation-to-combine question when it confined the inquiry to whether a motivation would exist to make" the asserted combination in the context specific to one of the references but not required by the challenged claims. *Id.* Here, the Board likewise adopted a legally incorrect framing by comparing Sekine's embodiments to Chung's embodiments with respect to certain design attributes, none of which are required by the claims. The question is not whether adding aspects of Sekine's embodiments would improve upon Chung's embodiments, or whether Sekine's embodiments outperform Chung's embodiments. The question is whether the R1/$f$ teachings in Sekine would have suggested to the skilled artisan, desiring to widen the field of view to 115 degrees while minimizing any resulting sacrifices to track length and image quality, to modify Chung Embodiments 11 and 12 per those teachings.

Even a star athlete can learn a new trick from a coach who never excelled at the game. Here, Sekine is the coach and its R1/$f$ teachings are the trick that improves

Chung's superior designs. That trick allows skilled artisans to minimize any sacrifices to track length and image quality when widening the field of view of Chung Embodiments 11 and 12 to 115 degrees, as recommended by Chung. The asserted combination was to modify Chung Embodiments 11 and 12 with Sekine's R1/$f$ teachings. It was not to combine Chung and Sekine wholesale or to combine any embodiment of Sekine with an embodiment of Chung. But the Board appears to have mostly miscomprehended this.

For example, the Board found that all six Sekine embodiments had field-of-view values below Chung's preferred range and concluded that this meant that skilled artisans would not "look to Sekine's R1/f teaching." (Appx35–38.) The Board noted that Chung criticizes lens assemblies with fields of view less than 85 degrees and "regards as its invention" the range of fields of view between 86 and 115 degrees. (Appx36 (citing Appx887 (¶¶ 20, 33); Appx906 (claims 8 & 18)).) It then noted that all six of Sekine's embodiments were below 86 degrees. (Appx36.) But this does not detract from the asserted combination any more than a coach being a lesser athlete somehow detracts from his or her coaching skills. No evidence limited the benefits associated with Sekine's R1/$f$ teachings to the particular embodiments of Sekine and, on the contrary, the unrefuted modeling evidence detailed by Motorola's expert demonstrated just the opposite.

Similarly, the Board faulted Motorola for the fact that Sekine's embodiments had different powers than the Chung embodiments and for supposed "differences in these systems' performance." (Appx33–34.) The Board also agreed with Largan's arguments that Sekine's embodiments had a different "f-number" than Chung's embodiments—which relates to image quality. (Appx34–35.) But the value of a coach's tip is no less because the coach herself (here Sekine) cannot execute it as well as a star athlete (Chung). The evidence here, including the dismissed modeling evidence, showed that Sekine's R1/$f$ teachings had the intended balancing benefit that Sekine predicted, when applied to the superior Chung Embodiments 11 and 12.

"The proper inquiry is whether the relevant artisan would be motivated to make the combination to arrive at the claims' actual limitations." *Axonics I*, 73 F.4th at 957. "When an obviousness challenge asserts a combination of identified prior art, the motivation-to-combine portion of the inquiry is 'whether "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve *the claimed invention*."'" *Id.* (internal citations omitted). "The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference." *Allied Erecting & Dismantling Co. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016) (citation omitted) Nor is it whether a secondary reference's embodiments are superior to a primary reference's embodiments. *Cf. In re Gurley*, 27 F.3d 551, 553

(Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.").

In sum, by mistakenly focusing on the differences between Sekine's embodiments and Chung's embodiments rather than starting by identifying that the only difference between Chung and claim 1 was the claim's R1/$f$ range, and then focusing on the asserted application of Sekine's R1/$f$ teachings to Chung's embodiments, the Board failed to conduct the legally required obviousness analysis. *See, e.g.*, *Netflix, Inc. v. DivX, LLC*, No. 2022-1083, 2023 WL 2298768, at *4 (Fed. Cir. Mar. 1, 2023) (non-precedential) (finding that the Board erred as a matter of law because its reasonable expectation of success analysis focused on the secondary reference's "inventive 'system'" rather than the reference's specific "teachings" that the Petition had relied upon).

### 3.    The Board Erred by Focusing on Sekine's Other Teachings

Further confirming the Board's improper framing of the combination, it also erred by requiring that Motorola, to establish motivation, needed to analyze all of Sekine's other, independent teachings and explain either (a) why a skilled artisan would have isolated Sekine's R1/$f$ teachings or (b) that the proposed combination meets the "other teachings" of Sekine. (Appx40.) But the Petition explained why a skilled artisan would have looked to Sekine for its R1/$f$ teachings specifically (*e.g.*,

Appx181–184), and obviousness does not require that *all* teachings from a secondary reference must be applied to the primary reference. *See, e.g.*, *Netflix*, 2023 WL 2298768, at *4 ("[T]he petitioner's contentions . . . define the scope of the litigation all the way from institution through to conclusion.") (citation omitted); *cf. Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020) (criticizing the Board as having required "a motivation to combine each element of the claim—even those present together in a reference," and "unduly dissect[ing] prior art references into collections of individual elements, requiring a party showing obviousness to re-do the work already done in the prior art reference").

Moreover, the Board never should have considered this argument, which was waived because it was raised only in Largan's Sur-Reply. And despite that, Motorola did note the following Sekine passage, which expressly states that each of its teachings applies independently: "It is not necessary to satisfy all the conditional expressions at the same time. Satisfying each conditional expression separately will make it possible to obtain the effect corresponding to each conditional expression." (Appx928–929 (¶ 50); *see* Appx7853 (8:3–11); Appx7904 (59:3–23).) Motorola's expert also noted this passage in his first declaration. (Appx707 (¶ 103).)

### B.    The Board Mostly Misidentified the Asserted Motivation

The Board oversimplified the asserted motivation for applying Sekine's R1/$f$ teachings to Chung Embodiments 11 and 12.

In its analysis, the Board primarily focused on motivations not argued by Motorola, such as whether a skilled artisan would apply Sekine's teachings to simply improve *only* the image quality or *only* the track length of Chung's embodiments without also increasing the field of view (i.e., widening the angle). To the extent that the Board considered the motivation Motorola asserted, the Board erred by assessing motivation from the perspective of the lead inventor of the prior art, not the hypothetical ordinarily skilled artisan.

### 1.    The Board Erred by Focusing on Whether There Would Be Improvement to Each Design Characteristic, in Isolation

Sekine's teachings on $R1/f$ are not for improving image quality or track length or field of view in isolation. Rather, those teachings are for balancing a short total track length and good image quality while widening the field of view. (*E.g.*, Appx927 (¶ 10) (teaching that a concave object-side surface allows "widening of the angle *while* maintaining the total track length short") (emphasis added); *id.*, (¶ 13) ("[C]onditional expression (1) is a condition for correcting the field curvature satisfactorily, *while* seeking widening of the angle.") (emphasis added).)

The Petition contended that a skilled artisan would be motivated to optimize the Chung embodiments to a wider field of view of 115 degrees, the upper limit of Chung's preferred range for field of view. (Appx887 (¶¶ 20, 33).) In doing so, however, the skilled artisan would be aware of the problem noted by Sekine and Chung that "widening of [the] angle" could lead to increased track length and

43

unsatisfactory field curvature or aberrations. (Appx926 (¶¶ 7–8); Appx936 (¶ 96); Appx886 (¶¶ 5–6).) This was a known problem. (Appx6757 (¶ 5); Appx6758–6759 (¶ 7); Appx6768–6769 (¶¶ 25–27).) Thus, the motivation was not to only widen the field of view, to only improve image quality, or to only shorten the track length. Instead, a skilled artisan would have been motivated to apply Sekine's R1/$f$ teachings to widen the field of view of Chung Embodiments 11 and 12 to 115 degrees, while minimizing any resulting sacrifices to track length and image quality.

Motorola's arguments and evidence were clear on this from day one—the Board even embraced this motivation in the Institution Decision. (Appx2564 ("[T]he objective is to balance a short [total track length], a wide [field of view], and improved image quality."); *see also* Appx2562–2563.)

But the Board's analysis largely addresses each variable separately, mostly disregarding the three-way balancing motivation.

For example, the Board adopted Largan's arguments that a combination of Chung and Sekine would not necessarily result in higher image quality and, as a result, a skilled artisan would therefore not have been motivated to combine them. (Appx34–35.) Then the Board concluded that a skilled artisan would not look to Sekine's R1/$f$ teachings to improve field of view, as the fields of view "that Sekine obtains from that teaching are inferior to Chung's." (Appx35–38.) The Board next decided that Sekine's teachings would not improve Chung's track length. (Appx38–

44

39). Each of these findings addressing the variables independently ignored that Sekine's R1/*f* teachings relate to minimizing any sacrifices in image quality or track length when widening field of view. *Cf. Gen. Elec. Co.*, 983 F.3d at 1351 ("[A] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine.") (citation omitted).)

### 2. To the Extent the Board's Analysis Touched on the Actual Motivation, It Failed to Consider the Correct Perspective

To the extent the Board touched on the three-way balancing motivation Motorola urged, it did so in only three sentences, quoted below. This cursory analysis, however, introduced another error of law: analyzing obviousness from the perspective of a prior art reference's inventor, not that of the hypothetical person of ordinary skill in the art:

> Petitioner further argues that Patent Owner ignores that lens design involves tradeoffs, for example, sacrificing image quality for a wider [field of view]. [Appx6280–6282; Appx6293–6294]. Chung teaches, however, that its objectives are to increase [field of view], reduce total track length, and increase image quality. [Appx886 (¶¶ 5–7)]. A proposed combination that sacrifices these objectives through tradeoffs is not what *Chung contemplates*.

(Appx40 (emphasis added).)

The skilled artisan is not confined to the four walls of the primary-reference inventors' thinking, knowledge, skill, or motivation. By cursorily dismissing the concept of tradeoffs because it was "not what Chung contemplates," the Board's

analysis failed as a matter of law. *Cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007) ("The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art.").

Whether Chung itself "contemplates" tradeoffs is beside the point given the undisputed evidence that skilled artisans would approach the problem knowing tradeoffs may be inevitable (but should be minimized if possible). The Petition had explained that designers would expect tradeoffs in certain design attributes, perhaps an increase in track length or decrease in image quality, when increasing a design's field of view. (*E.g.*, Appx182–184; Appx208–209.) Tradeoffs between wide angle and image quality were so commonplace that Largan's own expert mentions them in her 2011 lens design book. (Appx6460.) Motorola noted this and other evidence on tradeoffs, including testimony from both experts, yet the Board did not address any of it. (Appx6285; Appx6296–6297.) For example, Largan's expert's book explains that wide-angle lenses such as "[f]ish-eye lenses have an inherently large barrel distortion that is not necessarily considered to be an aberration but rather a necessity." (Appx6460; *see also* Appx6426 (explaining how lens designers were often responsible for "identifying engineering trades between performance, packaging constraints, tolerances, cost, and schedule").) And at deposition she testified that a skilled artisan knew how to "trade off some aperture for field of view

and vice versa." (Appx6350 (43:4–24); *see also* Appx6352–6353 (45:19–46:6); Appx6354 (47:5–15); Appx6355 (48:18–24); Appx6357 (50:20–22); Appx6358 (51:12–25).) Consistently, Motorola's expert explained how "in the challenges of lens design, you are compromising all the time," and that managing tradeoffs is a "common exercise in optical design." (Appx5431–5432 (34:15–35:25).) *See, e.g.*, *In re Ethicon, Inc.*, 844 F.3d 1344, 1351 (Fed. Cir. 2017) ("The normal desire of artisans to improve upon what is already generally known can provide the motivation to optimize variables.").

### C.    The Board Dismissed Evidence About Motivation by Interpreting It as Being Just About Reasonable Expectation of Success

The Board dismissed probative evidence of motivation on the mistaken belief that the Petition had presented it solely as evidence of reasonable expectation of success. (Appx38–39.) Specifically, the Board refused to consider as evidence of motivation the ZEMAX modeling that Motorola's expert had done, which confirmed that Sekine's teachings applied, and that a skilled artisan would have easily achieved the benefit of three-way balancing if she had used known techniques and tools to apply Sekine's R1/$f$ teachings to Chung Embodiments 11 and 12.

This modeling that the Board refused to consider used the very software and approach that the Board found that skilled artisans would typically use. (*E.g.*, Appx11–12 ("'A POSITA would have regularly used such software to create new lens designs, including through optimizing preexisting lens designs to reach a

47

desired design.'") (citing Appx172); *see also* Appx171–175; Appx700–704 (¶¶ 81–95); Appx2980–2981 (¶¶ 5–6).)

The Board erred in finding that this benefit-confirming evidence was not sufficiently raised by Motorola as to motivation, and in refusing to consider it.

### 1.    <u>The Petition Tied This Evidence to Motivation</u>

The Petition presented this modeling evidence as showing both reasonable expectation of success and motivation to combine, namely as showing the skilled artisan "would have optimized Chung with a reasonable expectation of success, with no undue experimentation, and easily reached a design with R1/$f$ of -3.37." (Appx195 (emphasis omitted); *see also* Appx184 (asserting that a skilled artisan would have required "no undue experimentation in applying Sekine's teachings to optimize Chung Embodiment 11 with a desirable [field of view] of 115 degrees and reduced aberrations through an r1/$f$ at -3.36"); Appx237 (citing this modeling as evidence of motivation); Appx248 ("ZEMAX modeling confirms the routine nature of implementing R1/$f$ near -3.0 and the reasonable expectation of success.").)

The evidence, demonstrating that modifying the Chung embodiments in accordance with the R1/$f$ teachings of Sekine would have been both straightforward using techniques and tools already known to the skilled artisan, and that it would have resulted in embodiments that achieved the goals of the alleged motivation, is probative of a motivation to combine. *See, e.g.*, *Intel Corp. v. PACT XPP Schweiz*

*AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023) ("[I]f there's a known technique to address a known problem using 'prior art elements according to their established functions,' then there is a motivation to combine."); *Polygroup Ltd. MCO v. Willis Elec. Co.*, 780 F. App'x 880, 884 (Fed. Cir. 2019) (non-precedential) (explaining that the Board had "failed to explain its decision to discount [petitioner's] evidence concerning the knowledge and skill of a POSITA and failed to consider the nature of the problem when analyzing the sufficiency of the proposed rationales" for a motivation to combine).

Indeed, Largan likewise cited this modeling evidence on the issue of motivation to combine in its Patent Owner Response. (Appx2728 (arguing that the fact that Mr. Aikens had not compared the aberration data of his optimized embodiments to the original embodiments meant that there was no motivation); Appx2732 (arguing that because both the T12 distance and first lens element power increased in Mr. Aikens' optimized embodiments, that there was no motivation); Appx2734–2737 (discussing various reasons why the optimized embodiments allegedly demonstrated no motivation existed).)

## 2. The Reply Properly Argued that <u>ZEMAX Modeling Supported the Motivation to Combine</u>

The Board also found that "the use of Mr. Aikens' optimizations to show motivation . . . goes beyond the scope of a proper reply because it is not responsive to any argument Patent Owner raised in the Response and is not a fair extension of

any previously raised argument in the Petition." (Appx39.) The Board was wrong on both counts.

Even if the Petition had relied on the ZEMAX optimization evidence only to support a reasonable expectation of success, the Reply noting that this evidence also supports motivation was directly responsive to the Patent Owner Response's arguments that the Petition had not shown a motivation to combine. (*E.g.*, Appx2724–2737.) *See, e.g.*, *Apple Inc. v. Andrea Elecs. Corp.*, 949 F.3d 697, 706 (Fed. Cir. 2020) ("[A]ny ambiguity as to whether Apple raised a new argument on reply is eliminated when we consider whether Apple's reply arguments are responsive to arguments raised in Andrea's Patent Owner Response.").

Further, arguing that the ZEMAX evidence supports motivation would "properly expand[] on and is a fair extension" of the prior arguments made in the Petition. *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023); *cf. Elekta Ltd. v. ZAP Surgical Sys., Inc.*, 81 F.4th 1368, 1377 (Fed. Cir. 2023) ("[I]n some cases, such as here, the evidence establishing a motivation to combine may establish a finding of reasonable expectation of success."); *Velander v. Garner*, 348 F.3d 1359, 1369 (Fed. Cir. 2003) (discussing Board argument that "motivation to combine and reasonable expectation of success are 'logically associated and thus it should not be surprising that they are discussed together'").

In sum, the Board's refusal to consider this evidence was legal error.

### D.    <u>The Board Erred by Disregarding the Level of Skill in the Art</u>

The Board underestimated the skilled artisan and disregarded the level of skill in the art it had adopted.

The Board underestimated the skilled artisan when it found no motivation in part because the skilled artisan allegedly would have had reason "to doubt or at least question that Sekine's teachings would have been useful in Chung." (Appx34.) But surely most routine advances in technology are accompanied by some question or doubt before success is confirmed. A skilled artisan is not a cowardly lion too scared to take the next natural step because success is uncertain.

Early in its Decision, the Board "adopt[ed] Petitioner's proposed level of ordinary skill." (Appx12.) The Petition had explained various skills and knowledge that a person of ordinary skill in the art would have had, including that she "would have known how to use lens design software" and "would have regularly used such software to create new lens designs, often using pre-existing lens designs as a starting point and then performing routine optimizations to reach a desired design." (Appx171–172.)

But in its later analysis, the Board disregarded this finding by suggesting that a skilled artisan designing a lens assembly would start from scratch upon receiving instructions from a customer, and that this would "lead[] to a nearly infinite variety of possible combinations of the lens parameters." (Appx32; *see also* Appx30–32.)

On the contrary, a skilled artisan had "experience in analyzing, tolerancing, adjusting, and optimizing multi-lens systems for manufacturing," as the Board agreed. (Appx11–12.)

Given that skilled artisans were known to start with a sample and iterate, the Board should have considered the normal process a skilled artisan would go through. If a customer had requested a lens assembly with features similar to those shown in Chung Embodiments 11 and 12, but wanted to increase the field of view to 115 degrees, as recommended by Chung, while minimizing any resulting sacrifices to image quality and track length, a skilled artisan would have looked to other art for ways to do that. Sekine taught about balancing those factors while increasing field of view using the R1/$f$ ratio.

In *Axonics I*, the Court explained that the Board's "legally incorrect framing of its motivation inquiry" in that case made "particularly little sense given the Board's definition of the relevant artisan providing the perspective that governs the obviousness analysis." 73 F.4th at 958. Here, instead of using the definition of a skilled artisan it had adopted to govern its analysis, the Board appears to have disregarded that definition.

### E.    The Board Erred by Dismissing Chung Embodiments 11 and 12 As Starting Point Designs

The Board dismissed Chung Embodiments 11 and 12 as starting point designs, based on the erroneous rationale that other Chung embodiments had higher fields of

view. (Appx37 (concluding that starting with Embodiments 11 and 12 "is a strong indication that hindsight is being used")).) But no prior art design is immune to improvement, and no law in the mechanical arts indicates that a petitioner must defend its starting point, especially when, as here, the starting point designs were undisputed by the patent owner. Moreover, in making this finding, the Board again misstated and oversimplified the motivation and level of skill in the art, further compounding its legal error.

The Board's analysis on this point was inconsistent with the analysis prescribed by *KSR*. "*KSR* assumes a starting reference point or points in the art, prior to the time of invention, from which a skilled artisan might identify a problem and pursue potential solutions." *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008). For example, in *KSR*, the Supreme Court assumed that a designer would start with Asano and found that "[t]he consequent legal question [was] whether a pedal designer of ordinary skill starting with Asano would have found it obvious to put the sensor on a fixed pivot point." 550 U.S. at 424–25. Here, the question before the Board was whether a skilled artisan starting with Chung Embodiment 11—or Embodiment 12—would have found it obvious to modify R1/$f$ as taught in Sekine. It was legal error for the Board to instead ask whether the skilled artisan should be improving another one of Chung's embodiments.

In the mechanical arts, nothing requires a petitioner to defend using the primary reference (or an embodiment thereof) as a starting point in an obviousness combination. Nor would it make sense to require petitioners to identify and explain away all other possible starting points. And such a requirement makes even less sense when, as here, the patent owner, Largan, never disputed that a skilled artisan would have picked Chung Embodiments 11 and 12 as starting point designs. As the Board found, a skilled artisan "would have regularly [] create[d] new lens designs, including through optimizing preexisting lens designs to reach a desired design." (Appx9–10.) A skilled artisan would identify a starting point that, for example, was "inherently capable of meeting the specifications for the design." (Appx2040; *see also, e.g.*, Appx5432 (35:1–5) ("I start from the solution that I think will get me where I want to go, which is . . . usually something that's fairly close to what my end goal is probably going to look like.").) It was thus legal error for the Board to find hindsight because of its own reasoning—unsupported by evidence—that a skilled artisan "would not have selected Chung Embodiment 11 and Chung Embodiment 12" but rather "would have selected the [Chung] embodiment with the highest (or at least higher) [field of view] as the starting point." (Appx37.)

In this starting-point analysis, the Board also erred by again oversimplifying the motivation and ignoring the knowledge of a skilled artisan. The Board once again mischaracterized the motivation as focused on only one attribute, "to design a wide

[field of view] system." (Appx37.) As already explained, however, the motivation presented by the Petition was not just widening the field of view of Chung Embodiments 11 and 12, but rather doing so with minimal adverse impact to track length and image quality. (*Supra* Section IV.A.3.) The Board also ignored that the skilled artisan knew that a first lens with a concave object-side surface was ideal for widening field of view while minimizing track length, as taught by Sekine. (Appx927 (¶ 10) (explaining to use a first lens with a concave object-side surface "[i]n order to achieve widening of angle and downsizing" and "to realize widening of the angle while maintaining the total track length short").) Thus, even if the law required a showing that one starting point was somehow "better" than others, the evidence supports that skilled artisans had a reason to choose Chung Embodiments 11 and 12, which have first lenses with concave object-side surfaces (e.g., Appx180).

These legal errors mandate vacatur and remand.

## III. <u>THE BOARD VIOLATED THE APA</u>

The Board's motivation analysis began by focusing on the different powers of the first and second lenses in Chung Embodiments 11 and 12 compared to those in the Sekine embodiments. (Appx33 (citing Appx2156 (¶ 79); Appx2157–2159 (¶¶ 82–83).) The Board faulted Motorola for failing to "sufficiently address . . . that Chung Embodiment 11 and Embodiment 12 have negative first lens and positive second lens while Sekine has a positive first lens and a negative second lens, and

how this would impact the Sekine teachings that Petitioner proposes to use in Chung." (Appx34.) The Board then found Motorola did not show sufficiently "that Sekine's teachings are applicable to Chung's [embodiments] despite their different systems." (*Id.*)

The Board erred procedurally under the APA in making this finding, as Largan had waived this issue by not raising it in its Patent Owner Response. Even had Largan not waived the point, no substantial evidence supported either (a) the Board's conclusion that the distinction was relevant, or (b) the Board's conclusion that Motorola had not sufficiently addressed the issue.

## A.    Because Largan Waived Its Argument Regarding Different Lens Powers, the Board Should Not Have Adopted It

Motorola lacked the reason and opportunity to respond to this supposedly meaningful difference between the Chung and Sekine embodiments because Largan waived it. Largan had argued in its Patent Owner *Preliminary* Response that "Chung and Sekine are totally different optical designs as they have opposite powers (positive or negative) in their first and second lenses." (Appx2091–2094.) But the Board rejected that argument in its Institution Decision, finding that the difference in powers did "not necessarily negate Chung's and Sekine's teachings to use the second lens to correct aberrations in the first lens." (Appx2565 (citing Appx886 (¶ 15); Appx887 (¶ 32); Appx927 (¶¶ 13, 18); Appx707–708 (¶¶ 104–105)).)

After Institution, but prior to filing its Patent Owner Response, Largan repeatedly asked Motorola's expert about this issue at deposition. (Appx5449 (52:2–24); Appx5491–5493 (94:7–96:2).) Motorola's expert testified that the difference did not matter and explained why. (*Infra* Section III.C.) Thereafter, Largan elected not to raise the argument again in its Patent Owner Response. Certainly, if Largan's expert (Dr. Bentley) had disagreed with the deposition testimony of Motorola's expert (Mr. Aikens), then Dr. Bentley would have offered that opinion in her supplemental declaration filed with the Patent Owner Response. She did not. And had Largan thought the evidence was on its side, it would have argued the issue in the Patent Owner Response. It did not.

By not re-raising this opposite-powers argument in its Patent Owner Response, Largan waived it. *See, e.g.*, *Parus Holdings, Inc. v. Google LLC*, 70 F.4th 1365, 1373 (Fed. Cir. 2023) ("By raising an argument in its Preliminary Response, but not its Response, a patent owner waives said argument.") (citations omitted); Appx2596 (cautioning that "any arguments not raised in the [Patent Owner] response may be deemed waived").

That Largan abandoned the argument explains why the Final Written Decision's discussion of the different powers between the Chung and Sekine embodiments cites to *pre-Institution* expert testimony that was not cited by Largan in either its Patent Owner Response or Patent Owner Sur-Reply. (Appx33 (citing

Appx2156 (¶ 79); Appx2157–2159 (¶¶ 82–83)).) And as explained below, even that testimony does not embrace Largan's pre-Institution argument. (*Infra* Section III.B.)

As the Board rejected this argument at Institution and Largan did not raise it again in its Patent Owner Response, the Board erred in criticizing Motorola for failing to "sufficiently address" the argument. (Appx34.) Motorola would have addressed it further in its briefing—and provided additional evidence regarding it—had Largan raised the argument in its Patent Owner Response, instead of waiving it.

A petitioner does not bear the burden of having to anticipate and explain away in its petition every possible difference between the embodiments of the prior art references, especially where, as here, the asserted combination relies on a more universal teaching of the secondary reference, not one of its embodiments. The Board's error was particularly problematic because it had rejected the same rationale in its Institution Decision and then changed course in its Final Written Decision without providing notice to Motorola. *Cf. Axonics II*, 75 F.4th at 1381–82 ("[U]nder the APA, the Board 'may not change theories midstream' by adopting a different claim construction in the final written decision than that adopted in the institution decision 'without giving respondents reasonable' notice of the change and the opportunity to present argument under the new theory.") (citations omitted).

**B.    No Substantial Evidence Supported
the Board's Finding that This Distinction Mattered**

The Board erred in finding that this was a distinction that mattered. No substantial evidence supports that finding. The only support for it was a conclusory assertion from Largan's expert which she supported not with her own testimony but by citing statements made by a different expert in a different matter involving a different, unrelated patent.

In a declaration filed with Largan's Patent Owner Preliminary Response, Largan's expert, Dr. Bentley, included this argument in a laundry-list of conclusory assertions of why a skilled artisan would have lacked motivation to combine the references. (Appx2156 (¶ 79) (asserting, without support, that "a POSITA would not have been motivated to modify [Chung's Embodiment 11 or 12] in view of Sekine because . . . (2) Chung and Sekine are totally different optical designs as they have opposite powers (positive or negative) in their first and second lenses").)

Apart from that assertion, Dr. Bentley provided no indication that she agreed the difference was relevant to the combination. Indeed, she went out of her way to avoid agreeing that the difference mattered. She first quoted out-of-context snippets from a Motorola petition in a different proceeding on a different patent and a different issue (full scope written description). (Appx2157–2158 (¶ 82) (quoting excerpts from Appx2273; Appx2274; Appx2278; Appx2292)).) She did not agree with these statements. Rather, she conditioned her ultimate opinion on these

statements being true, adding quotation marks within her written testimony as if to suggest she doubted the truth of those statements: "If the statements above are true, a POSITA would not have combined ChungEM11 (or ChungEM12) with Sekine, as Motorola did here, because they are 'considerably different lens systems' due to the 'opposite' power arrangement of both first and second lenses." (Appx2158 (¶ 83); *see also, e.g.*, Appx2159 (conditioning analysis and ultimate opinion by caveating that they were "according to Motorola's view in IPR2022-01170" and "based on Motorola's arguments in IPR2022-01170").)

Thus, even Largan's expert did not offer express testimony that this was a significant distinction between Chung and Sekine. (Appx2156 (¶ 79); Appx2157–2159 (¶¶ 82–83).)

While Largan's later-filed Sur-Reply briefly noted this difference when addressing whether Sekine and Chung were both retrofocus systems with readily transferable concepts (Appx7072), Largan cited to no evidence that this distinction was meaningful. Instead, the Largan Sur-Reply merely argued that "[t]here is no evidence that the effects of manipulating r1/f described in Sekine . . . could similarly apply to the negative first lens . . . of Chung." (Appx7072–7073.)

### C.    Substantial Evidence Does Not Support the Board's Finding About Sekine's Applicability to Chung's Embodiments

Motorola's Petition explained how Chung and Sekine were alike in the way that matters: "Both teach systems with a first lens having an object-side concave in

the paraxial region." (Appx180.) (Paraxial region means near the optical axis. (Appx168.)) The relevant teachings of Sekine are about R1/$f$, where R1 is the ratio of the curvature radius of the object-side surface of the first lens. (Appx181.) Sekine teaches about the benefits of having an R1/$f$ that is negative. (Appx927 (¶¶ 10–15).) It was undisputed that a negative R1 means the object-side surface of the first lens is a concave surface. (Appx6771; Appx2718; Appx2720–2721.) Because the teachings of Sekine are about where R1 is negative, the Sekine teachings relate to systems with first lenses that are concave on their object side, such as Chung Embodiments 11 and 12. (*See, e.g.*, Appx680 (¶ 51); Appx685–686 (¶ 57); Appx708 (¶ 105); Appx6771–6773 (¶¶ 31, 32).)

When Largan asked Mr. Aikens at his deposition whether it was true that "a negative first lens element would not perform similarly to a positive first lens element," he testified that "it depends on the lens, depends on the application, depends on the shape." (Appx5492–5493 (95:21–96:2).)

Mr. Aikens testified that Sekine's invention related to the shape of the first lens element, and that Sekine uses the first surface of that first lens element "to generate all the negative power." (Appx5449 (52:4–24); Appx5491 (94:23–25); Appx5492 (95:5–7).) He explained that in Sekine, the negative surface of that first lens acts "as what would ordinarily be a negative lens in a conventional retrofocus." (Appx5491 (94:7–22).)

He explained that, while "Chung works with a negative front lens and a positive second lens[], which is a fairly conventional retrofocus configuration[,] Sekine uses an interesting thick lens variant on the reverse telephoto." (Appx5492 (95:16–19).) He testified that while Chung's single element with a negative power and Sekine's front surface with a negative power were "different strategies," they were both "based on this concept of a retrofocus." (Appx5493 (96:4–14); *see also*, Appx5494 (97:12–18).)

He testified that when he took the invention of Sekine and applied it to Chung Embodiments 11 and 12, he "was able to open the field of view up to 115 degrees" and that he "was rather pleased with the result." (Appx5449 (52:4–24).)

Notably, Largan did not attempt to refute or otherwise address any of this testimony Motorola's expert provided that disproved the argument that the opposite lens powers mattered. Motorola did not cite this evidence in its Petitioner Reply brief because Largan had waived the issue by not raising it in its Patent Owner Response.

In addition, the ZEMAX modeling evidence that the Board refused to consider further demonstrated the applicability of Sekine's R1/$f$ teachings to Chung's embodiments, notwithstanding any alleged differences. (*Cf.* Appx34 (finding Motorola did not show "that Sekine's teachings are applicable to Chung's [embodiments] despite their different systems").)

## CONCLUSION

The Court should vacate the Board's conclusion that Motorola did not show a motivation to combine Chung Embodiments 11 and 12 with Sekine's R1/$f$ teachings, and remand for further proceedings on both grounds, under a proper obviousness framework.


Respectfully submitted.

/s/ Andrew M. Mason
Andrew M. Mason
Sarah E. Jelsema
John D. Vandenberg
Klarquist Sparkman, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204-2988
(503) 595-5300
andrew.mason@klarquist.com

*Counsel for Appellant
Motorola Mobility LLC*

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE**
**REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with the type-volume limitation of Federal Circuit Rule 32(a) or Federal Circuit Rule 28.1.

  ✓   This brief contains **13,747** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

___   This brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  ✓   This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman, or

___   This brief has been prepared in a monospaced typeface using with [state number of characters per inch and name of type style].

May 28, 2024                                    /s/ Andrew M. Mason
Date                                                  Andrew M. Mason

                                                      *Counsel for Appellant*
                                                      *Motorola Mobility LLC*

# ADDENDUM

Trials@uspto.gov                                                        Paper 54
571-272-7822                                          Entered: January 24, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

MOTOROLA MOBILITY LLC,
Petitioner,

v.

LARGAN PRECISION CO., LTD.,
Patent Owner.

———————————

IPR2022-01210
Patent 9,969,519 B1

———————————

Before JON M. JURGOVAN, NORMAN H. BEAMER, and
NABEEL U. KHAN, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

DECISION
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*
Dismissing Patent Owner's Motion to Amend and Revised Motion to
Amend
*35 U.S.C. § 316(d)*
Dismissing Patent Owner's Motion to Exclude
*37 C.F.R. 42.64(c)*
Granting Patent Owner's Motion to Seal
*37 C.F.R. §§ 42.14, 42.54*

IPR2022-01210
Patent 9,969,519 B1

# I. INTRODUCTION

## A.    Background and Summary

Motorola Mobility LLC ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of all claims 1–27 ("the challenged claims") of U.S. Patent No. 9,696,519 B1 ("the '519 patent," Ex. 1001). Largan Precision Co. Ltd. ("Patent Owner") filed a Preliminary Response (Paper 6). Petitioner filed a Preliminary Reply (Paper 7) and Patent Owner filed a Preliminary Sur-Reply (Paper 8) addressing the issue of real parties-in-interest. After reviewing these submissions, we instituted *inter partes* review (Paper 10).

Following institution, Patent Owner filed a Response (Paper 18 (board and parties only), Paper 19 (public), "PO Resp."), Petitioner filed a Reply (Paper 27), and Patent Owner filed a Sur-Reply (Paper 38). Patent Owner also filed a contingent Motion to Amend (Paper 20, "MTA"), and Petitioner filed Petitioner filed an Opposition to the Motion to Amend (Paper 28, "Opp. to MTA"). We entered Preliminary Guidance (Paper 35, "Prelim. Guid.") for the contingent Motion to Amend.

Following the Preliminary Guidance, Patent Owner filed a contingent Revised Motion to Amend (Paper 37, "Revised MTA"). Petitioner filed an Opposition (Paper 40) to the Revised Motion to Amend, Patent Owner filed a Reply (Paper 43) to Petitioner's Opposition to the Revised Motion to Amend, and Petitioner filed a Sur-Reply (Paper 50) in Opposition to the Revised Motion to Amend.

Patent Owner filed a Motion to Exclude (Paper 45) portions of expert testimony in Exhibits 1003, 2038, and 1045. Petitioner filed an Opposition

IPR2022-01210
Patent 9,969,519 B1

(Paper 47) to the Motion to Exclude, and Patent Owner filed a Reply (Paper 49) to Petitioner's Opposition to the Motion to Exclude.

Patent Owner filed a Motion to Seal portions of its Patent Owner Response and Exhibit 2044. Paper 17.

Petitioner and Patent Owner requested oral argument (Papers 41, 42). A hearing was held on November 28, 2023 and the transcript (Paper 53, "Tr.") has been entered in the record.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). Having reviewed the complete trial record, we determine that Petitioner has not shown, by a preponderance of the evidence, that the challenged claims are unpatentable.

B.   *Related Matters*

The parties identify the following pending matters as involving the '519 patent:

- *Largan Precision Co., Ltd. v. Motorola Mobility LLC*, Case No. 4:21-cv-09138 (N.D. Cal.).

- *Motorola Mobility LLC v. Largan Precision Co., Ltd.,* IPR2022-01022, regarding U.S. Pat. No. 8,514,499

- *Motorola Mobility LLC v. Largan Precision Co., Ltd.*, IPR2022-01023, regarding U.S. Pat. No. 8,310,767

- *Motorola Mobility LLC v. Largan Precision Co., Ltd.*, IPR2022-01156, regarding U.S. Pat. No. 9,784,948

- *Motorola Mobility LLC v. Largan Precision Co., Ltd.*, IPR2022-01170, regarding U.S. Pat. No. 10,209,487 (parent of U.S. Pat. No. 10,564,397)

IPR2022-01210
Patent 9,969,519 B1

- *Motorola Mobility LLC v. Largan Precision Co., Ltd.*, IPR2022-01172, regarding U.S. Pat. No. 10,564,397 (continuation of U.S. Pat. No. 10,209,487)
- U.S. Patent Application No. 17/511,732
- U.S. Patent No. 10,247,911
- U.S. Patent No. 10,705,316
- U.S. Patent No. 11,187,873

Pet. ix; Paper 3, 2; Paper 15, 1–2.

   C. *Real Parties-in-Interest*

   Petitioner identifies itself as the sole real party-in-interest, and notes that Motorola Mobility Holdings, LLC owns 100% of Petitioner's stock and is, indirectly, a wholly-owned subsidiary of Lenovo Group Limited.  Pet. ix.  Patent Owner identifies itself as the sole real party-in-interest.  Paper 3, 2.

   D. *Overview of the '519 Patent (Ex. 1001)*

   The '519 patent, titled "Imaging Optical Lens Assembly, Image Capturing Apparatus and Electronic Device," relates to an imaging optical lens assembly having a total of five lens elements.  Ex. 1001, code (54), code (57).  As background, the '519 patent states that there is a trend in using "photographing modules" in various intelligent products, including mobile phones, tablet computers, optical recognition devices, rear view cameras, and other devices, and that there is an increasing demand for lens systems with high image quality and specifications.  *Id.* at 1:19–30.  The '519 patent further explains "there is a trend in the market towards miniaturized photographing modules featuring wide angles of view" that would be applicable to the mentioned devices.  *Id.* at 1:31–36.  The '519 patent further explains that conventional lens assemblies usually require lens

IPR2022-01210
Patent 9,969,519 B1

elements of large size to capture an image of a larger area, but this increases total track length of the assembly and makes it difficult to reduce the device's size. *Id.* at 1:36–42. Viewed conversely, the strict size requirement of the lens module limits its field of view. *Id.* at 1:42–44.

To address this need, the '519 patent describes an imaging optical lens assembly with five lens elements having specific characteristics and properties. *Id.* at 1:51–2:9. Figure 1A of the '519 patent, reproduced below, illustrates one embodiment of the '519 patent's optical lens assembly.



**Fig. 1A**

Figure 1A shows an image capturing apparatus. *Id.* at 8:27–29. The apparatus includes, from object side to image side, a first (110), second

IPR2022-01210
Patent 9,969,519 B1

(120), third (130), fourth (140), and fifth (150) lens elements with object side and image side surfaces. *Id.* at 8:33–39. The apparatus further comprises a stop 100 and an image sensor 180 where image plane 170 is located. *Id.*

The first lens element 110 has negative refractive power and an object-side surface 111 that is concave in a paraxial region thereof, and an image-side surface 112 that is concave in a paraxial region thereof, which are both aspheric. *Id.* at 8:40–43. At least one convex shape is in an off-axial region on the object-side surface 111. *Id.* at 8:43–46. The first lens element 111 is made of plastic material.

The second lens element 120 with positive refractive power with an object-side surface 121 that is convex in a paraxial region thereof and an image-side surface 122 that is convex in a paraxial region thereof, which are both aspheric. *Id.* at 8:47–50. The second lens element 120 is made of plastic material. *Id.* at 8:51.

The third lens element 130 has a negative refractive power and has an object-side surface 131 that is convex in a paraxial region thereof and an image-side surface 132 that is concave in a paraxial region thereof, which are both aspheric. *Id.* at 8:52–55. The third lens element 130 is made of plastic material. *Id.* at 8:55–56.

The fourth lens element 140 has a positive refractive power with an object-side surface 141 that is convex in a paraxial region thereof and an image-side surface 142 that is convex in a paraxial region. *Id.* at 8:57–60. The surfaces 141, 142 are both aspheric. *Id.* at 8:59. The fourth lens element 140 is made of plastic material. *Id.* at 8:60.

IPR2022-01210
Patent 9,969,519 B1

The fifth lens element 150 has a negative refractive power and has an object-side surface 151 that is convex in a paraxial region thereof and an image-side surface 152 that is concave in a paraxial region thereof. *Id.* at 8:61–64. Both surfaces 151 and 152 are aspheric, and the image-side surface 11 has at least one convex shape in an off-axial region. *Id.* at 8:64–66. The fifth lens element 150 is made of plastic material. *Id.* at 8:66–67.

The '519 patent also places certain conditions on the apparatus's elements. For example, claim 1 provides the following conditions:

|R4/R3|<1.0;

*f*5/*f*3<1.0;

-10.0<R1/*f*<0

where R1 is a curvature radius of the object-side surface of the first lens element, R3 is a curvature radius of an object-side surface of the second lens element, R4 is a curvature radius of an image-side surface of the second lens element, *f* is a focal length of the imaging optical lens assembly, *f*3 is a focal length of the third lens element, *f*5 is a focal length of the fifth lens element. *Id.* at 33:16–28, 1:63–2:9.

The '519 patent includes another embodiment (claim 14) with the following conditions.

|R4/R3|<2.0;

*f*1/*f*3<2.0;

0.15<*Yc*11/*Yc*52<1.20

where *f*1 is a focal length of the first lens element, Yc11 is a vertical distance between an off-axial critical point on the object-side surface of the first lens

IPR2022-01210
Patent 9,969,519 B1

element and an optical axis, Yc52 is a vertical distance between an off-axial critical point on the image-side surface of the fifth lens element and the optical axis. *Id.* at 34:49–65, 2:23–37.

The '519 patent includes a further embodiment (claim 23) with the following conditions:

|R4/R3|<4.0;

*f*1/*f*3<5.0.

*Id.* at 36:6–15, 2:54–63.

E.   *Illustrative Claim*

Of the challenged claims, only claims 1, 14, and 23 are independent. Claim 1 is representative and is reproduced below with limitation identifiers in brackets corresponding to claim analysis headings in the Petition. *See, e.g.*, Pet. 23–31.

> [1.1] An imaging optical lens assembly, comprising, in order from an object side to an image side:
> [1.2] a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof;
> [1.3] a second lens element having positive refractive power;
> [1.4] a third lens element having negative refractive power;
> [1.5] a fourth lens element having positive refractive power; and
> [1.6] a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface;
> [1.7] wherein the imaging optical lens assembly has a total of five lens elements;

IPR2022-01210
Patent 9,969,519 B1

[1.8] and wherein a curvature radius of the object-side surface of the first lens element is Rl, a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the imaging optical lens assembly is f, a focal length of the third lens element is f3, a focal length of the fifth lens element is f5, and the following conditions are satisfied:

$|R4/R3|<1.0;$

$f5/f3<1.0;$

$-10.0<R1/f<0.$

Ex. 1001, 33:2–28.

F.    Evidence

The Petition relies on the following references:

| Reference | Exhibit No. |
|---|---|
| US 2015/0098137 Al; filed August 15, 2014; published April 9, 2015; ("Chung"). | 1004 |
| US 2013/0182339 A1; filed January 9, 2013; published July 18, 2013; ("Sekine") | 1005 |

Petitioner also relies on the Declarations of David Aikens (Ex. 1003; Ex. 1045; Ex. 2047; Ex. 1050) and Dr. Tom Milster (Ex. 2053) in support of its Petition. Patent Owner relies on the Declarations of Julie L. Bentley, Ph.D. (Ex. 2001; Ex. 2046) in support of its Response. The parties rely on other exhibits as noted below.

G.    Asserted Grounds of Unpatentability

Petitioner asserts that the challenged claims would have been unpatentable on the following grounds:

IPR2022-01210
Patent 9,969,519 B1

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–18, 20–27 | 103 | Chung (Embodiment 11), Sekine |
| 1–7, 9–27 | 103 | Chung (Embodiment 12), Sekine |

Pet. 2.

## II.    ANALYSIS OF ASSERTED GROUNDS

### A.    Principles of Law

Petitioner bears the burden of persuasion to prove unpatentability of the claims challenged in the Petition, and that burden never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) any objective evidence of obviousness or non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

---

[1] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. §§ 102 and 103 and became effective March 16, 2013. Because the '519 patent was filed after this date, the AIA versions of 35 U.S.C. §§ 102 and 103 apply.

IPR2022-01210
Patent 9,969,519 B1

B.    *Level of Ordinary Skill in the Art*

In determining the level of ordinary skill in the art, various factors may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (internal quotation marks and citation omitted).

Petitioner contends that a person of ordinary skill in the art ("POSITA") "would include someone who had . . . (i) a Bachelor's degree in Physics, Optical Sciences, or equivalent training, as well as (ii) approximately three years of experience in designing multi-lens optical systems." Pet. 7. "Lack of work experience could have been offset by additional education, and vice versa." *Id.* In addition, Petitioner argues that a POSITA would have had experience in analyzing, tolerancing, adjusting, and optimizing multi-lens systems for manufacturing, and would have been familiar with the specifications of lens systems and their fabrication. *Id.*. According to Petitioner, a "POSITA would have understood the fundamentals of optical aberration theory, and understood and used standard techniques for making lenses cheaper and more effective, especially for lens systems used in mobile devices." *Id.*. In addition, Petitioner argues, "a POSITA would have known how to use lens design software such as Code V, Oslo, and ZEMAX, and would have taken a lens design course or had equivalent training." *Id.* at 7–8. "A POSITA would have regularly used such software to create new lens designs, including through optimizing pre-existing lens designs to reach a desired design." *Id.* at 8. Petitioner argues a "POSITA would have followed and regularly consulted books, articles, and

IPR2022-01210
Patent 9,969,519 B1

other publications by the Society of Photo-Optical Instrumentation Engineers ("SPIE")." *Id.* (citing Ex. 1003 ¶¶ 33–37). "The knowledge and skill of a POSITA is reflected in numerous prior art textbooks and publications discussed herein." *Id.* (citing Ex. 1003 ¶¶ 39–45).

Patent Owner's declarant, Dr. Bentley, testifies that "a [POSITA] around the time of the invention would have had a bachelor's degree in physics or optics, and at least three years of experience in the field of optical design, or its equivalent experience." Ex. 2001 ¶ 28.

For purposes of this Decision, we adopt Petitioner's proposed level of ordinary skill. We note, however, that the two proposed levels of ordinary skill are similar and our analysis and conclusions would not change under Patent Owner's proposed level of ordinary skill.

C.     *Claim Construction*

We apply the same claim construction standard used in district court actions under 35 U.S.C. § 282(b), namely that articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). *See* 37 C.F.R. § 42.100(b) (2020).

In applying that standard, claim terms generally are given their ordinary and customary meaning as would have been understood by a POSITA at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Only claim terms in controversy require express

IPR2022-01210
Patent 9,969,519 B1

construction, "and only to the extent necessary to resolve the controversy." *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017); *see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

Petitioner does not propose a specific construction for any terms and instead argues that "no claim terms require specific construction to resolve the unpatentability issues presented" in their Petition. Pet. 12. Patent Owner also does not propose any specific constructions in their Response, nor does their declarant, Dr. Bentley.

We determine that no explicit constructions are required to resolve the dispute between the parties.

### D.    Obviousness over Chung Embodiment 11 and Sekine

Petitioner contends that claims 1–18 and 20–27 would have been obvious over Chung Embodiment 11 and Sekine. Pet. 13–71. Below we provide a brief overview of Chung Embodiment 11 and Sekine and then analyze Petitioner's contentions in light of Patent Owner's arguments.

#### 1.    Overview of Chung Embodiment 11

Chung is titled "Wide-Angle Image Taking Lens System," and it discloses several embodiments of five-lens systems satisfying various conditions. Ex. 1004, codes (54), (57). Chung's Embodiment 11 is depicted below in Figure 11A.

IPR2022-01210
Patent 9,969,519 B1



FIG.11A

Chung's Figure 11A shows, from object side to image side, first lens element 1110, second lens element 1120, third lens element 1130, fourth lens element 1140, fifth lens element 1150, an IR cut filter 1160, and an image plane 1170. *Id.* ¶ 179. Aperture stop 1100 is between the first and second lens elements. *Id.*

The first lens element 1110 with a negative refractive power has an object-side surface 1111 that is concave near the optical axis 1190 and an image-side surface 1112 that is convex near the optical axis 1190. *Id.* ¶ 180.

The second lens element 1120 with a positive refractive power has an object-side surface 1121 that is convex near optical axis 1190 and an image-side surface 1122 that is convex near the optical axis. *Id.* ¶ 181.

13

IPR2022-01210
Patent 9,969,519 B1

The third lens element 1130 with a negative refractive power has an object-side surface 1131 that is convex near the optical axis 1190 and an image-side surface 1132 that is concave near optical axis 1190. *Id.* ¶ 182.

The fourth lens element 1140 with a positive refractive power has an object-side surface 1141 that is concave near optical axis 1190 and an image-side surface 1142 that is convex near the optical axis 1190. *Id.* ¶ 183.

The fifth lens element 1150 has a negative refractive power and an object-side surface 1151 that is convex near the optical axis 1190 and an imade-side surface 1152 that is concave near the optical axis 1190. The fifth lens element 1150 has more than one inflection point formed on the surfaces 1151, 1152. *Id.* ¶ 184.

The first through fifth lens elements are made of plastic material, and all surfaces of the lens elements are aspheric. *Id.* ¶¶ 180–184.

Further properties and characteristics of Chung's Embodiment 11 are shown below in Table 21:

IPR2022-01210
Patent 9,969,519 B1

TABLE 21

| | | | | | | | Focal |
|---|---|---|---|---|---|---|---|
| \(Embodiment 11\)<br>f\(focal length\) = 2.574 mm, Fno = 2.4, HFOV = 47.97 deg. | | | | | | | |
| Surface | | Curvature Radius | Thickness | Material | index | Abbe # | length |
| 0 | Object | Plane | Infinity | | | | |
| 1 | Lens 1 | −39.1130(ASP) | 0.24 | Plastic | 1.515 | 57.0 | −133.92 |
| 2 | | −90.6338(ASP) | 0.29 | | | | |
| 3 | Aperture stop | Plane | 0.06 | | | | |
| 4 | Lens 2 | 7.6644(ASP) | 0.47 | Plastic | 1.544 | 56.5 | 3.97 |
| 5 | | −2.9441(ASP) | 0.22 | | | | |
| 6 | Lens 3 | 90.0000(ASP) | 0.25 | Plastic | 1.650 | 21.4 | −12.55 |
| 7 | | 7.4734(ASP) | 0.52 | | | | |
| 8 | Lens 4 | −2.8942(ASP) | 0.98 | Plastic | 1.533 | 55.7 | 1.39 |
| 9 | | −0.6603(ASP) | 0.09 | | | | |
| 10 | Lens 5 | 1.3075(ASP) | 0.35 | Plastic | 1.650 | 21.4 | −1.62 |
| 11 | | 0.5204(ASP) | 0.49 | | | | |
| 12 | IR-filter | Plane | 0.21 | Glass | 1.517 | 64.2 | |
| 13 | | Plane | 0.66 | | | | |
| 14 | Image | Plane | | | | | |

For example, Table 1 above shows values for curvature radii of the lens elements' surfaces, focal lengths for the lens elements and overall system, lens material, refractive index, Abbe number, and half field of view (HFOV) for the system. *Id.* ¶ 186.

## 2. *Overview of Sekine*

Sekine is titled "Image Pickup Lens" and describes a wide-angle pickup lens having small F-value, high resolution, and small distortion. Ex. 1005, codes (54), (57). The image pickup lens has, in order from object side to image side, a first lens having a positive refractive power with a concave surface facing the object side; an aperture stop; a second lens having a negative refractive power with a concave surface facing the image side; a third lens having a positive refractive power; a fourth lens having a positive refractive power with a concave surface facing the object side; and a

IPR2022-01210
Patent 9,969,519 B1

fifth lens having a negative refractive power with a concave surface facing the image side. *Id.* ¶ 9.

Sekine sets forth various conditions to be satisfied in the design of its wide-angle pickup lens. These conditions include R3/R4 and R1/*f* criteria. *Id.* ¶¶ 11–14, 16–18, 49, 55, 61, 79, 85 (Tables 1, 2, 5, 6).

> 3. *Combination of Chung Embodiment 11 and Sekine*

We now address Petitioner's reasons for combining Chung with Sekine, and Patent Owner's arguments against the combination.

> a) *Petitioner's Contentions*

Petitioner contends that a POSITA implementing Chung would have been motivated to incorporate Sekine's teachings on maintaining image quality at wider fields of view. Pet. 15–22. Specifically, Petitioner notes that the references have various similarities, including that both are directed to wide-angle systems that provide high-quality images, have small five-lens assemblies with aspheric plastic lenses, for use in mobile devices. *Id.* at 15–16 (citing Ex. 1004 ¶¶ 3, 5, 8, 201; Ex. 1005 ¶¶ 3–8, 53, 91, 94).

Petitioner contends that Chung and Sekine teach systems with a first lens having an object-side surface that is concave in the paraxial region. *Id.* at 16 (citing Ex. 1004 ¶¶ 180, 190; Ex. 1005 ¶ 10). Chung explains that its first lens causes aberrations to be corrected with the second lens. *Id.* (citing Ex. 1004 ¶¶ 15, 32). According to Petitioner, Sekine explains how to correct aberrations with its second lens, and further teaches reducing aberrations by balancing the concavity of the first lens against the system focal length, i.e.,

IPR2022-01210
Patent 9,969,519 B1

R1/f.[2]  *Id.* (citing Ex. 1005 ¶¶ 13, 18).  Petitioner contends that Chung and Sekine thus complement each other.  *Id.* (citing Ex. 1003 ¶¶ 104–105).

Petitioner contends that Chung and other references recognize the need for high image quality at wide angles (i.e., higher FOV).  *Id.* (citing Ex. 1004 ¶¶ 3, 5, 7; Ex. 1019, 20; Ex. 1007 ¶¶ 55, 63; Ex. 1003 ¶ 106).  Chung identifies the popularity of self-portraits or "selfies" as a reason for increased demand.  *Id.* (citing Ex. 1004 ¶ 5).  Petitioner contends that "[o]ther background prior art publications reflect the known benefits of lenses with wider angles—including for cell-phone selfies and video chart applications—thus confirming that a POSITA would have been motivated to implement the Chung designs at the higher end of the disclosed FOV, i.e., FOV=115 degrees."  *Id.* at 17 (citing Ex. 1008, 5–6 (noting that wider angle lenses "capture more people and background than a regular narrow angle module" and that "benefits include additional background information," then providing examples of selfie and video as areas where wide angle lenses provide these benefits); Ex. 1003 ¶ 106).

Petitioner contends that Chung gives a preferred FOV of "86<FOV<115."  *Id.* (citing Ex. 1004 ¶¶ 20, 33; Ex. 1003 ¶ 106).  Petitioner argues that, given the demands for camera systems with a higher FOV, a POSITA would have been motivated to push Chung's embodiments to its higher end FOV of 115 degrees, and would have sought out teachings on maintaining image quality while increasing FOV.  *Id.*

---

[2] The papers and exhibits in the record variously refer to this ratio using different combinations of capital and small case letters and italics.  We refer to this ratio consistently in the remainder of this decision as "R1/f."

17

IPR2022-01210
Patent 9,969,519 B1

Petitioner contends that "[i]n doing so, a POSITA would have naturally encountered Sekine, which teaches improving image quality at wide viewing angles." *Id.* (citing Ex. 1005 ¶¶ 3–8, 13–14, 49; Ex. 1003 ¶ 107). Petitioner argues that Sekine reinforces the importance of wider angles, and explains how to reduce aberrations in wide-angle systems using the ratio "R1/f" which is the ratio of curvature of the "curvature radius of the object side surface of first lens" to the "focal length of overall optical system." *Id.* (citing Ex. 1005 ¶¶ 6–13, 49). Petitioner contends that a POSITA would have been motivated to apply Sekine's teachings on R1/f to Chung Embodiment 11, in order to reduce aberrations. *Id.* at 17–18 (citing Ex. 1003 ¶ 107).

Petitioner argues that "Sekine discloses that [R1/f] within -70.0<[R1/f]<0 allows for a wide angle while maintaining image quality." *Id.* at 18 (citing Ex. 1005 ¶¶ 11–13). Petitioner contends that Sekine gives an upper limit of zero because otherwise "the object side of the first lens becomes a convex surface, so that it is disadvantageous in widening of the angle." *Id.* Petitioner asserts that "Sekine correlates a lower (i.e., more negative) [R1/f] with a wider angle—but warns that going too negative causes aberrations." *Id.* (citing Ex. 1005 ¶ 13 ("if the [R1/f] value is below the lower limit [-70.0], it is advantageous in widening of the angle, however, the chromatic aberration at high image height deteriorates"); Ex. 1003 ¶ 108). Petitioner contends "a POSITA would have thus understood that Sekine describes a tradeoff with [R1/f]: a value closer to -70.0 widens the angle but undesirably affects aberrations, compared to an [R1/f] closer to zero." *Id.* Petitioner contends that a POSITA would know that a very small R1/f of -0.1 or -0.2 would result in a first lens that was too fast to be used

IPR2022-01210
Patent 9,969,519 B1

with a wide field. *Id.* (citing Ex. 1003 ¶ 108; Ex. 1010, 402). According to Petitioner, Sekine explains that an upper limit of -3.0 such that -70<R1/f<-3.0 would permit shortening the total track length of the system. *Id.* (citing Ex. 1005 ¶ 15). Petitioner contends a POSITA would have been motivated to start with an R1/f at or near -3.0, and then reduce that value if possible to balance between aberration correction with shorter track length. *Id.* at 18–19 (citing Ex. 1003 ¶ 108).

Petitioner contends that a "POSITA would have appreciated that two simple design techniques were available for reaching R1/f near -3.0: (1) set the radius of curvature to a smaller value; or (2) bend the lens so its R1 nears -3*f. *Id.* at 19 (citing Ex. 1010, 50 ("useful to first vary only the curvatures"), 47 ("Bend an element. Change its shape but maintain its power."), 607 (bending definition); Ex. 1019, 1 ("The lens parameters available to the designer for change . . . include the radii of curvature of the surfaces."), 21, 80 ("One of the most powerful tools available to the lens designer is bending" (emphasis omitted)), 182; Ex. 1003 ¶ 109).

Petitioner contends "a POSITA would also be mindful of the need to minimize the power of the first lens while obtaining the wider field. *Id.* (citing Ex. 1003 ¶ 110). According to Petitioner, Smith explains that, in a wide-angle retrofocus system with a negative first lens and positive second lens, increasing the spacing between the negative and positive lenses improves performance by decreasing the required power of especially the front negative lens. *Id.* (citing Ex. 1010, 397 ("a large airspace will reduce the power of the components, especially of the front component"); Ex. 1003 ¶ 110). Petitioner contends that "increasing the field of view requires both decreasing the magnitude of [R1] while balancing this by increasing the

19

IPR2022-01210
Patent 9,969,519 B1

spacing between lenses 1 and 2." *Id.* Petitioner further asserts that a "POSITA would implement an [R1/f] ratio of -3 (as taught by Sekine), increase the spacing between lenses 1 and 2, and then reoptimize the lens with a wider field of view." *Id.* Petitioner contends, in order to recover the lost track length, the POSITA would perform routine optimizations to reduce the other lens spacings as needed to maintain total track length. *Id.* at 19–20. Petitioner then contends that a "POSITA would then turn to the lens design program to find the balance between these competing objectives—a short TTL, a wide field of view, and improved image quality—and optimize [R1/f] to an appropriate value." *Id.* at 20. In doing so, Petitioner contends that "a POSITA would have had a reasonable expectation of success in achieving an FOV of roughly 115 degrees for wide viewing angle, with an [R1/f] near -3 or below for reduced aberrations and better performance." *Id.* Petitioner contends that ZEMAX modeling confirms that "a POSITA would have had a reasonable expectation of success and required no undue experimentation in applying Sekine's teachings to optimize Chung Embodiment 11." *Id.* (citing Ex. 1003 ¶ 111).

> b)    *Patent Owner's Contentions*

Patent Owner argues that the similarities that Petitioner notes between Chung and Sekine (both are wide-angle systems with a first lens having an object-side surface that is concave in the paraxial region, which concavity can cause aberrations) "suggests at best that the two references are *analogous* art, not that a POSITA would have been motivated to combine them." PO Resp. 24–25 (emphasis Patent Owner's).

Patent Owner further argues that the evidence does not support a finding that a POSITA would have used Sekine to maintain Chung's image

IPR2022-01210
Patent 9,969,519 B1

quality while increasing field of view. *Id.* at 25–28. Specifically, in response to Petitioner's contention that a POSITA would have been motivated to push Chung's embodiments toward the higher end FOV of 115, Patent Owner argues that Chung already taught how to obtain an FOV of 115, discloses and claims the range 86<FOV<115, discusses the desirability of that range, and teaches three different ways to widen FOV. *Id.* (citing Ex. 1004, claims 8 and 18, ¶¶ 11, 18–20, 33). Patent Owner argues that a "fourth way would have been a superfluity that a POSITA would not have sought." *Id.* (citing *In re NTP*, 654 F.3d 1279, 1298–99 (Fed. Cir. 2011) (improper hindsight demonstrated by choice to add a feature that would render existing feature superfluous); Ex. 2046 ¶ 30).

Patent Owner next argues that Chung criticizes Sekine's disclosed FOVs as too small. *Id.* at 25. Patent Owner asserts that Sekine's six embodiments range from 72.02° to 85.66°. *See* Ex. 1005 ¶ 92. Patent Owner argues that "Chung expressly criticizes prior art lens systems 'with a maximal field of view (FOV) that is smaller than 85 degrees' as presenting 'problems' that '[t]he present invention has been made to solve.'" PO Resp. 26 (citing Ex. 1004 ¶¶ 5–6). Patent Owner asserts that this would have dissuaded a POSITA from looking to Sekine if the motivation was to achieve FOV of 115. *Id.* (citing Ex. 2046 ¶ 31).

Patent Owner also argues that Sekine seeks to widen FOV but lacks any suggestion of achieving a FOV beyond the 85.66° ceiling disclosed in Sekine. *Id.* (citing § II.B.1). Patent Owner asserts that this stands in contrast to Chung, which teaches the desirability of a range that exceeds Sekine's embodiments, claims that range, and provides instruction in how to achieve widened FOV. *Id.*

IPR2022-01210
Patent 9,969,519 B1

Patent Owner next argues that "Sekine does not actually teach any kind of predictable relationship between [Rr1/f] and FOV." *Id.* (citing § II.B.5). Patent Owner states that Sekine discusses manipulating R1/f between -70 and 0, but states that it is advantageous to widening the angle of view if the value is below the lower limit of -70. *Id.* (citing Ex. 1005 ¶ 13). Patent Owner argues that Sekine's teachings would have led a POSITA to make R1/f more negative, not less, to increase the FOV, and a POSITA would not have tried R1/f close to -3.0 but closer to -70.0 without going beyond that point where Sekine indicates that aberrations lie. *Id.* (citing Ex. 2046 ¶ 33). Patent Owner contends that while Mr. Aikens interprets Sekine as teaching "a value closer to -70.0 widens the angle," he implements an R1/f close to -3 in his optimized designs despite his alleged motivation of widening the angle, which is against Sekine's teaching. *Id.* at 27 (citing Ex. 1003 ¶ 108).

Patent Owner further argues that "Sekine's refinement of the [R1/f] range from -70<[R1/f]<0 to -70<[R1/f]<-3.0 is not for correcting aberration" but for "shortening the total (mechanical) track length by reducing the amount of space the object side surface requires." *Id.* (citing § II.B.4). Patent Owner asserts that Sekine teaches that "if the value is below the lower limit [of -70] . . . the chromatic aberration at high image heights deteriorates." *Id.* (citing Ex. 1005 ¶ 13). According to Patent Owner, Mr. Aikens noted that Chung's Embodiment 11 and Embodiment 12 already have R1/f values of -15.195 and -25.641, that are not beyond -70.0, and since Chung's image quality is acceptable, there is no need for further correction of aberrations. *Id.* (citing Ex. 2046 ¶ 34).

IPR2022-01210
Patent 9,969,519 B1

Patent Owner further argues that "there is no evidence that images from the combined Chung and Sekine systems would have been of a quality equal to or higher than those of either system standing alone." *Id.* at 28 (citing Ex. 2046 ¶ 35). According to Patent Owner, "Mr. Aikens testified emphatically that he did not evaluate any aberration data either before or after 'optimizing' Chung's [Embodiment 11] and [Embodiment 12], because he was not interested in achieving a finished product, only a preliminary design." *Id.* (citing Ex. 2040, 89:8–92:4, 208:14–210:3). Patent Owner asserts that "there is, in other words, no evidence to suggest that a POSITA would have been motivated to use Sekine to maintain or improve Chung's image quality." *Id.*

Patent Owner argues that the evidence does not support a finding that a POSITA would have used Sekine to correct aberrations or shorten track length that is found in Chung. *Id.* at 28–32. Patent Owner argues that Petitioner's expert testified that "a POSITA would have been motivated to apply Sekine's teachings on Rl/f to Chung Embodiment 11, in order to reduce aberrations" but there was "nothing to suggest that Chung was suffering from significant aberrations." *Id.* at 28–29 (citing § II.A.3; Ex. 1004, Figs. 1B–12B; Ex. 1003 ¶ 107). Patent Owner argues that the aberration diagrams in Chung show that the lenses are well corrected (which Mr. Aikens allegedly does not refute); that Chung teaches five ways to reduce aberrations (which Mr. Aikens allegedly ignored and did not try); and that a sixth way of reducing aberrations taken from Sekine would have been superfluous and not something a POSITA would have been motivated to do. *Id.* at 29 (citing Ex. 2046 ¶ 38; *In re NTP*, 654 F.3d at 1299).

IPR2022-01210
Patent 9,969,519 B1

According to Patent Owner, Mr. Aikens testified that "a POSITA would thus have been motivated to use an [R1/f] at or near -3.0 for a balance between aberration correction and shorter track length." *Id.* (citing Ex. 1003 ¶ 109). Patent Owner asserts that Sekine attempted to shorten the "total track length," not the "TTL," by reducing the amount of space required to house the object-side surface of the first lens. *Id.* (citing §II.B.4). Patent Owner presents the following figure to explain the difference between "total track length" and "TTL."



*Id.* at 19 (citing Ex. 1005 ¶ 57; Ex. 2046 ¶ 23). In the figure above, Patent Owner states that "TTL" is used in its traditional sense, i.e., to refer the distance on the optical axis X from the object side surface of the first lens Ll to the image plane IM," which is highlighted in red in the figure above. Patent Owner asserts that Sekine uses "total track length" to refer to the distance highlighted in blue in the figure above. *Id.* at 20. According to Patent Owner, Sekine shortens total track length in order to "decrease the

24

IPR2022-01210
Patent 9,969,519 B1

SAG amount" of r1 and "shortens the total track length, in the case of including the circumferential edge portion of an effective diameter of the first lens." *Id.* at 29. "SAG" is a measure of the length of a lens, as shown in the figure below. Ex. 2046 ¶¶ 39–40.



The above figure from Dr. Bentley's supplemental declaration (PO Resp. 31; Ex. 2046 ¶ 40) shows that as R1/f increases from -3.23 for the top lens, to -0.74 for the middle lens, and -0.3 for the bottom lens, the SAG increases due to extension of the circumferential edges of the lenses relative to their central points at which the object-side surfaces meet their optical axes. Thus, the higher the SAG, the greater the length and the space occupied by

IPR2022-01210
Patent 9,969,519 B1

the lens, and conversely, the lower the SAG, the lesser the length and space occupied by the lens.

Patent Owner argues that the Sekine teaches that if R1/f is below -3.0, then this shortens total track length. PO Resp. 29–30. However, Patent Owner argues, Chung has no need for this improvement because the circumferential region of its first lens bends away from the object. According to Patent Owner, a "POSITA would have had no reason to combine Sekine with Chung to obtain the SAG benefits Sekine describes" and "Sekine provides a solution for a problem that does not exist in Chung." *Id.* at 31 (citing Ex. 2046 ¶ 41).

Patent Owner further argues that "Sekine has a central TTL that is more than two times that of Chung," and that "POSITA would not have been inspired by Sekine's extremely long 10mm TTL if the goal was to shorten or maintain Chung's sub-5mm TTL." *Id.* at 32 (citing Ex. 2046 ¶ 42).

Patent Owner further argues that a POSITA would have considered Sekine for all that it discloses, including that a negative R1 on the concave object-side surface of the first lens makes it "possible to shorten the length from the first lens to the stop." *Id.* (citing § II.B.4; Ex. 1005 ¶ 10; *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019)). According to Patent Owner, Mr. Aikens did the opposite and increased the distance T12 between the first and second lenses in his optimizations, and increased the power of the first lens element despite testifying that increasing the spacing between the negative and positive lenses improves performance by decreasing the required power of especially the front negative lens. *Id.* (citing Ex. 1003 ¶ 111; Ex. 2040, 136:2–16, 157:18–

IPR2022-01210
Patent 9,969,519 B1

158:8, 225:4–13; Ex. 2046 ¶ 43).  Patent Owner asserts that the only explanation for Mr. Aikens's decisions is hindsight.  *Id.*

Patent Owner further argues that Mr. Aikens's testimony is not proof of what a POSITA would have done, but merely what Mr. Aikens actually did, and that his explanations indicate hindsight bias.  *Id.* at 33–37. Specifically, Patent Owner argues that "there is the clear divergence between Chung and Sekine, especially given the alleged motivations of widening Chung's FOV while maintaining image quality, and balancing aberration reduction with short TTL."  *Id.* at 33.  Compared to Sekine, Patent Owner asserts, "Chung has a much wider FOV, much shorter TTL, and a much faster f-number."  *Id.*  Patent Owner argues that there is "no rational explanation for using Sekine to widen Chung, other than the '519 patent's recitation of a negative [R1/f] value in each of its claims" which "can only be found in Sekine, which is why Mr. Aikens was focused on it."  *Id.*

Patent Owner argues that Mr. Aikens' fixated "on narrow parts of both Chung and Sekine, to the exclusion of the other parts that would have discouraged a POSITA from pursuing the combination, such as Chung's criticism of Sekine's FOV range as too small and Sekine's TTL as too long." *Id.*  Specifically, Patent Owner asserts that Mr. Aikens's "focused singularly on Chung's [Embodiment 11] and [Embodiment 12], and ignored Chung's teachings on widening FOV and correcting aberration."  *Id.* (citing Ex. 2040, 46:25–48:21, 49:11–51:6, 52:25–53:15).  Patent Owner argues that Mr. Aikens could only characterize his motivation to widen FOV to a value that Chung already disclosed as an "academic exercise."  *Id.* at 33–34 (citing Ex. 2040, 79:3–23).

IPR2022-01210
Patent 9,969,519 B1

Patent Owner further criticizes Mr. Aikens's "odd choice" to increase the T12 distance between the first two lenses when Sekine contradicts this change.  *Id.* at 34 (citing Ex. 1003 ¶ 111; Ex. 1005 ¶ 10).  Patent Owner asserts that Sekine teaches to shorten the distance between the first lens and the stop on the object side of the second lens, but Mr. Aikens increased T12 without explanation other than hindsight.  *Id.* (citing Ex. 2040, 146:6–147:7).

Patent Owner asserts that Mr. Aikens testified that he elected to increase the optical power for the first lenses in the Chung Embodiment 11 and Embodiment 12 optimizations.  *Id.*  According to Patent Owner, this conflicts with Mr. Aikens declaration concerning Smith's teaching to bend an element to change its shape but maintain its power.  *Id.* at 34 n.9 (citing Ex. 1003 ¶ 135).  In addition, Patent Owner notes that Mr. Aikens stated "increasing the spacing between the negative and positive lenses improves performance by decreasing the required power of especially the front negative lens."  *Id.* at 35 (emphasis omitted); Ex. 1003 ¶ 111.  Patent Owner argues that Mr. Aikens increased both T12 and the power of the first lens, and the only explanation is hindsight.  PO Resp. 35.

Patent Owner further argues that Mr. Aikens used hindsight in his optimization of Chung Embodiment 12 resulting in R1/f of -2.56 when Sekine discourages a value between 0 and -3.0 as increasing the SAG thickness of R1, thus causing thickening at the circumferential edge of the first lens.  *Id.* (citing Ex. 1003 ¶¶ 109, 233; Ex. 1005 ¶ 15).

Patent Owner also criticizes Mr. Aikens's terminating "both optimizations in the middle, once he reached a point where at least some of the rays converged at the image plane, without regard to the presence of

IPR2022-01210
Patent 9,969,519 B1

aberrations, or an unacceptably large f-number." *Id.* at 35–36 (citing
Ex. 2040, 90:10–13, 90:22–91:22, 187:14–25, 202:20–203:7,
208:18–209:14, 229:3–230:8, 233:13–20). Patent Owner states that the
f-numbers for these intermediate designs are 4.6 and 5.4, and Sekine
criticizes prior art designs have f-numbers over 4.5 as "large" and "not
suitable for obtaining bright image." *Id.* at 36 (citing Ex. 2038 ¶¶ 9, 10;
Ex. 1005 ¶ 7). Patent Owner argues, "[w]ith the benefit of hindsight, it is
easy to stop the optimization process at a point where the 'intermediate'
'preliminary' design meets the requirements of the [c]hallenged [c]laims,
even if those designs feature f-numbers Sekine itself rejected as not 'a
suitable option.'" *Id.* at 36–37 (citing *Intel Corp. v. Qualcomm Inc.*, 21
F.4th 784, 800 (Fed. Cir. 2021)).

Patent Owner argues that "both 'optimizations' perform substantially
worse than Chung alone." *Id.* at 37. Patent Owner asserts that "[t]here is no
conceivable reason why a POSITA would have been motivated to make
Mr. Aikens' proposed optimizations, absent a hindsight desire to create a
"non-final" design reading on the [c]hallenged [c]laims." *Id.* Patent Owner
further argues that "these 'preliminary' designs cannot support a finding of
obviousness as both are unsatisfactory for Chung's intended purpose." *Id.*
(citing *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984)).

    *c)    Analysis*

Dr. Bentley states that five-lens optical systems are defined by many
different interdependent parameters, and the design of optical systems is
highly complex. *Id.* ¶ 34. According to Dr. Bentley, the POSITA first
obtains a set of specifications, for example, supplied by a customer, which
are targets for the lens design process. These specifications include the

f-number, the maximum image height or the related parameter FOV (defined by the image sensor to be used), total track length (TTL) or maximum length of the opto-mechanical assembly, and performance metrics such as modulation transfer function (MTF) (to evaluate resolution), and distortion. *Id.* (citing Ex. 1029, 171).

Dr. Bentley explains that the f-number is set or selected to provide resolution matching the image sensor. *Id.* ¶ 35. A smaller f-number means the optical system is faster, and a larger f-number means the optical system is slower. *Id.* (citing Ex. 1012, 71). If the f-number is too high (i.e., too slow), then the resolution of the optical system is limited by the lens rather than the sensor, a circumstance which the designer seeks to avoid. *Id.*

To meet the specifications issued by the customer (e.g., f-number, FOV, total track length), the designer chooses parameters including the properties of the lens materials (index of refraction, Abbe number (dispersion)), the shape of the optical lenses, the thicknesses of the lens elements, the precise contours of the front (object-facing) and back (image-facing) surfaces of the lenses, the size and location of the aperture stop, and the air spaces between lenses. *Id.* ¶¶ 36–38 (citing Ex. 1029, 173). These parameters define the "prescription" of the optical system. *Id.* ¶ 38 (citing Ex. 1010, 87).

Dr. Bentley further explains that the parameters that can be varied during a computer-aided optimization of a lens system include the following:

> (i) radius of curvature, r, for each lens surface;
>
> (ii) conic coefficient, k, for each aspheric lens surface;
>
> (iii) aspheric coefficients for each aspheric lens surface (typically at

least four coefficients per surface);

(iv) air spaces between each of these components, including the distance to the image sensor;

(v) thickness of each lens element;

(vi) refractive index for each lens element; and

(vii) Abbe number for each lens element.

*Id.* ¶ 39 (citing Ex. 1029, 173–174). Dr. Bentley notes that this leads to a nearly infinite variety of possible combinations of the lens parameters. *Id.* ¶ 40 (citing Ex. 1029, 178). Optimization software such as Code V, Oslo, and Zemax is used to manipulate these parameters to derive a prescription meeting the design specifications. *See, e.g.*, Pet. 7–8. The Petition similarly sets forth the lens design process and it accords with Dr. Bentley's description. *Id.* at 8–11.

Against this background, on the full record, we now consider Petitioner's reasons why a POSITA would combine Chung and Sekine. *Id.* at 15–22; Reply 2–17. Petitioner contends that Chung and Sekine are both small wide-angle lens systems that provide high-quality images with aspheric plastic lenses for use in a mobile device. Pet. 15–16 (citing Ex. 1004 ¶¶ 3, 5, 8, 201; Ex. 1005 ¶¶ 3–8, 53, 91, 94); Reply 2 (citing Ex. 1045 ¶¶ 4–5). Petitioner further argues that Chung and Sekine both have first lenses with an object-side concave in their paraxial regions. Pet. 16 (citing Ex. 1004 ¶¶ 180, 190; Ex. 1005 ¶ 10); Reply 2. Petitioner contends that these similarities were one factor that would have led a POSITA to combine Chung with Sekine. Reply 4–5.

Patent Owner argues that these alleged similarities at best establish that the two references are analogous, and that this is insufficient to establish

IPR2022-01210
Patent 9,969,519 B1

that one of ordinary skill in the art would have combined their teachings in the manner set forth in the claims. PO Resp. 24–25 (citing *Johns Manville Corp. v. Knauf Insulation, Inc.*, IPR2018-00827, Paper 9 at 10 (PTAB Oct. 16, 2018) (informative) (citing *Securus Techs., Inc. v. Global Tel\*Link Corp.*, 701 F. App'x 971, 977 (Fed. Cir. 2017)). Patent Owner argues that it is not enough to show that "a skilled artisan, once presented with the two references, would have understood that they *could* be combined." *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993 (Fed. Cir. 2017) (emphasis altered). According to Patent Owner, "[n]either analogousness nor compatibility can alone supply the 'rational underpinning to support the legal conclusion of obviousness' that the law requires." PO Resp. 24–25 (citing *KSR*, 550 U.S. at 418).

Although Petitioner points to the similarities between Chung and Sekine as supporting the combination, there are significant differences in the systems as well, as Patent Owner explains. Pet. 15–16; PO Resp. 24–25; Reply 2–4; Sur-Reply 1–3. Chung Embodiment 11 and Embodiment 12 each have a negative first lens and a positive second lens. Ex. 2001 ¶¶ 79, 82–83. Conversely, Sekine has a positive first lens and negative second lens. *Id.* ¶ 79. Patent Owner states that Petitioner's expert in another case, Dr. Milster, testified that positive and negative lenses have the opposite effect, and that the use of a negative first lens instead of a positive first lens results in a considerably different system with considerably different performance. *Id.* ¶ 82 (citing Ex. 2053 ¶ 88). Patent Owner argues that, if Dr. Milster's testimony is true, then a POSITA would not have combined Chung Embodiment 11 or Chung Embodiment 12 with Sekine. *Id.* ¶ 83.

IPR2022-01210
Patent 9,969,519 B1

Petitioner does not sufficiently address in this proceeding that Chung Embodiment 11 and Embodiment 12 have negative first lens and positive second lens while Sekine has a positive first lens and a negative second lens, and how this would impact the Sekine teachings that Petitioner proposes to use in Chung. *See* Pet. 15–22. The differences in these systems' performance would have led a POSITA to doubt or at least question that Sekine's teachings would have been useful in Chung even considering their alleged similarities. In any case, Petitioner bears the burden of showing that Sekine's teachings are applicable to Chung's despite their different systems, which Petitioner did not show sufficiently on this record. *Dynamic Drinkware*, 800 F.3d at 1378.

While assuming that Sekine's teachings would apply to Chung despite their different systems, Petitioner contends that Chung has a first lens with a concave object-side surface R1 that generates aberrations and suggests correcting the aberrations with a second lens. Pet. 16 (citing Ex. 1004 ¶¶ 15, 32). Petitioner contends that Sekine teaches how to correct aberrations with a second lens by balancing the concavity of the first lens against the system focal length. *Id.* (citing Ex. 1005 ¶¶ 13, 18).

We agree with Patent Owner that there is insufficient evidence to support that a POSITA would consider Sekine's teachings to improve Chung's image quality, as Petitioner contends. PO Resp. 38 (citing Ex. 2046 ¶ 35); Pet. 15–19; Reply 2–17. Dr. Bentley explains that "Chung has a faster f-number, at 2.4, than Sekine's f-number of 3.0." Ex. 2046 ¶ 35 (citing Ex. 1004 ¶ 73; Ex. 1005 ¶ 92). According to Dr. Bentley, "Chung's faster system lets in more light and produces higher resolution images than Sekine's system." *Id.* Dr. Bentley further stated that she saw no evidence

IPR2022-01210
Patent 9,969,519 B1

that images from combined Chung and Sekine systems would have been of equal or higher quality than either system standing alone. *Id.* ¶ 36. She further testified that in her opinion a POSITA would not have used Sekine to correct aberrations or shorten the track length found in Chung. *Id.* ¶ 37. In addition, Dr. Bentley states that there was no evidence that Chung suffered from significant aberrations, that Chung shows that all lenses are well corrected, and that Mr. Aikens does not testify otherwise. *Id.* ¶ 38.

Dr. Bentley further indicates that Chung teaches five ways to reduce aberrations, so a POSITA would not have looked to Sekine for yet another way to correct aberrations, particularly not one that would appear to produce inferior results. PO Resp. 29 (citing *In re NTP, Inc.*, 654 F.3d at 1299; Ex. 2046 ¶ 38). We agree with Patent Owner that a POSITA would not have been motivated to combine Chung with Sekine for the reasons that Dr. Bentley provides.

Sekine discloses a range of -70<R1/f<0 and states that it is a condition for correcting field curvature while seeking widening of the angle (FOV). Ex. 1005 ¶¶ 11–13. Patent Owner provides the following table to explain why a POSITA would not have recognized Sekine to be helpful in widening Chung's FOV:

|      | EM1    | EM2    | EM3    | EM4    | EM5    | EM6    |
|------|--------|--------|--------|--------|--------|--------|
| HFOV | 38.09° | 42.83° | 39.04° | 36.01° | 36.49° | 37.51° |
| FOV  | 76.18° | 85.66° | 78.08° | 72.02° | 72.98° | 75.02° |

IPR2022-01210
Patent 9,969,519 B1

PO Resp. 14 (citing Ex. 1005 ¶¶ 55, 61, 67, 73, 79, 85, 92); Ex. 2046, ¶ 18.

The table above shows the HFOV and FOV (=2*HFOV[3]) for each of

Sekine's six embodiments.

    In its background, Chung criticizes various patents as having a FOV

that is "smaller than 85 degrees," and states that "[t]he present invention

[has] been made in order to solve the above-mentioned problems." Ex. 1004

¶¶ 5–6. Only Sekine's second embodiment meets this criterion, and just

barely, at 85.66 degrees (see "FOV" data for "EM2" in table above). The

other Sekine embodiments have FOVs that are considerably below 85

degrees.

    Furthermore, Chung discloses and claims (and thus regards as its

invention) the range from 86<FOV<115. Ex. 1004, ¶¶ 20, 33, claim 8,

claim 18. This range excludes all Sekine embodiments (i.e., the FOV values

for all six of Sekine embodiments are below 86 degrees).

    Dr. Bentley provides the following table derived from Chung's FOV

data.

---

[3] "HFOV" means "half field of view." *See, e.g.*, Ex. 2001 ¶ 46.

IPR2022-01210
Patent 9,969,519 B1

| Embodiment of Chung | Curvature of object side of first lens element | FOV |
|---|---|---|
| EM1 | convex | 103.4 |
| EM2 | convex | 105.7 |
| EM3 | convex | 99.9 |
| EM4 | convex | 100.4 |
| EM5 | convex | 106.7 |
| EM6 | convex | 105.8 |
| EM7 | convex | 108.5 |
| EM8 | convex | 103.8 |
| EM9 | convex | 106.9 |
| EM10 | convex | 99.7 |
| EM11 | concave | 95.9 |
| EM12 | concave | 96.4 |

Ex. 2001 ¶ 85.  The above table indicates Chung's twelve embodiments and the FOV associated with each embodiment.  As shown in red, the smallest FOV is 95.9 for Chung Embodiment 11, and the next smallest FOV is 96.4 for Chung Embodiment 12, which are the only two Chung embodiments with a concave (negative) R1.

According to the Chung FOV data in the table above, a POSITA seeking to widen the FOV would not have selected Chung Embodiment 11 and Chung Embodiment 12, the two embodiments with the smallest FOVs, as starting points to design a wide FOV system.  To the contrary, a POSITA would have selected the embodiment with the highest (or at least higher) FOV as the starting point, which would lead one to choose a first lens with an object-side surface R1 that is convex (positive), not concave (negative), as the above table shows.  This is a strong indication that impermissible hindsight is being used in the proposed combination of Chung and Sekine.

In addition, as Patent Owner notes, Chung teaches three ways to increase FOV, to attain angles much wider than Sekine's.  PO Resp. 25;

IPR2022-01210
Patent 9,969,519 B1

Ex. 1004 ¶¶ 11, 18, 19; Ex. 1005 ¶ 92. Thus, we disagree with Petitioner's contention that a POSITA would look to Sekine's R1/f teaching when the FOVs that Sekine obtains from that teaching are inferior to Chung's. Pet. 16–22; Reply 5–10.

Petitioner further relies on Sekine's teaching that a "better effect" can be obtained with an FOV in the range from -70.0<R1/f<-3.0 because the SAG amount on the object side of the first lens can be reduced, which permits shortening the total track length. Pet. 18–22; Reply 10–13; Ex. 1005 ¶¶ 14–15. Chung similarly has as its objective to shorten the total track length. Ex. 1004 ¶¶ 4–5. However, as Patent Owner noted, the first lenses of Chung's Embodiment 11 and Embodiment 12 are complex surfaces that have circumferential regions that bend away from the object. Ex. 1004, Figs. 11A, 12A. Accordingly, Sekine's teaching of how to reduce SAG amount of the first lens and total track length is inapplicable to Chung's Embodiment 11 and Embodiment 12, notwithstanding Petitioner's arguments to the contrary. Reply 13–14. As Patent Owner puts it, Sekine teaches a solution to a problem that does not exist in Chung. PO Resp. 32 (citing Ex. 2046 ¶ 41).

As discussed in Sections II.D.3.a and II.D.3.b, many of the parties' contentions relate to Mr. Aikens's optimizations (Ex. 1003 ¶¶ 112, 233) of the combination of Chung's Embodiment 11 or Embodiment 12 with Sekine. Pet. 19–22; Reply 11, 14–17; PO Resp. 3–4, 37–56; Sur-Reply 5–7, 12–14. Patent Owner and Petitioner have argued over the role that Mr. Aikens's optimizations should play in this proceeding, if any. Petitioner has not shown them to be "patents and publications" under 35 U.S.C. § 311(b), and they have not been shown to be prior art for, as Patent Owner

IPR2022-01210
Patent 9,969,519 B1

notes, they were created by Mr. Aikens many years after the priority date of the '519 patent. *See, e.g.*, PO Resp. 55. Petitioner initially relies on these optimizations as demonstrating a reasonable expectation of success for the proposed combination of Chung Embodiment 11 or Embodiment 12 with Sekine. *See, e.g.*, Pet. 20. Although Patent Owner argues in its Reply that these optimizations also provide motivation to apply Sekine's teachings to increase Chung's FOV, Petitioner seems to have retreated from this position. Reply 1–2; Tr. 16:21–17:13. In any event, the use of Mr. Aikens' optimizations to show motivation would amount to a new argument that was not in the Petition, and one that goes beyond the scope of a proper reply because it is not responsive to any argument Patent Owner raised in the Response and is not a fair extension of any previously raised argument in the Petition. 37 C.F.R. § 42.23(b); *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023) (reply argument not new if responsive to argument raised in response and is a fair extension of previously raised argument).

    As we need only address the motivation to combine for the proposed combination to resolve this proceeding, we do not reach the separate issue of expectation of success. *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1365 (Fed. Cir. 2016) (discussing reasonable expectation of success as a separate requirement for a conclusion of obviousness); *Elekta Ltd. v. ZAP Surgical Systems, Inc.*, 81 F.4th 1368, 1375 (Fed. Cir. 2023) (similar). Thus, we do not consider Mr. Aikens's optimizations further in this decision, which were relied on in the Petition only for the purpose of showing a reasonable expectation of success.

IPR2022-01210
Patent 9,969,519 B1

Petitioner contends that Patent Owner's arguments attempt to distinguish the art based on unclaimed features such as image quality. Reply 1. We do not agree. Petitioner's stated motivation to combine was to improve image quality, and Patent Owner's arguments were responsive to this assertion. *See, e.g.*, Pet. 16; PO Resp. 38–50.

Petitioner further argues that Patent Owner ignores that lens design involves tradeoffs, for example, sacrificing image quality for a wider FOV. Reply 1–3, 14–15. Chung teaches, however, that its objectives are to increase FOV, reduce total track length, and increase image quality. Ex. 1004 ¶¶ 5–7. A proposed combination that sacrifices these objectives through tradeoffs is not what Chung contemplates.

Patent Owner further argues that Petitioner is considering Sekine's teachings selectively and is not considering other teachings such as the disclosed ranges for the ratios R1/R2 and the lenses' focal lengths compared to the system focal length. Sur-Reply 4–7 (quoting *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) ("the prior art must be considered for all its teachings, not selectively.")). We agree that Petitioner did not explain sufficiently why a POSITA would have isolated Sekine's R1/f teaching from the other Sekine teachings. Nor did Petitioner adequately explain how the proposed combination meets the other ranges, to the extent applicable, described in Sekine's other teachings.

On the full record, we determine that the Petition does not show by a preponderance of the evidence that a POSITA would have had reason to combine Sekine and Chung.

IPR2022-01210
Patent 9,969,519 B1

### E.    *Obviousness over Chung Embodiment 12 and Sekine*

Petitioner argues that claims 1–7 and 9–27 would have been obvious over Chung Embodiment 12 and Sekine.  Pet. 71–125.  Below we provide a brief overview of Chung Embodiment 12 and address the motivation to combine Chung Embodiment 12 with Sekine.

### 1.    *Chung Embodiment 12*

Chung's Embodiment 12 is depicted below in Figure 12A.



FIG.12A

Chung's Figure 12A shows, from object side to image side, first lens element 1210, second lens element 1220, third lens element 1230, fourth lens element 1240, fifth lens element 1250, an IR cut filter 1260, and an image plane 1270.  Ex. 1004 ¶ 189.  Aperture stop 1200 is between the first and second lens elements.  *Id.*

The first lens element 1210 with a negative refractive power has an object-side surface 1211 that is concave near the optical axis 1290 and an image-side surface 1212 that is convex near the optical axis 1290.  *Id.* ¶ 190.

IPR2022-01210
Patent 9,969,519 B1

The second lens element 1220 with a positive refractive power has an object-side surface 1221 that is convex near optical axis 1290 and an image-side surface 1222 that is convex near the optical axis. *Id.* ¶ 191.

The third lens element 1230 with a negative refractive power has an object-side surface 1231 that is concave near the optical axis 1290 and an image-side surface 1232 that is concave near optical axis 1190. *Id.* ¶ 192.

The fourth lens element 1240 with a positive refractive power has an object-side surface 1241 that is concave near optical axis 1290 and an image-side surface 1242 that is convex near the optical axis 1290. *Id.* ¶ 193.

The fifth lens element 1250 has a negative refractive power and an object-side surface 1251 that is convex near the optical axis 1290 and an image-side surface 1252 that is concave near the optical axis 1290. *Id.* ¶ 194. The fifth lens element 1250 has more than one inflection point formed on the surfaces 1251, 1252. *Id.*

The first through fifth lens elements are made of plastic material, and all surfaces of the lens elements are aspheric. *Id.* ¶¶ 190–194.

Further properties and characteristics of Chung's Embodiment 12 are shown below in Table 23:

IPR2022-01210
Patent 9,969,519 B1

TABLE 23

| | | | | | | | Focal |
| Surface | | Curvature Radius | Thickness | Material | index | Abbe # | length |
|---|---|---|---|---|---|---|---|
| | | (Embodiment 12) f(focal length) = 2.555 mm, Fno = 2.4, HFOV = 48.18 deg. | | | | | |
| 0 | Object | Plane | Infinity | | | | |
| 1 | Lens 1 | −65.5134(ASP) | 0.24 | Plastic | 1.515 | 57.0 | −491.75 |
| 2 | | −88.5093(ASP) | 0.29 | | | | |
| 3 | Aperture stop | Plane | 0.05 | | | | |
| 4 | Lens 2 | 8.9984(ASP) | 0.46 | Plastic | 1.544 | 56.5 | 3.68 |
| 5 | | −2.5262(ASP) | 0.25 | | | | |
| 6 | Lens 3 | −9.6224(ASP) | 0.25 | Plastic | 1.650 | 21.4 | −8.94 |
| 7 | | 14.8291(ASP) | 0.46 | | | | |
| 8 | Lens 4 | −2.7750(ASP) | 0.99 | Plastic | 1.533 | 55.7 | 1.46 |
| 9 | | −0.6818(ASP) | 0.12 | | | | |
| 10 | Lens 5 | 1.3228(ASP) | 0.35 | Plastic | 1.650 | 21.4 | −1.76 |
| 11 | | 0.5481(ASP) | 0.50 | | | | |
| 12 | IR-filter | Plane | 0.21 | Glass | 1.517 | 64.2 | |
| 13 | | Plane | 0.65 | | | | |
| 14 | Image | Plane | | | | | |

For example, Table 23 above shows values for curvature radii of the lens elements' surfaces, focal lengths for the lens elements and overall system, lens material, refractive index, Abbe number, and half field of view (HFOV) for the system. *Id.* ¶ 196.

      *2.    Combination of Chung Embodiment 12 and Sekine*

Petitioner contends that a POSITA would have combined Chung Embodiment 12 and Sekine for the same reasons already discussed in Section III.D.3. Pet. 15–22. For the reasons explained in Section III.D.3.c, on the full record, we determine that the Petition does not show by a preponderance of the evidence that a POSITA would have had a reason to combine Sekine and Chung.

IPR2022-01210
Patent 9,969,519 B1

###### F.    Motion to Amend and Revised Motion to Amend

As we determine that motivation to combine has not been shown by a preponderance of the evidence, we dismiss the Motion to Amend and Revised Motion to Amend pursuant to 35 U.S.C. § 316(d) because they were contingent upon our finding a claim of the '519 patent to be unpatentable. MTA 1; Revised MTA 1.

###### G.    Motion to Exclude

Patent Owner filed a Motion to Exclude the portions of Mr. Aikens declaration testimony present in Exhibit 1003 and Exhibit 1045 relating to or arising from "lens design studies, simulations, or optimizations using Zemax lens design software, or otherwise rely[ing] on undisclosed facts and data." Paper 45, 1.

Because we do not rely on any of this evidence in this decision in a manner adverse to Patent Owner, we dismiss Patent Owner's Motion to Exclude.

###### H.    Motion to Seal

Pursuant to 37 C.F.R. §§ 42.14 and 42.54, Patent Owner filed a Motion to Seal portions of Patent Owner's Response and Exhibit 2044.[4] Paper 17, 1.  Patent Owner contends this paper and the exhibits contain sales data regarding lens product units sold and market share, and customer information, which constitutes confidential research development or commercial information.  *Id.* at 3–4.  Patent Owner asserts that good cause to seal exists because revealing this sensitive, competitive information could

---

[4] Patent Owner's reference to Exhibit 2037 appears to be an error because there is no exhibit in the record with that number.

IPR2022-01210
Patent 9,969,519 B1

put Patent Owner at a disadvantage in the marketplace. *Id.* Petitioner does not oppose Patent Owner's Motion to Seal.

After review, and based on Patent Owner's representations, we determine that the information sought to be sealed constitutes confidential research, development or commercial information, and that good cause has been shown to seal the identified portions of the paper and exhibits, and grant Patent Owner's Motion to Seal. 37 C.F.R. § 42.54. Patent Owner's Response (Paper 18) and the sealed version of Exhibit 2044 shall remain sealed and only the redacted versions thereof will be publicly available.

## III.    CONCLUSION

After consideration of the full record, the Petition does not demonstrate by a preponderance of the evidence that any claim of the '519 patent is unpatentable due to lack of a reason to combine the prior art references asserted in the challenge grounds.

## IV.    ORDER

For the foregoing reasons, it is

ORDERED that, pursuant to 35 U.S.C. § 318(a), claims 1–27 of the '519 patent have not been shown to be unpatentable; and

FURTHER ORDERED that Patent Owner's contingent Motion to Amend and Revised Motion to Amend are dismissed;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed; and

FURTHER ORDERED that Patent Owner's Motion to Seal is granted and Paper 18 and the sealed version of Exhibit 2044 shall remain sealed.

IPR2022-01210
Patent 9,969,519 B1

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 1–18, 20–27 | 103 | Chung (Embodiment 11), Sekine | | 1–18, 20–27 |
| 1–7, 9–27 | 103 | Chung (Embodiment 12), Sekine | | 1–7, 9–27 |
| **Overall Outcome** | | | | 1–27 |

IPR2022-01210
Patent 9,969,519 B1

FOR PETITIONER:

Andrew M. Mason
Todd M. Siegel
Roy Chamcharas
Michael J. Loy
Frank Morton-Park
Sara Slabisak
KLARQUIST SPARKMAN, LLP
andrew.mason@klarquist.com
todd.siegel@klarquist.com
roy.chamcharas@klarquist.com
michael.loy@klarquist.com
frank.morton-park@klarquist.com
sara.slabisak@klarquist.com


FOR PATENT OWNER:

Eric L. Maschoff
R. Parrish Freeman
MASCHOFF BRENNAN PLLC
emaschoff@mabr.com
pfreeman@mabr.com



US009696519B1

(12) **United States Patent**
Chen et al.

(10) Patent No.: **US 9,696,519 B1**
(45) Date of Patent: **Jul. 4, 2017**

(54) **IMAGING OPTICAL LENS ASSEMBLY, IMAGE CAPTURING APPARATUS AND ELECTRONIC DEVICE**

(71) Applicant: **LARGAN PRECISION CO., LTD.**, Taichung (TW)

(72) Inventors: **Kuan-Ming Chen**, Taichung (TW); **Hsin-Hsuan Huang**, Taichung (TW)

(73) Assignee: **LARGAN PRECISION CO., LTD.**, Taichung (TW)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/131,452**

(22) Filed: **Apr. 18, 2016**

(30) **Foreign Application Priority Data**

Dec. 15, 2015    (TW) .............................. 104142068 A

(51) **Int. Cl.**
　　*G02B 9/60*　　　　(2006.01)
　　*G02B 13/00*　　　(2006.01)
(52) **U.S. Cl.**
　　CPC ........... *G02B 9/60* (2013.01); *G02B 13/0015* (2013.01); *G02B 13/0045* (2013.01)
(58) **Field of Classification Search**
　　CPC ............................. G02B 9/60; G02B 13/0045
　　USPC ................................ 359/714, 754, 763, 770
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,982,821 | A | 9/1976 | Shoemaker |
| 5,485,313 | A | 1/1996 | Betensky |
| 5,781,350 | A | 7/1998 | Tachihara et al. |
| 2011/0273611 | A1 | 11/2011 | Matsusaka et al. |
| 2014/0029117 | A1* | 1/2014 | Noda .................... G02B 13/18 359/714 |
| 2015/0098137 | A1 | 4/2015 | Chung et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 7-253535 | 10/1995 |
| JP | 2004-069777 | 3/2004 |
| TW | 200722785 | 6/2007 |
| TW | 201520592 A | 6/2015 |

* cited by examiner

*Primary Examiner* — Darryl J Collins
(74) *Attorney, Agent, or Firm* — Locke Lord LLP; Tim Tingkang Xia, Esq.

(57) **ABSTRACT**

The present disclosure provides an imaging optical lens assembly, including, in order from an object side to an image side: a first lens element with negative refractive power having an object-side surface being concave in a paraxial region, a second lens element with positive refractive power, a third lens element with negative refractive power, a fourth lens element with positive refractive power, and a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region and at least one convex shape in an off-axial region on the image-side surface, wherein the imaging optical lens assembly has a total of five lens elements.

27 Claims, 24 Drawing Sheets



MOTOROLA MOBILITY
EXHIBIT 1001



Fig. 1A



Fig. 1B



Fig. 2A



Fig. 2B



Fig. 3A



Fig. 3B



Fig. 4A



Fig. 4B



Fig. 1B



Fig. 2B



Fig. 3A



Fig. 3B



Fig. 4A



Fig. 4B



Fig. 5A



Fig. 5A



Fig. 5B



Fig. 6A



Fig. 6B



Fig. 7A



Fig. 7B



Fig. 8A



Fig. 8B



Fig. 9A



Fig. 9B



Fig. 10



Fig. 11



Fig. 12A



Fig. 12B



Fig. 12C

1230

1201



Fig. 12D

US 9,696,519 B1

**1**

# IMAGING OPTICAL LENS ASSEMBLY, IMAGE CAPTURING APPARATUS AND ELECTRONIC DEVICE

## RELATED APPLICATIONS

This application claims priority to Taiwan Application Serial Number 104142068, filed on Dec. 15, 2015, which is incorporated by reference herein in its entirety.

## BACKGROUND

### Technical Field

The present disclosure relates to an imaging optical lens assembly and an image capturing apparatus, and more particularly, to an imaging optical lens assembly and an image capturing apparatus applicable to electronic devices.

### Description of Related Art

In addition to applications in mobile devices, photographing modules have a wide range of applications. Utilizing photographing modules in various intelligent electronic products, such as vehicular devices and intelligent household appliances has become a trend in recent technological developments. As more and more devices, such as mobile phones, tablet computers, optical recognition devices, rear view cameras, driving recording systems and drone cameras, have been equipped with photographing modules in order to expand the range of applications, there is an increasing demand for lens systems with high image quality and specifications.

Currently, there is a trend in the market towards miniaturized photographing modules featuring wide angles of view and applicable for various intelligent electronic devices, driving cameras, surveillance cameras, sports cameras, drone cameras, recreational devices, and portable devices associated with many parts of our daily lives. A conventional lens assembly with a wide field of view usually requires lens elements of a larger size to retrieve light so as to capture an image of a larger area. However, such an arrangement often increases the total track length of the lens assembly and makes it difficult to reduce the size of the product equipped with the lens assembly. Furthermore, the field of view of a conventional miniaturized lens module is limited due to the strict size requirement of the lens module. Therefore, the conventional design can no longer meet the specifications and requirements of products in the market of the foreseeable future.

## SUMMARY

According to one aspect of the present disclosure, an imaging optical lens assembly comprises, in order from an object side to an image side: a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof; a second lens element having positive refractive power; a third lens element having negative refractive power; a fourth lens element having positive refractive power; and a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface; wherein the imaging optical lens assembly has a total of five lens elements; and wherein a curvature radius of the object-side surface of the first lens element is R1, a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the imaging

**2**

optical lens assembly is f, a focal length of the third lens element is f3, a focal length of the fifth lens element is f5, and the following conditions are satisfied:

$$|R4/R3|<1.0;$$

$$f5/f3<1.0;$$

$$-10.0<R1/f<0.$$

According to another aspect of the present disclosure, an imaging optical lens assembly comprises, in order from an object side to an image side: a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the object-side surface; a second lens element having positive refractive power; a third lens element; a fourth lens element having positive refractive power; and a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface; wherein the imaging optical lens assembly has a total of five lens elements; and wherein a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the first lens element is f1, a focal length of the third lens element is f3, a vertical distance between an off-axial critical point on the object-side surface of the first lens element and an optical axis is Yc11, a vertical distance between an off-axial critical point on the image-side surface of the fifth lens element and the optical axis is Yc52, and the following conditions are satisfied:

$$|R4/R3|<2.0;$$

$$f1/f3<2.0;$$

$$0.15<Yc11/Yc52<1.20.$$

According to still another aspect of the present disclosure, an imaging optical lens assembly comprises, in order from an object side to an image side: a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the object-side surface; a second lens element having positive refractive power; a third lens element; a fourth lens element with positive refractive power having an image-side being surface being convex in a paraxial region thereof; and a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface; wherein the imaging optical lens assembly has a total of five lens elements and further comprises an aperture stop disposed between the first lens element and the second lens element; and wherein a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the first lens element is f1, a focal length of the third lens element is f3, and the following conditions are satisfied:

$$|R4/R3|<4.0;$$

$$f1/f3<5.0.$$

According to yet another aspect of the present disclosure, an image capturing apparatus includes the aforementioned imaging optical lens assembly and an image sensor disposed on an image surface of the imaging optical lens assembly.

US 9,696,519 B1

3

According to a further aspect of the present disclosure, an electronic device includes the aforementioned image capturing apparatus.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1**A is a schematic view of an image capturing apparatus according to the 1st embodiment of the present disclosure;

FIG. **1**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 1st embodiment;

FIG. **2**A is a schematic view of an image capturing apparatus according to the 2nd embodiment of the present disclosure;

FIG. **2**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 2nd embodiment;

FIG. **3**A is a schematic view of an image capturing apparatus according to the 3rd embodiment of the present disclosure;

FIG. **3**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 3rd embodiment;

FIG. **4**A is a schematic view of an image capturing apparatus according to the 4th embodiment of the present disclosure;

FIG. **4**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 4th embodiment;

FIG. **5**A is a schematic view of an image capturing apparatus according to the 5th embodiment of the present disclosure;

FIG. **5**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 5th embodiment;

FIG. **6**A is a schematic view of an image capturing apparatus according to the 6th embodiment of the present disclosure;

FIG. **6**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 6th embodiment;

FIG. **7**A is a schematic view of an image capturing apparatus according to the 7th embodiment of the present disclosure;

FIG. **7**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 7th embodiment;

FIG. **8**A is a schematic view of an image capturing apparatus according to the 8th embodiment of the present disclosure;

FIG. **8**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 8th embodiment;

FIG. **9**A is a schematic view of an image capturing apparatus according to the 9th embodiment of the present disclosure;

FIG. **9**B shows longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 9th embodiment;

FIG. **10** is a schematic view showing point A, point A' and point B of a first lens element of the present disclosure;

FIG. **11** is a schematic view showing distances represented by the parameters Yc11, Yc52 and Y52 of an image capturing apparatus.

4

FIG. **12**A shows a rear view camera with an image capturing apparatus of the present disclosure installed therein;

FIG. **12**B shows a driving recording system with an image capturing apparatus of the present disclosure installed therein;

FIG. **12**C shows a surveillance camera with an image capturing apparatus of the present disclosure installed therein.

FIG. **12**D shows a smart phone with an image capturing apparatus of the present disclosure installed therein.

DETAILED DESCRIPTION

The present disclosure provides an imaging optical lens assembly including, in order from an object side to an image side, a first lens element, a second lens element, a third lens element, a fourth lens element, and a fifth lens element.

The first lens element has negative refractive power so that a wide field of view can be favorably achieved, thereby obtaining a larger image forming region. The first lens element has an object-side surface being concave in a paraxial region thereof, and may have at least one convex shape in an off-axial region on the object-side surface thereof to enhance the feature of a wide field of view and thereby to obtain a larger image forming region.

Please refer to FIG. **10**. When a projected position (A') on an optical axis from an effective radius position (A) on the object-side surface of the first lens element can be closer to the image side than a position (B) of the object-side surface of the first lens element on the optical axis, it is favorable for reducing the incident angle of light on the object-side surface of the first lens element from an off-axis region to prevent total reflection caused by an excessively large angle.

The second lens element has positive refractive power so that it has a complementary function to the first lens element, thereby providing the imaging optical lens assembly with a sufficient converging ability to prevent the total track length of the lens assembly from being too long.

The third lens element may have negative refractive power, thus it is favorable for coordinating the light converging ability in an off-axial view field and thereby to correct the Petzval Sum. The third lens element may have an object-side surface being convex and an image-side surface being concave thereof so that the principal point thereof can be shifted toward the image side to favorably enlarge the field of view.

The fourth lens element has positive refractive power so as to enhance the focusing power and concurrently achieve the goal of miniaturization of the imaging optical lens assembly. The fourth lens element may have an image-side surface being convex in a paraxial region thereof to further improve the focusing performance.

The fifth lens element has negative refractive power so as to correct the field curvature to further improve the image quality. The fifth lens element has an image-side surface being concave in a paraxial region thereof and at least one convex shape in an off-axial region on the image-side surface thereof so as to favorably shorten the back focal length for further miniaturization. The fifth lens element may have an object-side surface being convex so as to correct aberrations of the imaging optical lens assembly.

The imaging optical lens assembly has a total of five lens elements, and an axial distance between the first lens element and the second lens element may be the largest among respective axial distances between every two adjacent lens elements of the first lens element, the second lens element,

US 9,696,519 B1

5

the third lens element, the fourth lens element, and the fifth lens element so as to attain a balance between the wide field of view and the miniaturization of the imaging optical lens assembly.

The imaging optical lens assembly may comprise an aperture stop disposed between the first lens element and the second lens element, and such a configuration is advantageous with a wide field of view. Moreover, each of the first lens element, the second lens element, the third lens element, the fourth lens element, and the fifth lens element may have at least one surface being aspheric so as to correct the aberrations and to further shorten the total track length of the imaging optical lens assembly.

When a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, and the following condition is satisfied: $|R4/R3|<4.0$, the principal point of the second lens element can be shifted toward the image side so that a wide field of view can be obtained. Preferably, the following condition can be satisfied: $|R4/R3|<2.0$. More preferably, the following condition can be satisfied: $|R4/R3|<1.0$. More preferably, the following condition can be satisfied: $|R4/R3|<0.60$.

When a focal length of the third lens element is f3, a focal length of the fifth lens element is f5, and the following condition can be satisfied: $f5/f3<1.0$, the refractive power of the imaging optical lens assembly can be balanced so that the fifth lens element is capable of controlling the optical path, and the third lens element can effectively correct various aberrations to improve the image quality.

When a curvature radius of the object-side surface of the first lens element is R1, a focal length of the imaging optical lens assembly is f, and the following condition can be satisfied: $-10.0<R1/f<0$, the light diverging ability of the first lens element can be enhanced to correspond with the feature of a wide field of view, thereby obtaining a larger image forming region to extend the range of applications for the imaging optical lens assembly. Preferably, the following condition can be satisfied: $-5.0<R1/f<0$. More preferably, the following condition can be satisfied: $-3.0<R1/f<0$

When a focal length of the first lens element is f1, the focal length of the third lens element is f3, and the following condition can be satisfied: $f1/f3<5.0$, the negative refractive power of the imaging optical lens assembly can be effectively distributed, thereby reducing aberrations while maintaining a wide field of view. Preferably, the following condition can be satisfied: $f1/f3<2.0$.

When a vertical distance between an off-axial critical point on the object-side surface of the first lens element and the optical axis is Yc11, a vertical distance between an off-axial critical point on the image-side surface of the fifth lens element and the optical axis is Yc52, and the following condition can be satisfied: $0.15<Yc11/Yc52<1.20$, the off-axial light of the first lens element and the fifth lens element can be effectively controlled, thus the imaging optical lens assembly can be further miniaturized while featuring a wide field of view.

When an axial distance between the object-side surface of the first lens element and an image surface is TL, a maximum image height of the imaging optical lens assembly is ImgH, and the following condition can be satisfied: $TL/ImgH<3.0$, the total track length of the imaging optical lens assembly can be effectively controlled, which is favorable for the miniaturization of the imaging optical lens assembly.

6

When an Abbe number of the third lens element is V3, an Abbe number of the fourth lens element is V4, an Abbe number of the fifth lens element is V5, and the following condition can be satisfied: $0.3<(V3+V5)/V4<1.0$, the chromatic aberration of the whole imaging optical lens assembly can be balanced such that light of different wavelengths can be converged at the same image point to improve the image quality. Preferably, the following condition can be satisfied: $V5<30$.

When an axial distance between the first lens element and the second lens element is T12, an axial distance between the second lens element and the third lens element is T23, an axial distance between the third lens element and the fourth lens element is T34, an axial distance between the fourth lens element and the fifth lens element is T45, and the following condition can be satisfied: $0<(T23+T34+T45)/T12<0.90$, a satisfactory balance between a wide field of view and a short total track length can be obtained.

When half of a maximal field of view of the imaging optical lens assembly is HFOV, and the following condition can be satisfied: $1.50<\tan(HFOV)$, the image scope can be effectively controlled and a sufficient field of view can be achieved.

Please refer to FIG. 11. When a vertical distance between a maximum effective diameter position on the image-side surface of the fifth lens element and an optical axis is Y52, the focal length of the imaging optical lens assembly is f, and the following condition can be satisfied: $0.85<Y52/f$, the off-axial aberration caused by a large view angle can be corrected and the relative illumination in the off-axial region can be increased.

When the vertical distance between the off-axial critical point on the object-side surface of the first lens element and the optical axis is Yc11, the focal length of the imaging optical lens assembly is f, and the following condition can be satisfied: $0.10<Yc11/f<0.80$, the off-axial aberration caused by a large view angle can be corrected and the relative illumination in the off-axial region can be increased.

When the maximum image height of the imaging optical lens assembly is ImgH, the focal length of the imaging optical lens assembly is f, and the following condition can be satisfied: $1.20<ImgH/f<1.70$, the imaging optical lens assembly can maintain a sufficient image forming region to receive light for brighter images while obtaining a wide field of view at the same time.

When the focal length of the third lens element is f3, a focal length of the fourth lens element is f4, and the following condition can be satisfied: $|f4/f3|<1.0$, the distribution of the refractive power of the imaging optical lens assembly can be balanced, thereby reducing the sensitivity of the imaging optical lens assembly.

When the focal length of the first lens element is f1, a focal length of the second lens element is f2, the focal length of the third lens element is f3, the focal length of the fourth lens element is f4, the focal length of the fifth lens element is f5, a focal length of the i-th lens element is fi, a focal length of the j-th lens element is fj, and the following conditions can be satisfied: $|f1|>|fi|$, $i=2, 4, 5$; $|f3|>|fj|$, $j=2, 4, 5$, the distribution of the refractive power of the imaging optical lens assembly can be balanced, and this is favorable for forming a wide field of view.

When an axial distance between the image-side surface of the fifth lens element and the image surface is BL, the maximum image height of the imaging optical lens assembly is ImgH, and the following condition can be satisfied: $BL/ImgH<0.75$, the back focal length can be effectively controlled.

US 9,696,519 B1

7

According to the imaging optical lens assembly of the present disclosure, the lens elements thereof can be made of glass or plastic material. When the lens elements are made of glass material, the distribution of the refractive power of the imaging optical lens assembly may be more flexible to design. When the lens elements are made of plastic material, the manufacturing cost can be effectively reduced. Furthermore, surfaces of each lens element can be arranged to be aspheric (ASP). Since these aspheric surfaces can be easily formed into shapes other than spherical shapes so as to have more controllable variables for eliminating aberrations and to further decrease the required number of lens elements, the total track length of the imaging optical lens assembly can be effectively reduced.

According to the imaging optical lens assembly of the present disclosure, the imaging optical lens assembly can include at least one stop, such as an aperture stop, a glare stop or a field stop, so as to favorably reduce the amount of stray light and thereby to improve the image quality.

According to the imaging optical lens assembly of the present disclosure, an aperture stop can be configured as a front stop or a middle stop. A front stop disposed between an imaged object and the first lens element can provide a longer distance between an exit pupil of the imaging optical lens assembly and the image surface, so that the generated telecentric effect can improve the image-sensing efficiency of an image sensor, such as a CCD or CMOS sensor. A middle stop disposed between the first lens element and the image surface is favorable for enlarging the field of view of the imaging optical lens assembly, thereby providing the imaging optical lens assembly the advantages of a wide-angle lens.

According to the imaging optical lens assembly of the present disclosure, when the lens element has a convex surface and the region of convex shape is not defined, it indicates that the surface can be convex in the paraxial region thereof. When the lens element has a concave surface and the region of concave shape is not defined, it indicates that the surface can be concave in the paraxial region thereof. Likewise, when the region of refractive power or focal length of a lens element is not defined, it indicates that the region of refractive power or focal length of the lens element can be in the paraxial region thereof.

According to the imaging optical lens assembly of the present disclosure, the image surface of the imaging optical lens assembly, based on the corresponding image sensor, can be a plane or a curved surface with any curvature, especially a curved surface being concave facing towards the object side.

The imaging optical lens assembly of the present disclosure can be optionally applied to moving focus optical systems. According to the imaging optical lens assembly of the present disclosure, the imaging optical lens assembly features a good correction capability and high image quality, and can be applied to 3D (three-dimensional) image capturing applications and electronic devices, such as digital cameras, mobile devices, smart phones, digital tablets, smart TVs, network surveillance devices, motion sensing input devices, driving recording systems, rear view camera systems, drone cameras and wearable devices.

8

According to the present disclosure, an image capturing apparatus includes the aforementioned imaging optical lens assembly and an image sensor, wherein the image sensor is disposed on or near an image surface of the imaging optical lens assembly. Therefore, the design of the imaging optical lens assembly enables the image capturing apparatus to achieve the best image quality. Preferably, the imaging optical lens assembly can further include a barrel member, a holder member or a combination thereof.

Referring to FIG. **12**A, FIG. **12**B, FIG. **12**C and FIG. **12**D, an image capturing apparatus **1201** may be installed in an electronic device including, but not limited to, a rear view camera **1210**, a driving recording system **1220**, a surveillance camera **1230**, or a smart phone **1240**. The four exemplary figures of different electronic devices are only exemplary for showing the image capturing apparatus of the present disclosure installed in an electronic device, and the present disclosure is not limited thereto. Preferably, the electronic device can further include a control unit, a display unit, a storage unit, a random access memory unit (RAM) or a combination thereof.

According to the above description of the present disclosure, the following 1st-9th specific embodiments are provided for further explanation.

1st Embodiment

FIG. **1**A is a schematic view of an image capturing apparatus according to the 1st embodiment of the present disclosure. FIG. **1**B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 1st embodiment.

In FIG. **1**A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor **180**. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element **110**, an aperture stop **100**, a second lens element **120**, a third lens element **130**, a fourth lens element **140**, and a fifth lens element **150**.

The first lens element **110** with negative refractive power has an object-side surface **111** being concave in a paraxial region thereof and an image-side surface **112** being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface **111**. The first lens element **110** is made of plastic material.

The second lens element **120** with positive refractive power has an object-side surface **121** being convex in a paraxial region thereof and an image-side surface **122** being convex in a paraxial region thereof, which are both aspheric, and the second lens element **120** is made of plastic material.

The third lens element **130** with negative refractive power has an object-side surface **131** being convex in a paraxial region thereof and an image-side surface **132** being concave in a paraxial region thereof, which are both aspheric, and the third lens element **130** is made of plastic material.

The fourth lens element **140** with positive refractive power has an object-side surface **141** being convex in a paraxial region thereof and an image-side surface **142** being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element **140** is made of plastic material.

The fifth lens element **150** with negative refractive power has an object-side surface **151** being convex in a paraxial region thereof and an image-side surface **152** being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface **111**. The fifth lens element **150** is made of plastic material.

US 9,696,519 B1

| 9 | 10 |

The imaging optical lens assembly further includes an IR cut filter **160** located between the fifth lens element **150** and an image surface **170**. The IR cut filter **160** is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor **180** is disposed on or near the image surface **170** of the imaging optical lens assembly.

The detailed optical data of the 1st embodiment are shown in TABLE 1, and the aspheric surface data are shown in TABLE 2, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is a half of the maximal field of view.

TABLE 1

(1st Embodiment)
f = 1.73 mm, Fno = 2.40, HFOV = 70.0 deg.

| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −2.390 | ASP | 0.322 | Plastic | 1.544 | 56.0 | −4.09 |
| 2 | | 33.500 | ASP | 0.866 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | 5.069 | ASP | 0.758 | Plastic | 1.544 | 56.0 | 1.57 |
| 5 | | −0.975 | ASP | 0.035 | | | | |
| 6 | Lens 3 | 2.966 | ASP | 0.250 | Plastic | 1.639 | 23.5 | −3.81 |
| 7 | | 1.294 | ASP | 0.256 | | | | |
| 8 | Lens 4 | 31.143 | ASP | 1.167 | Plastic | 1.544 | 56.0 | 1.54 |
| 9 | | −0.850 | ASP | 0.025 | | | | |
| 10 | Lens 5 | 1.986 | ASP | 0.367 | Plastic | 1.639 | 23.5 | −1.61 |
| 11 | | 0.627 | ASP | 0.450 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.341 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

TABLE 2

Aspheric Coefficients

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| k = | −2.8974E+01 | −9.0000E+01 | 2.0000E+01 | −1.0489E+00 | −3.2310E+00 |
| A4 = | 3.1043E−01 | 6.4676E−01 | −1.5578E−01 | −1.3947E−01 | −4.9211E−01 |
| A6 = | −2.3973E−01 | −3.2653E−01 | 7.6228E−02 | 3.7766E−01 | 8.6023E−01 |
| A8 = | 1.4241E−01 | 1.3540E−01 | −2.1009E+00 | −1.7999E+00 | −1.3116E+00 |
| A10 = | −4.7154E−02 | 2.4251E−01 | 2.2957E+00 | 2.5419E+00 | 9.4826E−01 |
| A12 = | 5.9825E−03 | | | −2.1013E+00 | −2.3163E−01 |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.4561E+00 | −2.6496E+00 | −9.4934E−01 | −3.4941E+01 | −4.2829E+00 |
| A4 = | −4.4621E−01 | 1.6206E−01 | 4.6484E−01 | −2.8103E−01 | −2.4891E−01 |
| A6 = | 6.9001E−01 | −2.3409E−01 | −7.1292E−01 | −6.5565E−02 | 1.9219E−01 |
| A8 = | −7.9982E−01 | 2.5223E−01 | 7.4111E−01 | 1.0830E−01 | −1.1130E−01 |
| A10 = | 5.8009E−01 | −1.7510E−01 | −4.5911E−01 | −4.2813E−02 | 4.2945E−02 |
| A12 = | −2.2847E−01 | 7.4175E−02 | 1.5600E−01 | 1.2329E−02 | −1.0603E−02 |
| A14 = | 3.5977E−02 | −1.6475E−02 | −2.1395E−02 | −1.8523E−03 | 1.5050E−03 |
| A16 = | | 1.3637E−03 | | | −9.1039E−05 |

The equation of the aspheric surface profiles is expressed as follows:

$$X(Y) = (Y^2/R)/(1 + sqrt(1 - (1 + k)*(Y/R)^2)) + \sum_i (Ai)*(Y^i)$$

where:

X is the relative distance between a point on the aspheric surface spaced at a distance Y from the optical axis and the tangential plane at the aspheric surface vertex on the optical axis;

Y is the vertical distance from the point on the aspheric surface profile to the optical axis;

R is the curvature radius;

k is the conic coefficient; and

Ai is the i-th aspheric coefficient.

In the 1st embodiment, a focal length of the imaging optical lens assembly is f, an f-number of the imaging optical lens assembly is Fno, half of a maximal field of view of the imaging optical lens assembly is HFOV, and these parameters have the following values: f=1.73 mm; Fno=2.40; and HFOV=70.0 degrees.

In the 1st embodiment, an Abbe number of the fifth lens element **150** is V5, and it satisfies the condition: V5=23.5.

In the 1st embodiment, an Abbe number of the third lens element **130** is V3, an Abbe number of the fourth lens element **140** is V4, the Abbe number of the fifth lens element **150** is V5, and they satisfy the condition: (V3+V5)/V4=0.84.

In the 1st embodiment, an axial distance between the first lens element **110** and the second lens element **120** is T12, an axial distance between the second lens element **120** and the third lens element **130** is T23, an axial distance between the third lens element **130** and the fourth lens element **140** is T34, an axial distance between the fourth lens element **140** and the fifth lens element **150** is T45, and they satisfy the condition: (T23+T34+T45)/T12=0.35.

In the 1st embodiment, a curvature radius of an object-side surface **111** of the first lens element **110** is R1, the focal length of the imaging optical lens assembly is f, and they satisfy the condition: R1/f=−1.38.

In the 1st embodiment, a curvature radius of an object-side surface **121** of the second lens element **120** is R3, a curvature radius of the image-side surface **122** of the second lens element **120** is R4, and they satisfy the condition: |R4/R3|=0.19.

US 9,696,519 B1

| 11 | 12 |

In the 1st embodiment, a focal length of the third lens element 130 is f3, a focal length of the fourth lens element 140 is f4, and they satisfy the condition: |f4/f3|=0.40.

In the 1st embodiment, a focal length of the first lens element 110 is f1, the focal length of the third lens element 130 is f3, and they satisfy the condition: f1/f3=1.07.

In the 1st embodiment, the focal length of the third lens element 130 is f3, a focal length of the fifth lens element 150 is f5, and they satisfy the condition: f5/f3=0.42.

In the 1st embodiment, a vertical distance between a maximum effective diameter position on the image-side surface 152 of the fifth lens element 150 and an optical axis is Y52, the focal length of the imaging optical lens assembly is f, and they satisfy the condition: Y52/f=1.10.

In the 1st embodiment, a projected point on an optical axis from an effective radius position on the object-side surface 111 of the first lens element 110 is closer to the image side than an axial vertex of the object-side surface 111 of the first lens element 110 on the optical axis, a vertical distance between an off-axial critical point on the object-side surface 111 of the first lens element 110 and the optical axis is Yc11, the focal length of the imaging optical lens assembly is f, and they satisfy the condition: Yc11/f=0.31.

In the 1st embodiment, the vertical distance between the off-axial critical point on the object-side surface 111 of the first lens element 110 and the optical axis is Yc11, a vertical distance between an off-axial critical point on the image-side surface 152 of the fifth lens element 150 and the optical axis is Yc52, and they satisfy the condition: Yc11/Yc52=0.47.

In the 1st embodiment, a maximum image height of the imaging optical lens assembly is ImgH, the focal length of the imaging optical lens assembly is f, and they satisfy the condition: ImgH/f=1.35.

In the 1st embodiment, an axial distance between the object-side surface 111 of the first lens element 110 and the image surface 170 is TL, the maximum image height of the imaging optical lens assembly is ImgH, and they satisfy the condition: TL/ImgH=2.17.

In the 1st embodiment, an axial distance between the image-side surface 152 of the fifth lens element 150 and the image surface 170 is BL, the maximum image height of the imaging optical lens assembly is ImgH, and they satisfy the condition: BL/ImgH=0.43.

In the 1st embodiment, half of the maximal field of view of the imaging optical lens assembly is HFOV, and it satisfies the condition: tan(HFOV)=2.75.

2nd Embodiment

FIG. 2A is a schematic view of an image capturing apparatus according to the 2nd embodiment of the present disclosure. FIG. 2B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 2nd embodiment.

In FIG. 2A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor 280. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element 210, an aperture stop 200, a second lens element 220, a third lens element 230, a fourth lens element 240, and a fifth lens element 250.

The first lens element 210 with negative refractive power has an object-side surface 211 being concave in a paraxial region thereof and an image-side surface 212 being concave in a paraxial region thereof, which are both aspheric, and at least a convex shape in an off-axial region on the object-side surface 211. The first lens element 210 is made of plastic material.

The second lens element 220 with positive refractive power has an object-side surface 221 being convex in a paraxial region thereof and an image-side surface 222 being convex in a paraxial region thereof, which are both aspheric, and the second lens element 220 is made of plastic material.

The third lens element 230 with negative refractive power has an object-side surface 231 being convex in a paraxial region thereof and an image-side surface 232 being concave in a paraxial region thereof, which are both aspheric, and the third lens element 230 is made of plastic material.

The fourth lens element 240 with positive refractive power has an object-side surface 241 being convex in a paraxial region thereof and an image-side surface 242 being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element 240 is made of plastic material.

The fifth lens element 250 with negative refractive power has an object-side surface 251 being concave in a paraxial region thereof and an image-side surface 252 being concave in a paraxial region thereof, which are both aspheric, and at least a convex shape in an off-axial region on the image-side surface 252. The fifth lens element 250 is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter 260 located between the fifth lens element 250 and an image surface 270. The IR cut filter 260 is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor 280 is disposed on or near the image surface 270 of the imaging optical lens assembly.

The detailed optical data of the 2nd embodiment are shown in TABLE 3, and the aspheric surface data are shown in TABLE 4, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

TABLE 3

| (2nd Embodiment) f = 1.62 mm, Fno = 2.40, HFOV = 65.0 deg. | | | | | | |
|---|---|---|---|---|---|---|
| Surface # | | Curvature Radius | Thickness | Material | Index | Abbe # | Focal Length |
| 0 | Object | Plano | Infinity | | | | |
| 1 | Lens 1 | −1.771 ASP | 0.293 | Plastic | 1.544 | 56.0 | −2.87 |
| 2 | | 13.891 ASP | 0.935 | | | | |
| 3 | Ape. Stop | Plano | 0.025 | | | | |
| 4 | Lens 2 | 3.274 ASP | 0.739 | Plastic | 1.544 | 56.0 | 1.50 |
| 5 | | −1.004 ASP | 0.035 | | | | |
| 6 | Lens 3 | 4.001 ASP | 0.250 | Plastic | 1.639 | 23.5 | −3.69 |
| 7 | | 1.446 ASP | 0.306 | | | | |
| 8 | Lens 4 | 20.092 ASP | 0.960 | Plastic | 1.544 | 56.0 | 1.57 |
| 9 | | −0.876 ASP | 0.275 | | | | |
| 10 | Lens 5 | −28.409 ASP | 0.250 | Plastic | 1.660 | 20.4 | −1.65 |
| 11 | | 1.138 ASP | 0.400 | | | | |
| 12 | IR Cut Filter | Plano | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | 0.390 | | | | |
| 14 | Image Surface | Plano | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

US 9,696,519 B1

13    14

TABLE 4

| Aspheric Coefficients | | | | | |
|---|---|---|---|---|---|
| Surface # | 1 | 2 | 4 | 5 | 6 |
| k = | −2.8974E+01 | −9.0000E+01 | 2.0000E+00 | −1.0267E+00 | −3.2310E+00 |
| A4 = | 4.2260E-01 | 1.1051E+00 | −1.4398E-01 | −4.2553E-02 | −4.8896E-01 |
| A6 = | −3.7664E-01 | −1.2315E+00 | −4.5134E-01 | −1.5018E+00 | 4.0638E-01 |
| A8 = | 2.4768E-01 | 2.5216E+00 | 6.3744E-01 | 9.3643E+00 | 3.9971E-01 |
| A10 = | −8.8064E-02 | −3.1120E+00 | −4.3465E+00 | −3.1953E+01 | −3.1843E+00 |
| A12 = | 1.1863E-02 | 2.7825E+00 | | 5.0340E+01 | 4.0319E+00 |
| A14 = | | | | −3.1887E+01 | −1.4433E+00 |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.4627E+00 | −2.6496E+00 | −9.9633E-01 | −3.4941E+01 | −4.2829E+00 |
| A4 = | −4.2775E-01 | 3.6771E-02 | 4.8098E-01 | 2.5978E-02 | −2.5135E-01 |
| A6 = | 6.6050E-01 | 2.3640E-03 | −8.4899E-01 | −6.4299E-01 | 1.4552E-01 |
| A8 = | −8.2360E-01 | −1.5848E-02 | 1.0790E+00 | 8.6518E-01 | −4.9814E-02 |
| A10 = | 5.9612E-01 | 2.0829E-02 | −8.1088E-01 | −5.6759E-01 | 7.6735E-03 |
| A12 = | −2.0891E-01 | −1.1957E-02 | 3.2182E-01 | 1.7882E-01 | −1.8407E-04 |
| A14 = | 2.2082E-02 | 4.9734E-03 | −5.0021E-02 | −2.1116E-02 | −8.2045E-05 |
| A16 = | | −1.0457E-03 | | | 8.2897E-06 |

In the 2nd embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 5 below are the same as those stated in the 1st embodiment with corresponding values for the 2nd embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 3 and TABLE 4 and satisfy the conditions stated in TABLE 5.

TABLE 5

| 2nd Embodiment | | | |
|---|---|---|---|
| f [mm] | 1.62 | f1/f3 | 0.78 |
| Fno | 2.40 | f5/f3 | 0.45 |
| HFOV [deg.] | 65.0 | Y52/f | 1.11 |
| V5 | 20.4 | Yc11/f | 0.31 |
| (V3 + V5)/V4 | 0.78 | Yc11/Yc52 | 0.49 |
| (T23 + T34 + T45)/T12 | 0.64 | ImgH/f | 1.41 |
| R1/f | −1.09 | TL/ImgH | 2.22 |
| |R4/R3| | 0.31 | BL/ImgH | 0.44 |
| |f4/f3| | 0.43 | tan(HFOV) | 2.14 |

3rd Embodiment

FIG. 3A is a schematic view of an image capturing apparatus according to the 3rd embodiment of the present disclosure. FIG. 3B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 3rd embodiment.

In FIG. 3A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor 380. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element 310, an aperture stop 300, a second lens element 320, a third lens element 330, a fourth lens element 340, and a fifth lens element 350.

The first lens element 310 with negative refractive power has an object-side surface 311 being concave in a paraxial region thereof and an image-side surface 312 being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface 311. The first lens element 310 is made of plastic material.

The second lens element 320 with positive refractive power has an object-side surface 321 being convex in a paraxial region thereof and an image-side surface 322 being convex in a paraxial region thereof, which are both aspheric, and the second lens element 320 is made of plastic material.

The third lens element 330 with negative refractive power has an object-side surface 331 being concave in a paraxial region thereof and an image-side surface 332 being concave in a paraxial region thereof, which are both aspheric, and the third lens element 330 is made of plastic material.

The fourth lens element 340 with positive refractive power has an object-side surface 341 being convex in a paraxial region thereof and an image-side surface 342 being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element 340 is made of plastic material.

The fifth lens element 350 with negative refractive power has an object-side surface 351 being convex in a paraxial region thereof and an image-side surface 352 being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface 352. The fifth lens element 350 is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter 360 located between the fifth lens element 350 and an image surface 370. The IR cut filter 360 is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor 380 is disposed on or near the image surface 370 of the imaging optical lens assembly.

The detailed optical data of the 3rd embodiment are shown in TABLE 6, and the aspheric surface data are shown in TABLE 7, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

US 9,696,519 B1

**15**

TABLE 6

(3rd Embodiment)
f = 1.53 mm, Fno = 2.30, HFOV = 62.0 deg.

| Surface # | | Curvature Radius | | Thick-ness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −2.154 | ASP | 0.355 | Plastic | 1.535 | 55.8 | −3.02 |
| 2 | | 6.814 | ASP | 0.967 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | 3.138 | ASP | 0.626 | Plastic | 1.544 | 56.0 | 1.52 |
| 5 | | −1.043 | ASP | 0.035 | | | | |
| 6 | Lens 3 | −3.893 | ASP | 0.250 | Plastic | 1.535 | 55.8 | −2.55 |
| 7 | | 2.144 | ASP | 0.142 | | | | |
| 8 | Lens 4 | 2.656 | ASP | 0.997 | Plastic | 1.535 | 55.8 | 1.27 |
| 9 | | −0.795 | ASP | 0.035 | | | | |
| 10 | Lens 5 | 1.977 | ASP | 0.283 | Plastic | 1.660 | 20.4 | −1.59 |
| 11 | | 0.647 | ASP | 0.450 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.643 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

TABLE 7

Aspheric Coefficients

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| k = | −2.8974E+01 | −9.0000E+01 | 2.0000E+01 | −1.1003E+00 | −3.2310E+00 |
| A4 = | 2.9643E−01 | 7.6545E−01 | −2.7076E−01 | −4.2096E−01 | −1.2722E+00 |
| A6 = | −2.1472E−01 | −6.1991E−01 | −3.0990E−01 | −1.6826E−01 | 5.4884E+00 |
| A8 = | 1.0880E−01 | 1.1538E+00 | 6.6040E−01 | 1.3207E+01 | −1.0259E+01 |
| A10 = | −2.8884E−02 | −1.4394E+00 | −6.8350E+00 | −6.2038E+01 | 8.8313E+00 |
| A12 = | 2.8959E−03 | 1.2542E+00 | | 1.1287E+02 | −3.3043E+00 |
| A14 = | | | | −8.0175E+01 | 4.0348E−01 |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.9457E−01 | −2.6496E+00 | −9.3538E−01 | −3.4941E+00 | −4.2829E+00 |
| A4 = | −7.8879E−01 | −4.2643E−02 | 8.8807E−01 | −1.0295E−01 | −3.7312E−01 |
| A6 = | 1.5941E+00 | −6.2078E−02 | −2.2363E+00 | −1.3177E+00 | 2.5760E−01 |
| A8 = | −1.6685E+00 | 4.4639E−02 | 3.6782E+00 | 2.3456E+00 | −1.0807E−01 |
| A10 = | 1.0163E+00 | 1.5325E−02 | −3.5168E+00 | −2.1004E+00 | 8.7430E−03 |
| A12 = | −4.0366E−01 | −1.5950E−02 | 1.7078E+00 | 9.3280E−01 | 1.3967E−02 |
| A14 = | 7.6169E−02 | 4.2082E−03 | −3.1910E−01 | −1.5584E−01 | −6.1205E−03 |
| A16 = | | −4.5570E−04 | | | 8.0890E−04 |

In the 3rd embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 8 below are the same as those stated in the 1st embodiment with corresponding values for the 3rd embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 6 and TABLE 7 and satisfy the conditions stated in TABLE 8.

TABLE 8

3rd Embodiment

| | | | |
|---|---|---|---|
| f [mm] | 1.53 | f1/f3 | 1.18 |
| Fno | 2.30 | f5/f3 | 0.63 |
| HFOV [deg.] | 62.0 | Y52/f | 1.01 |
| V5 | 20.4 | Yc11/f | 0.37 |
| (V3 + V5)/V4 | 1.37 | Yc11/Yc52 | 0.63 |
| (T23 + T34 + T45)/T12 | 0.21 | ImgH/f | 1.37 |
| R1/f | −1.41 | TL/ImgH | 2.40 |

**16**

TABLE 8-continued

3rd Embodiment

| | | | |
|---|---|---|---|
| \|R4/R3\| | 0.33 | BL/ImgH | 0.62 |
| \|f4/f3\| | 0.50 | tan(HFOV) | 1.88 |

4th Embodiment

FIG. **4**A is a schematic view of an image capturing apparatus according to the 4th embodiment of the present disclosure. FIG. **4**B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 4th embodiment.

In FIG. **4**A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor **480**. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element **410**, an

US 9,696,519 B1

**17**

aperture stop **400**, a second lens element **420**, a third lens element **430**, a fourth lens element **440**, and a fifth lens element **450**.

The first lens element **410** with negative refractive power has an object-side surface **411** being concave in a paraxial region thereof and an image-side surface **412** being convex in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface **411**. The first lens element **410** is made of plastic material.

The second lens element **420** with positive refractive power has an object-side surface **421** being concave in a paraxial region thereof and an image-side surface **422** being convex in a paraxial region thereof, which are both aspheric, and the second lens element **420** is made of plastic material.

The third lens element **430** with negative refractive power has an object-side surface **431** being convex in a paraxial region thereof and an image-side surface **432** being concave in a paraxial region thereof, which are both aspheric, and the third lens element **430** is made of plastic material.

The fourth lens element **440** with positive refractive power has an object-side surface **441** being concave in a

**18**

paraxial region thereof and an image-side surface **442** being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element **440** is made of plastic material.

The fifth lens element **450** with negative refractive power has an object-side surface **451** being convex in a paraxial region thereof and an image-side surface **452** being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface **452**. The fifth lens element **450** is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter **460** located between the fifth lens element **450** and an image surface **470**. The IR cut filter **460** is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor **480** is disposed on or near the image surface **470** of the imaging optical lens assembly.

The detailed optical data of the 4th embodiment are shown in TABLE 9, and the aspheric surface data are shown in TABLE 10, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

TABLE 9

(4th Embodiment)
f = 1.60 mm, Fno = 2.50, HFOV = 72.0 deg.

| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −2.283 | ASP | 0.405 | Plastic | 1.544 | 56.0 | −6.06 |
| 2 | | −7.881 | ASP | 0.741 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | −14.930 | ASP | 1.010 | Plastic | 1.544 | 56.0 | 1.70 |
| 5 | | −0.891 | ASP | 0.035 | | | | |
| 6 | Lens 3 | 3.829 | ASP | 0.255 | Plastic | 1.544 | 56.0 | −150.99 |
| 7 | | 3.572 | ASP | 0.059 | | | | |
| 8 | Lens 4 | −3.378 | ASP | 1.042 | Plastic | 1.544 | 56.0 | 2.09 |
| 9 | | −0.943 | ASP | 0.030 | | | | |
| 10 | Lens 5 | 2.589 | ASP | 0.400 | Plastic | 1.639 | 23.5 | −1.68 |
| 11 | | 0.712 | ASP | 0.400 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.402 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

TABLE 10

Aspheric Coefficients

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| k = | −2.8974E+01 | −9.0000E+01 | 2.0000E+01 | −1.1663E+00 | −3.2318E+00 |
| A4 = | 2.1570E−01 | 5.2923E−01 | −4.6631E−01 | −2.5438E−02 | −5.9278E−01 |
| A6 = | −1.4042E−01 | −5.1436E−01 | 3.8403E+00 | −3.5449E−01 | 9.8664E−01 |
| A8 = | 6.0685E−02 | 3.4938E−01 | −2.6371E+01 | 7.8638E−01 | −1.0129E+00 |
| A10 = | −1.3646E−02 | −7.8551E−02 | 5.4745E+01 | −1.4013E+00 | 5.4320E−01 |
| A12 = | 1.2652E−03 | | | 6.8921E−01 | −1.1130E−01 |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.3377E+00 | −2.6496E+00 | −8.4194E−01 | −3.4941E+01 | −4.2830E+00 |
| A4 = | −4.9492E−01 | 4.6007E−01 | 4.4099E−01 | −4.8476E−01 | −3.4628E−01 |
| A6 = | 9.2199E−01 | −6.0187E−01 | −8.8803E−01 | −3.1608E−01 | 3.4540E−01 |
| A8 = | −1.3345E+00 | 5.4562E−01 | 1.3507E+00 | 8.6974E−01 | −2.2778E−01 |
| A10 = | 1.1721E+00 | −4.4450E−01 | −1.1362E+00 | −7.2027E−01 | 8.8577E−02 |
| A12 = | −5.2865E−01 | 2.8844E−01 | 4.5254E−01 | 2.8092E−01 | −1.8484E−02 |
| A14 = | 9.2522E−02 | −1.0877E−01 | −6.6105E−02 | −4.1792E−02 | 1.7305E−03 |
| A16 = | | 1.6610E−02 | | | −3.5480E−05 |

US 9,696,519 B1

| 19 | 20 |

In the 4th embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 11 below are the same as those stated in the 1st embodiment with corresponding values for the 4th embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 9 and TABLE 10 and satisfy the conditions stated in TABLE 11.

TABLE 11

| 4th Embodiment | | | |
|---|---|---|---|
| f [mm] | 1.60 | f1/f3 | 0.04 |
| Fno | 2.50 | f5/f3 | 0.01 |
| HFOV [deg.] | 72.0 | Y52/f | 1.12 |
| V5 | 23.5 | Yc11/f | 0.40 |
| (V3 + V5)/V4 | 1.42 | Yc11/Yc52 | 0.58 |
| (T23 + T34 + T45)/T12 | 0.16 | ImgH/f | 1.37 |
| R1/f | −1.42 | TL/ImgH | 2.28 |
| |R4/R3| | 0.06 | BL/ImgH | 0.46 |
| |f4/f3| | 0.01 | tan(HFOV) | 3.08 |

5th Embodiment

FIG. 5A is a schematic view of an image capturing apparatus according to the 5th embodiment of the present disclosure. FIG. 5B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 5th embodiment.

In FIG. 5A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor 580. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element 510, an aperture stop 500, a second lens element 520, a third lens element 530, a fourth lens element 540, and a fifth lens element 550.

The first lens element 510 with negative refractive power has an object-side surface 511 being concave in a paraxial region thereof and an image-side surface 512 being convex in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface 511. The first lens element 510 is made of plastic material.

The second lens element 520 with positive refractive power has an object-side surface 521 being concave in a paraxial region thereof and an image-side surface 522 being convex in a paraxial region thereof, which are both aspheric, and the second lens element 520 is made of plastic material.

The third lens element 530 with negative refractive power has an object-side surface 531 being concave in a paraxial region thereof and an image-side surface 532 being convex in a paraxial region thereof, which are both aspheric, and the third lens element 530 is made of plastic material.

The fourth lens element 540 with positive refractive power has an object-side surface 541 being concave in a paraxial region thereof and an image-side surface 542 being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element 540 is made of plastic material.

The fifth lens element 550 with negative refractive power has an object-side surface 551 being convex in a paraxial region thereof and an image-side surface 552 being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface 552. The fifth lens element 550 is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter 560 located between the fifth lens element 550 and an image surface 570. The IR cut filter 560 is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor 580 is disposed on or near the image surface 570 of the imaging optical lens assembly.

The detailed optical data of the 5th embodiment are shown in TABLE 12, and the aspheric surface data are shown in TABLE 13, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

TABLE 12

| (5th Embodiment) f = 1.54 mm, Fno = 3.20, HFOV = 67.0 deg. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Surface # | | Curvature Radius | | Thick-ness | Material | Index | Abbe # | Focal Length |
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −2.832 | ASP | 0.738 | Plastic | 1.544 | 56.0 | −6.71 |
| 2 | | −13.791 | ASP | 0.779 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | −25.270 | ASP | 0.866 | Plastic | 1.544 | 56.0 | 1.27 |
| 5 | | −0.681 | | 0.049 | | | | |
| 6 | Lens 3 | −2.608 | ASP | 0.250 | Plastic | 1.639 | 23.3 | −4.23 |
| 7 | | −78.431 | ASP | 0.143 | | | | |
| 8 | Lens 4 | −4.608 | ASP | 1.129 | Plastic | 1.544 | 56.0 | 2.15 |
| 9 | | −1.014 | ASP | 0.030 | | | | |
| 10 | Lens 5 | 1.865 | ASP | 0.400 | Plastic | 1.639 | 23.5 | −1.82 |
| 11 | | 0.656 | ASP | 0.350 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.260 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

US 9,696,519 B1

21 | 22

### TABLE 13

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| Aspheric Coefficients | | | | | |
| k = | −2.8970E+01 | −9.0000E+01 | 2.0000E+00 | −1.0602E+00 | −3.2323E+00 |
| A4 = | 8.9572E−02 | 2.8570E−01 | −3.1521E−01 | −1.5742E−01 | −7.7631E−01 |
| A6 = | −3.6241E−02 | −1.8245E−01 | 8.9354E−01 | 8.6128E−01 | 1.6980E+00 |
| A8 = | 8.3481E−03 | 4.8565E−02 | −1.5034E+01 | −4.4670E+00 | −2.3234E+00 |
| A10 = | −9.5136E−04 | 1.4638E−02 | 4.4048E+01 | 8.0318E+00 | 1.6635E+00 |
| A12 = | 4.4000E−05 | | | −6.5731E+00 | −4.5290E−01 |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −9.0000E+01 | −2.6490E+00 | −8.3138E−01 | −3.4939E+01 | −4.2832E+00 |
| A4 = | −3.8097E−01 | 7.1968E−01 | 1.8753E−01 | −5.1420E−01 | −2.2336E−01 |
| A6 = | 4.3033E−01 | −1.3337E+00 | 2.0811E−01 | −1.2468E−01 | 2.7822E−02 |
| A8 = | −5.0416E−01 | 1.5667E+00 | −2.9700E−01 | 5.2118E−01 | 1.6968E−01 |
| A10 = | 5.7838E−01 | −1.2131E+00 | 2.9368E−02 | −4.0090E−01 | −1.9413E−01 |
| A12 = | −3.7622E−01 | 5.9313E−01 | 5.3051E−02 | 1.3838E−01 | 9.5194E−02 |
| A14 = | 8.8702E−02 | −1.6241E−01 | −1.2668E−02 | −1.7324E−02 | −2.2143E−02 |
| A16 = | | 1.8708E−02 | | | 2.0000E−03 |

In the 5th embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 14 below are the same as those stated in the 1st embodiment with corresponding values for the 5th embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 12 and TABLE 13 and satisfy the conditions stated in TABLE 14.

### TABLE 14

| 5th Embodiment | | | |
|---|---|---|---|
| f [mm] | 1.54 | f1/f3 | 1.59 |
| Fno | 3.20 | f5/f3 | 0.43 |
| HFOV [deg.] | 67.0 | Y52/f | 1.07 |
| V5 | 23.5 | Yc11/f | 0.58 |
| (V3 + V5)/V4 | 0.84 | Yc11/Yc52 | 0.83 |
| (T23 + T34 + T45)/T12 | 0.28 | ImgH/f | 1.24 |
| R1/f | −1.84 | TL/ImgH | 2.74 |
| |R4/R3| | 0.03 | BL/ImgH | 0.43 |
| |f4/f3| | 0.51 | tan(HFOV) | 2.36 |

#### 6th Embodiment

FIG. 6A is a schematic view of an image capturing apparatus according to the 6th embodiment of the present disclosure. FIG. 6B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 6th embodiment.

In FIG. 6A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor 680. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element 610, an aperture stop 600, a second lens element 620, a third lens element 630, a fourth lens element 640, and a fifth lens element 650.

The first lens element 610 with negative refractive power has an object-side surface 611 being concave in a paraxial region thereof and an image-side surface 612 being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface 611. The first lens element 610 is made of plastic material.

The second lens element 620 with positive refractive power has an object-side surface 621 being convex in a paraxial region thereof and an image-side surface 622 being convex in a paraxial region thereof, which are both aspheric, and the second lens element 620 is made of plastic material.

The third lens element 630 with negative refractive power has an object-side surface 631 being convex in a paraxial region thereof and an image-side surface 632 being concave in a paraxial region thereof, which are both aspheric, and the third lens element 630 is made of plastic material.

The fourth lens element 640 with positive refractive power has an object-side surface 641 being concave in a paraxial region thereof and an image-side surface 642 being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element 640 is made of plastic material.

The fifth lens element 650 with negative refractive power has an object-side surface 651 being convex in a paraxial region thereof and an image-side surface 652 being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface 652. The fifth lens element 650 is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter 660 located between the fifth lens element 650 and an image surface 670. The IR cut filter 660 is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor 680 is disposed on or near the image surface 670 of the imaging optical lens assembly.

The detailed optical data of the 6th embodiment are shown in TABLE 15, and the aspheric surface data are shown in TABLE 16, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

US 9,696,519 B1

23

### TABLE 15

(6th Embodiment)
f = 1.88 mm, Fno = 2.20, HFOV = 64.0 deg.

| Surface # | | Curvature Radius | | Thick-ness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −2.929 | ASP | 0.300 | Plastic | 1.544 | 55.9 | −5.21 |
| 2 | | 90.818 | ASP | 0.551 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | 36.192 | ASP | 0.891 | Plastic | 1.544 | 55.9 | 1.62 |
| 5 | | −0.898 | ASP | 0.031 | | | | |
| 6 | Lens 3 | 2.476 | ASP | 0.250 | Plastic | 1.639 | 23.5 | −3.97 |
| 7 | | 1.204 | ASP | 0.217 | | | | |
| 8 | Lens 4 | −5.475 | ASP | 1.161 | Plastic | 1.544 | 55.9 | 1.73 |
| 9 | | −0.863 | ASP | 0.156 | | | | |
| 10 | Lens 5 | 1.371 | ASP | 0.300 | Plastic | 1.639 | 23.5 | −1.99 |
| 11 | | 0.603 | ASP | 0.450 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | |
| 13 | | Plano | | 0.429 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

### TABLE 16

Aspheric Coefficients

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| k = | −5.1420E+01 | 2.0000E+01 | −7.4850E+01 | −1.3649E+00 | −1.2954E+00 |
| A4 = | 2.1127E−01 | 5.5573E−01 | −1.1867E−01 | −4.4062E−02 | −3.9805E−01 |
| A6 = | −1.6122E−01 | −6.2580E−01 | −3.2695E−01 | 5.5863E−02 | 3.9835E−01 |
| A8 = | 9.2565E−02 | 7.4185E−01 | 6.0112E−01 | −7.9819E−01 | −2.4878E−01 |
| A10 = | −3.3359E−02 | −3.9450E−01 | −2.5100E+00 | 1.3323E+00 | 3.6988E−02 |
| A12 = | 4.9157E−03 | | | −1.1085E+00 | 1.6968E−02 |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.5056E+00 | −4.9986E+00 | −9.2503E−01 | −1.5125E+01 | −3.9176E+00 |
| A4 = | −3.9659E−01 | 3.0712E−01 | 3.3264E−01 | −2.2900E−01 | −2.1423E−01 |
| A6 = | 4.4440E−01 | −4.2682E−01 | −4.0747E−01 | 9.5703E−03 | 1.4216E−01 |
| A8 = | −3.1225E−01 | 4.4620E−01 | 3.6777E−01 | 3.3828E−02 | −7.1977E−02 |
| A10 = | 1.2478E−01 | −2.9023E−01 | −2.1223E−01 | −2.2585E−02 | 2.4650E−02 |
| A12 = | −2.2626E−02 | 1.0817E−01 | 7.2987E−02 | 8.5888E−03 | −5.3438E−03 |
| A14 = | 4.5350E−04 | −1.9819E−02 | −1.0387E−02 | −1.2336E−03 | 6.4719E−04 |
| A16 = | | 1.1733E−03 | | | −3.2311E−05 |

In the 6th embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 17 below are the same as those stated in the 1st embodiment with corresponding values for the 6th embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 15 and TABLE 16 and satisfy the conditions stated in TABLE 17.

### TABLE 17

6th Embodiment

| f [mm] | 1.88 | f1/f3 | 1.31 |
|---|---|---|---|
| Fno | 2.20 | f5/f3 | 0.50 |
| HFOV [deg.] | 64.0 | Y52/f | 1.01 |
| V5 | 23.5 | Yc11/f | 0.31 |
| (V3 + V5)/V4 | 0.84 | Yc11/Yc52 | 0.47 |
| (T23 + T34 + T45)/T12 | 0.70 | ImgH/f | 1.21 |
| R1/f | −1.56 | TL/ImgH | 2.18 |

24

### TABLE 17-continued

6th Embodiment

| |R4/R3| | 0.02 | BL/ImgH | 0.48 |
|---|---|---|---|
| |f4/f3| | 0.44 | tan(HFOV) | 2.05 |

### 7th Embodiment

FIG. **7A** is a schematic view of an image capturing apparatus according to the 7th embodiment of the present disclosure. FIG. **7B** shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 7th embodiment.

In FIG. **7A**, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor **780**. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element **710**, an aperture stop **700**, a second lens element **720**, a third lens element **730**, a fourth lens element **740**, and a fifth lens element **750**.

US 9,696,519 B1

**25**

The first lens element **710** with negative refractive power has an object-side surface **711** being concave in a paraxial region thereof and an image-side surface **712** being convex in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface **711**. The first lens element **710** is made of plastic material.

The second lens element **720** with positive refractive power has an object-side surface **721** being concave in a paraxial region thereof and an image-side surface **722** being convex in a paraxial region thereof, which are both aspheric, and the second lens element **720** is made of plastic material.

The third lens element **730** with negative refractive power has an object-side surface **731** being convex in a paraxial region thereof and an image-side surface **732** being concave in a paraxial region thereof, which are both aspheric, and the third lens element **730** is made of plastic material.

The fourth lens element **740** with positive refractive power has an object-side surface **741** being concave in a paraxial region thereof and an image-side surface **742** being

**26**

convex in a paraxial region thereof, which are both aspheric, and the fourth lens element **740** is made of plastic material.

The fifth lens element **750** with negative refractive power has an object-side surface **751** being convex in a paraxial region thereof and an image-side surface **752** being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface **752**. The fifth lens element **750** is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter **760** located between the fifth lens element **750** and an image surface **770**. The IR cut filter **760** is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor **780** is disposed on or near the image surface **770** of the imaging optical lens assembly.

The detailed optical data of the 7th embodiment are shown in TABLE 18, and the aspheric surface data are shown in TABLE 19, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

TABLE 18

| | | | | | | | Abbe | Focal |
|---|---|---|---|---|---|---|---|---|

(7th Embodiment)
f = 1.75 mm, Fno = 2.40, HFOV = 67.7 deg.

| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −2.287 | ASP | 0.314 | Plastic | 1.544 | 56.0 | −5.18 |
| 2 | | −12.719 | ASP | 0.637 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | −48.165 | ASP | 0.831 | Plastic | 1.544 | 56.0 | 1.59 |
| 5 | | −0.856 | ASP | 0.035 | | | | |
| 6 | Lens 3 | 2.541 | ASP | 0.250 | Plastic | 1.639 | 23.5 | −4.52 |
| 7 | | 1.299 | ASP | 0.143 | | | | |
| 8 | Lens 4 | −8.428 | ASP | 1.233 | Plastic | 1.544 | 56.0 | 1.75 |
| 9 | | −0.899 | ASP | 0.039 | | | | |
| 10 | Lens 5 | 1.928 | ASP | 0.400 | Plastic | 1.639 | 23.5 | −1.88 |
| 11 | | 0.680 | ASP | 0.400 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.427 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

TABLE 19

Aspheric Coefficients

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| k = | −2.9617E+01 | −1.9390E+01 | 1.6857E+01 | −1.1144E+00 | −2.4878E+00 |
| A4 = | 2.4717E−01 | 6.2147E−01 | −1.6110E−01 | −1.3325E−02 | −4.9884E−01 |
| A6 = | −1.9982E−01 | −6.4416E−01 | −3.5710E−01 | −5.1141E−01 | 6.9289E−01 |
| A8 = | 1.3968E−01 | 7.3019E−01 | −3.1305E−01 | 1.5980E+00 | −7.0612E−01 |
| A10 = | −6.0060E−02 | −2.6102E−01 | | −3.2287E+00 | 3.8431E−01 |
| A12 = | 1.3492E−02 | | | 1.8308E+00 | −7.4049E−02 |
| A14 = | −1.2333E−03 | | | | |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.4421E+01 | 1.5521E+00 | −9.0427E−01 | −9.0094E−01 | −3.9821E+00 |
| A4 = | −3.8570E−01 | 3.8701E−01 | 3.0866E−01 | −6.3212E−01 | −2.4029E−01 |
| A6 = | 4.9236E−01 | −5.0177E−01 | −4.9187E−01 | 5.7320E−01 | 1.6903E−01 |
| A8 = | −4.7540E−01 | 4.5694E−01 | 5.3256E−01 | −8.7867E−01 | −1.0069E−01 |
| A10 = | 3.0664E−01 | −2.6500E−01 | −3.1695E−01 | 9.8020E−01 | 4.5185E−02 |
| A12 = | −1.1596E−01 | 8.7894E−02 | 1.0243E−01 | −5.9596E−01 | −1.3014E−02 |
| A14 = | 1.8218E−02 | −1.2567E−02 | −1.3471E−02 | 1.8175E−01 | 2.0282E−03 |
| A16 = | | | | −2.1786E−02 | −1.2729E−04 |

US 9,696,519 B1

**27**

In the 7th embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 20 below are the same as those stated in the 1st embodiment with corresponding values for the 7th embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 18 and TABLE 19 and satisfy the conditions stated in TABLE 20.

TABLE 20

| 7th Embodiment | | | |
|---|---|---|---|
| f [mm] | 1.75 | f1/f3 | 1.15 |
| Fno | 2.40 | f5/f3 | 0.42 |
| HFOV [deg.] | 67.7 | Y52/f | 1.07 |
| V5 | 23.5 | Yc11/f | 0.35 |
| (V3 + V5)/V4 | 0.84 | Yc11/Yc52 | 0.53 |
| (T23 + T34 + T45)/T12 | 0.33 | ImgH/f | 1.30 |
| R1/f | −1.30 | TL/ImgH | 2.16 |
| |R4/R3| | 0.02 | BL/ImgH | 0.45 |
| |f4/f3| | 0.39 | tan(HFOV) | 2.44 |

### 8th Embodiment

FIG. **8**A is a schematic view of an image capturing apparatus according to the 8th embodiment of the present disclosure. FIG. **8**B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 8th embodiment.

In FIG. **8**A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor **880**. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element **810**, an aperture stop **800**, a second lens element **820**, a third lens element **830**, a fourth lens element **840**, and a fifth lens element **850**.

**28**

The first lens element **810** with negative refractive power has an object-side surface **811** being concave in a paraxial region thereof and an image-side surface **812** being convex in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface **811**. The first lens element **810** is made of plastic material.

The second lens element **820** with positive refractive power has an object-side surface **821** being concave in a paraxial region thereof and an image-side surface **822** being convex in a paraxial region thereof, which are both aspheric, and the second lens element **820** is made of plastic material.

The third lens element **830** with positive refractive power has an object-side surface **831** being convex in a paraxial region thereof and an image-side surface **832** being concave in a paraxial region thereof, which are both aspheric, and the third lens element **830** is made of plastic material.

The fourth lens element **840** with positive refractive power has an object-side surface **841** being concave in a paraxial region thereof and an image-side surface **842** being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element **840** is made of plastic material.

The fifth lens element **850** with negative refractive power has an object-side surface **851** being convex in a paraxial region thereof and an image-side surface **852** being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface **852**. The fifth lens element **850** is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter **860** located between the fifth lens element **850** and an image surface **870**. The IR cut filter **860** is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor **880** is disposed on or near the image surface **870** of the imaging optical lens assembly.

The detailed optical data of the 8th embodiment are shown in TABLE 21, and the aspheric surface data are shown in TABLE 22, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

TABLE 21

| (8th Embodiment) f = 1.33 mm, Fno = 2.70, HFOV = 60.0 deg. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Surface # | | Curvature Radius | | Thickness | Material | Index | Abbe # | Focal Length |
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −1.761 | ASP | 0.350 | Glass | 1.540 | 59.5 | −4.43 |
| 2 | | −7.148 | ASP | 0.955 | | | | |
| 3 | Ape. Stop | Plano | | 0.025 | | | | |
| 4 | Lens 2 | −10.699 | ASP | 0.917 | Plastic | 1.535 | 56.3 | 1.74 |
| 5 | | −0.883 | ASP | 0.048 | | | | |
| 6 | Lens 3 | 5.141 | ASP | 0.332 | Plastic | 1.544 | 56.0 | 11.08 |
| 7 | | 34.048 | ASP | 0.049 | | | | |
| 8 | Lens 4 | −2.111 | ASP | 0.916 | Plastic | 1.544 | 56.0 | 2.42 |
| 9 | | −0.935 | ASP | 0.030 | | | | |
| 10 | Lens 5 | 2.462 | ASP | 0.355 | Plastic | 1.634 | 23.8 | −2.50 |
| 11 | | 0.911 | ASP | 0.350 | | | | |
| 12 | IR Cut Filter | Plano | | 0.210 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.468 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

US 9,696,519 B1

29

30

TABLE 22

| | | Aspheric Coefficients | | | |
|---|---|---|---|---|---|
| Surface # | 1 | 2 | 4 | 5 | 6 |
| k = | −2.8974E+01 | −9.0000E+01 | 2.0000E+00 | −8.5573E−01 | −3.2310E+00 |
| A4 = | 2.8292E−01 | 6.4677E−01 | −5.3037E−01 | −4.6044E−01 | −1.0636E+00 |
| A6 = | −1.9177E−01 | −5.8784E−01 | 6.6501E+00 | 1.8116E+00 | 2.6448E+00 |
| A8 = | 8.8578E−02 | 3.8944E−01 | −7.9059E+01 | −4.1125E+00 | −3.7264E+00 |
| A10 = | −2.1114E−02 | −7.6700E−02 | 2.8620E+02 | 3.4492E+00 | 2.6099E+00 |
| A12 = | 2.0041E−03 | | | −1.4292E+00 | −6.8704E−01 |
| Surface # | 7 | 8 | 9 | 10 | 11 |
| k = | 1.9759E+01 | −2.6495E+00 | −7.9436E−01 | −3.4941E+01 | −4.2830E+00 |
| A4 = | −9.6835E−02 | 8.9806E−01 | −6.6146E−01 | −1.5483E+00 | −3.6919E−01 |
| A6 = | −6.5760E−01 | −1.8095E+00 | 3.0861E+00 | 3.0160E+00 | 4.5778E−01 |
| A8 = | 1.0481E+00 | 1.9248E+00 | −4.4611E+00 | −3.6828E+00 | −4.2078E−01 |
| A10 = | −5.9582E−01 | −1.1774E+00 | 3.0829E+00 | 2.4215E+00 | 2.4727E−01 |
| A12 = | 1.2368E−01 | 4.4092E−01 | −1.0556E+00 | −7.8357E−01 | −8.6920E−02 |
| A14 = | −3.3061E−03 | −1.0565E−01 | 1.4511E−01 | 9.6759E−02 | 1.6710E−02 |
| A16 = | | 1.3069E−02 | | | −1.3512E−03 |

In the 8th embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 23 below are the same as those stated in the 1st embodiment with corresponding values for the 8th embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 21 and TABLE 22 and satisfy the conditions stated in TABLE 23.

TABLE 23

| | 8th Embodiment | | |
|---|---|---|---|
| f [mm] | 1.33 | f1/f3 | −0.40 |
| Fno | 2.70 | f5/f3 | −0.23 |
| HFOV [deg.] | 60.0 | Y52/f | 1.12 |
| V5 | 23.8 | Yc11/f | 0.44 |
| (V3 + V5)/V4 | 1.43 | Yc11/Yc52 | 0.56 |
| (T23 + T34 + T45)/T12 | 0.13 | ImgH/f | 1.41 |
| R1/f | −1.32 | TL/ImgH | 2.66 |
| |R4/R3| | 0.08 | BL/ImgH | 0.55 |
| |f4/f3| | 0.22 | tan(HFOV) | 1.73 |

9th Embodiment

FIG. 9A is a schematic view of an image capturing apparatus according to the 9th embodiment of the present disclosure. FIG. 9B shows, in order from left to right, longitudinal spherical aberration curves, astigmatic field curves and a distortion curve of the image capturing apparatus according to the 9th embodiment.

In FIG. 9A, the image capturing apparatus includes an imaging optical lens assembly (not otherwise herein labeled) of the present disclosure and an image sensor 980. The imaging optical lens assembly includes, in order from an object side to an image side, a first lens element 910, an aperture stop 900, a second lens element 920, a third lens element 930, a fourth lens element 940, and a fifth lens element 950.

The first lens element 910 with negative refractive power has an object-side surface 911 being concave in a paraxial region thereof and an image-side surface 912 being convex in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the object-side surface 911. The first lens element 910 is made of plastic material.

The second lens element 920 with positive refractive power has an object-side surface 921 being concave in a paraxial region thereof and an image-side surface 922 being convex in a paraxial region thereof, which are both aspheric, and the second lens element 920 is made of plastic material.

The third lens element 930 with negative refractive power has an object-side surface 931 being convex in a paraxial region thereof and an image-side surface 932 being concave in a paraxial region thereof, which are both aspheric, and the third lens element 930 is made of plastic material.

The fourth lens element 940 with positive refractive power has an object-side surface 941 being concave in a paraxial region thereof and an image-side surface 942 being convex in a paraxial region thereof, which are both aspheric, and the fourth lens element 940 is made of plastic material.

The fifth lens element 950 with negative refractive power has an object-side surface 951 being convex in a paraxial region thereof and an image-side surface 952 being concave in a paraxial region thereof, which are both aspheric, and at least one convex shape in an off-axial region on the image-side surface 952. The fifth lens element 950 is made of plastic material.

The imaging optical lens assembly further includes an IR cut filter 960 located between the fifth lens element 950 and an image surface 970. The IR cut filter 960 is made of glass material and will not affect the focal length of the imaging optical lens assembly. The image sensor 980 is disposed on or near the image surface 970 of the imaging optical lens assembly.

The detailed optical data of the 9th embodiment are shown in TABLE 24, and the aspheric surface data are shown in TABLE 25, wherein the units of the curvature radius, the thickness and the focal length are expressed in mm, and HFOV is half of the maximal field of view.

US 9,696,519 B1

31

32

TABLE 24

(9th Embodiment)
f = 2.46 mm, Fno = 2.20, HFOV = 67.0 deg.

| Surface # | | Curvature Radius | | Thick-ness | Material | Index | Abbe # | Focal Length |
|---|---|---|---|---|---|---|---|---|
| 0 | Object | Plano | | Infinity | | | | |
| 1 | Lens 1 | −3.152 | ASP | 0.446 | Plastic | 1.544 | 56.0 | −2.87 |
| 2 | | −19.568 | ASP | 0.995 | | | | |
| 3 | Ape. Stop | Plano | | 0.056 | | | | 1.50 |
| 4 | Lens 2 | −8.452 | ASP | 1.190 | Plastic | 1.544 | 56.0 | |
| 5 | | −1.268 | ASP | 0.035 | | | | |
| 6 | Lens 3 | 2.855 | ASP | 0.250 | Plastic | 1.660 | 20.4 | −3.69 |
| 7 | | 1.796 | ASP | 0.236 | | | | |
| 8 | Lens 4 | −15.222 | ASP | 2.073 | Plastic | 1.544 | 56.0 | 1.57 |
| 9 | | −1.179 | ASP | 0.035 | | | | |
| 10 | Lens 5 | 2.465 | ASP | 0.523 | Plastic | 1.639 | 23.5 | −1.65 |
| 11 | | 0.926 | ASP | 0.800 | | | | |
| 12 | IR Cut Filter | Plano | | 0.300 | Glass | 1.517 | 64.2 | — |
| 13 | | Plano | | 0.690 | | | | |
| 14 | Image Surface | Plano | | — | | | | |

Note:
Reference wavelength is d-line 587.6 nm

TABLE 25

Aspheric Coefficients

| Surface # | 1 | 2 | 4 | 5 | 6 |
|---|---|---|---|---|---|
| k = | −2.8840E+01 | −9.0000E+01 | 1.9873E+01 | −1.1773E+00 | −2.6191E+00 |
| A4 = | 8.0482E−02 | 1.9150E−01 | −6.0435E−02 | −3.3772E−03 | −1.5899E−01 |
| A6 = | −2.8568E−02 | −6.5994E−02 | −1.2856E−02 | −2.3102E−02 | 9.8380E−02 |
| A8 = | 7.3014E−03 | 3.6971E−03 | −5.3004E−02 | 2.6928E−02 | −3.1640E−02 |
| A10 = | −9.7787E−04 | 1.5276E−02 | 7.7017E−03 | −3.5313E−02 | 4.3625E−03 |
| A12 = | 5.2989E−05 | −4.0279E−03 | | 8.9250E−03 | −1.4619E−04 |
| A14 = | | | | | |

| Surface # | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|
| k = | −1.4585E+00 | −2.4327E+00 | −9.5976E−01 | −3.5099E+01 | −4.6360E+00 |
| A4 = | −1.3205E−01 | 1.2863E−01 | 1.2081E−01 | −5.0695E−02 | −4.1565E−02 |
| A6 = | 6.8536E−02 | −8.0981E−02 | −6.7993E−02 | −9.4619E−03 | 6.4916E−03 |
| A8 = | −2.1337E−02 | 3.3403E−02 | 2.5688E−02 | 2.9283E−03 | −1.4569E−04 |
| A10 = | 3.8367E−03 | −9.0282E−03 | −4.9267E−03 | 9.5512E−04 | −1.6619E−04 |
| A12 = | −3.8832E−04 | 1.5450E−03 | 3.4210E−04 | −4.1322E−04 | 3.5055E−05 |
| A14 = | 1.6096E−05 | −1.5088E−04 | 5.8452E−06 | 3.8054E−05 | −3.1937E−06 |
| A16 = | | 6.5449E−06 | | | 1.1506E−07 |

In the 9th embodiment, the equation of the aspheric surface profiles of the aforementioned lens elements is the same as the equation of the 1st embodiment. Also, the definitions of these parameters shown in TABLE 26 below are the same as those stated in the 1st embodiment with corresponding values for the 9th embodiment, so an explanation in this regard will not be provided again.

Moreover, these parameters can be calculated from TABLE 24 and TABLE 25 and satisfy the conditions stated in TABLE 26.

TABLE 26

9th Embodiment

| | | | |
|---|---|---|---|
| f [mm] | 2.46 | f1/f3 | 0.86 |
| Fno | 2.20 | f5/f3 | 0.33 |
| HFOV [deg.] | 67.0 | Y52/f | 1.11 |
| V5 | 23.5 | Yc11/f | 0.37 |
| (V3 + V5)/V4 | 0.78 | Yc11/Yc52 | 0.46 |
| (T23 + T34 + T45)/T12 | 0.29 | ImgH/f | 1.37 |
| R1/f | −1.28 | TL/ImgH | 2.27 |

TABLE 26-continued

9th Embodiment

| | | | |
|---|---|---|---|
| |R4/R3| | 0.15 | BL/ImgH | 0.53 |
| |f4/f3| | 0.28 | tan(HFOV) | 2.36 |

The foregoing description, for purpose of explanation, has been described with reference to specific embodiments. It is to be noted that TABLES 1-26 show different data of the different embodiments; however, the data of the different embodiments are obtained from experiments. The embodiments were chosen and described in order to best explain the principles of the disclosure and its practical applications, and thereby to enable others skilled in the art to best utilize the disclosure and various embodiments with various modifications as are suited to the particular use contemplated. The embodiments depicted above and the appended drawings are exemplary and are not intended to be exhaustive or to limit the scope of the present disclosure to the precise forms disclosed. Many modifications and variations are possible in view of the above teachings.

US 9,696,519 B1

33      34

What is claimed is:

1. An imaging optical lens assembly, comprising, in order from an object side to an image side:

a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof;

a second lens element having positive refractive power;

a third lens element having negative refractive power;

a fourth lens element having positive refractive power; and

a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface;

wherein the imaging optical lens assembly has a total of five lens elements;

and wherein a curvature radius of the object-side surface of the first lens element is R1, a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the imaging optical lens assembly is f, a focal length of the third lens element is f3, a focal length of the fifth lens element is f5, and the following conditions are satisfied:

$$|R4/R3|<1.0;$$

$$f5/f3<1.0;$$

$$-10.0<R1/f<0.$$

2. The imaging optical lens assembly of claim 1, wherein the third lens element has an image-side surface being concave in a paraxial region thereof.

3. The imaging optical lens assembly of claim 1, wherein the fourth lens element has an image-side surface being convex in a paraxial region thereof, and the fifth lens element has an object-side surface being convex in a paraxial region thereof.

4. The imaging optical lens assembly of claim 1, further comprising an aperture stop disposed between the first lens element and the second lens element, wherein each of the first lens element, the second lens element, the third lens element, the fourth lens element, and the fifth lens element has at least one surface being aspheric, and wherein an axial distance between the object-side surface of the first lens element and an image surface is TL, a maximum image height of the imaging optical lens assembly is ImgH, and the following condition is satisfied:

$$TL/ImgH<3.0.$$

5. The imaging optical lens assembly of claim 1, wherein an Abbe number of the third lens element is V3, an Abbe number of the fourth lens element is V4, an Abbe number of the fifth lens element is V5, and the following condition is satisfied:

$$0.3<(V3+V5)/V4<1.0.$$

6. The imaging optical lens assembly of claim 1, wherein the curvature radius of the object-side surface of the second lens element is R3, the curvature radius of the image-side surface of the second lens element is R4, and the following condition is satisfied:

$$|R4/R3|<0.60.$$

7. The imaging optical lens assembly of claim 1, wherein the curvature radius of the object-side surface of the first lens element is R1, the focal length of the imaging optical lens assembly is f, and the following condition is satisfied:

$$-5.0<R1/f<0.$$

8. The imaging optical lens assembly of claim 1, wherein an axial distance between the first lens element and the second lens element is T12, an axial distance between the second lens element and the third lens element is T23, an axial distance between the third lens element and the fourth lens element is T34, an axial distance between the fourth lens element and the fifth lens element is T45, and the following condition is satisfied:

$$0<(T23+T34+T45)/T12<0.90.$$

9. The imaging optical lens assembly of claim 1, wherein half of a maximal field of view of the imaging optical lens assembly is HFOV, and the following condition is satisfied:

$$1.50<\tan(HFOV).$$

10. The imaging optical lens assembly of claim 1, wherein a vertical distance between a maximum effective diameter position on the image-side surface of the fifth lens element and an optical axis is Y52, the focal length of the imaging optical lens assembly is f, and the following condition is satisfied:

$$0.85<Y52/f.$$

11. The imaging optical lens assembly of claim 1, wherein a projected point on an optical axis from an effective radius position on the object-side surface of the first lens element is closer to the image side than an axial vertex of the object-side surface of the first lens element on the optical axis, a vertical distance between an off-axial critical point on the object-side surface of the first lens element and the optical axis is Yc11, the focal length of the imaging optical lens assembly is f, and the following condition is satisfied:

$$0.10<Yc11/f<0.80.$$

12. An image capturing apparatus, comprising the imaging optical lens assembly of claim 1 and an image sensor disposed on an image surface of the imaging optical lens assembly.

13. An electronic device, comprising the image capturing apparatus of claim 12.

14. An imaging optical lens assembly, comprising, in order from an object side to an image side:

a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the object-side surface;

a second lens element having positive refractive power;

a third lens element;

a fourth lens element having positive refractive power; and

a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the image-side surface;

wherein the imaging optical lens assembly has a total of five lens elements; and wherein a curvature radius of an object-side surface of the second lens element is R3, a curvature radius of an image-side surface of the second lens element is R4, a focal length of the first lens element is f1, a focal length of the third lens element is f3, a vertical distance between an off-axial critical point on the object-side surface of the first lens element and an optical axis is Yc11, a vertical distance between an off-axial critical point on the image-side surface of the fifth lens element and the optical axis is Yc52, and the following conditions are satisfied:

$$|R4/R3|<2.0;$$

$$f1/f3<2.0;$$

$$0.15<Yc11/Yc52<1.20.$$

15. The imaging optical lens assembly of claim 14, wherein the third lens element has negative refractive power.

US 9,696,519 B1

35

**16**. The imaging optical lens assembly of claim **14**, wherein an axial distance between the first lens element and the second lens element is the largest among respective axial distances between every two adjacent lens elements of the first lens element, the second lens element, the third lens element, the fourth lens element, and the fifth lens element.

**17**. The imaging optical lens assembly of claim **14**, further comprising an aperture stop disposed between the first lens element and the second lens element.

**18**. The imaging optical lens assembly of claim **14**, wherein a maximum image height of the imaging optical lens assembly is ImgH, a focal length of the imaging optical lens assembly is f, and the following condition is satisfied:

$1.20 < ImgH/f < 1.70.$

**19**. The imaging optical lens assembly of claim **14**, wherein a curvature radius of the object-side surface of the first lens element is R1, a focal length of the imaging optical lens assembly is f, and the following condition is satisfied:

$-3.0 < R1/f < 0.$

**20**. The imaging optical lens assembly of claim **14**, wherein the focal length of the third lens element is f3, a focal length of the fourth lens element is f4, a focal length of the fifth lens element is f5, and the following conditions are satisfied:

$|f4/f3| < 1.0;$

$f5/f3 < 1.0.$

**21**. The imaging optical lens assembly of claim **14**, wherein an Abbe number of the fifth lens element is V5, and the following condition is satisfied:

$V5 < 30.$

**22**. The imaging optical lens assembly of claim **14**, wherein the fifth lens element has an object-side surface being convex in a paraxial region thereof.

**23**. An imaging optical lens assembly, comprising, in order from an object side to an image side:

a first lens element with negative refractive power having an object-side surface being concave in a paraxial region thereof, and at least one convex shape in an off-axial region on the object-side surface;

a second lens element having positive refractive power;

a third lens element;

a fourth lens element with positive refractive power having an image-side surface being convex in a paraxial region thereof; and

a fifth lens element with negative refractive power having an image-side surface being concave in a paraxial

36

region thereof, and at least one convex shape in an off-axial region on the image-side surface;

wherein the imaging optical lens assembly has a total of five lens elements and further comprises an aperture stop disposed between the first lens element and the second lens element; and wherein a curvature radius of an object-side surface of the first lens element is R3, a curvature radius of the image-side surface of the second lens element is R4, a focal length of the first lens element is f1, a focal length of the third lens element is f3, and the following conditions are satisfied:

$|R4/R3| < 4.0;$

$f1/f3 < 5.0.$

**24**. The imaging optical lens assembly of claim **23**, wherein a vertical distance between a maximum effective diameter position on the image-side surface of the fifth lens element and an optical axis is Y52, a focal length of the imaging optical lens assembly is f, and the following condition is satisfied:

$0.85 < Y52/f.$

**25**. The imaging optical lens assembly of claim **23**, wherein the third lens element has an object-side surface being convex in a paraxial region thereof and an image-side surface being concave in a paraxial region thereof.

**26**. The imaging optical lens assembly of claim **23**, wherein the focal length of the first lens element is f1, a focal length of the second lens element is f2, the focal length of the third lens element is f3, a focal length of the fourth lens element is f4, a focal length of the fifth lens element is f5, a focal length of the i-th lens element is fi, a focal length of the j-th lens element is fj, and the following conditions are satisfied:

$|f1| > |fi|, i=2,4,5;$

$|f3| > |fj|, j=2,4,5.$

**27**. The imaging optical lens assembly of claim **23**, wherein each of the first lens element, the second lens element, the third lens element, the fourth lens element, and the fifth lens element has at least one surface being aspheric; and wherein an axial distance between the image-side surface of the fifth lens element and an image surface is BL, a maximum image height of the imaging optical lens assembly is ImgH, and the following condition is satisfied:

$BL/ImgH < 0.75.$

\* \* \* \* \*